1
2
3
4
5

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

6

7   DANIEL MITCHELL, ROBIN BALL, LUKE
    RETTMER, NATHANIEL CASEY,
8   MATTHEW WALD, SECOND AMENDMENT
    FOUNDATION, and NATIONAL RIFLE
9   ASSOCIATION,

10                    *Plaintiffs*,

11          v.

12   CHUCK ATKINS, in his official capacity as the
     Sheriff of Clark County, Washington, CRAIG
13   MEIDL, in his official capacity as the Chief of
     Police of Spokane, Washington, and TERESA
14   BERNTSEN, in her official capacity as the
     Director of the Washington State Department
15   of Licensing,

16                    *Defendants*,

17          and

18   SAFE SCHOOLS SAFE COMMUNITIES,

19                    *Defendant-Intervenor.*

20

The Honorable Ronald B. Leighton

No. 3:19-cv-05106-RBL

PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

NOTING DATE: APRIL 24, 2020

ORAL ARGUMENT REQUESTED

21
22
23
24
25
26
27

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - i
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1

## TABLE OF CONTENTS

2  I.  INTRODUCTION ................................................................................1

3  II. FACTUAL BACKGROUND ............................................................. 2

4      A.  The Banned Firearms ............................................................... 2

       B.  Semi-automatic Rifle Sales Are Governed By Extensive Safety Regulation................. 2
5
       C.  The Banned Firearms Are In Common, Lawful Use In America And
6          Washington State .................................................................4

7  III. ARGUMENT .................................................................................... 6

8      A.  Each Plaintiff Has Established Standing .................................. 6

9          1.  The Under-21 Plaintiffs Have Standing ........................... 6

               a)  Each Plaintiff Has Suffered an Injury In Fact .......................... 6
10
               b)  The Injury Is "Fairly Traceable" To I-1639 .......................... 6
11
               c)  The Remedy Sought Will Remove the Obstacle ..................... 7
12
           2.  The Dealer Plaintiffs Have Standing .................................. 7
13
           3.  The Organizational Plaintiffs Have Standing ..................... 7
14
       B.  The Under-21 Sales Ban Infringes Second Amendment Rights..................................... 7
15
           1.  The Scope Of This Ban Renders It Unconstitutional Under Any Level
16             Of Scrutiny, Without Any Means-Ends Or Balancing Test .............................. 8

17         2.  The State Bans Arms Which Are Protected By The Second
               Amendment.......................................................... 10
18
               a)  The Restricted Arms Are In Common Use.......................................11
19
               b)  The Restricted Arms Are Used By Law Abiding Citizens For
20                 Lawful Purposes.................................................................... 13

21             c)  The Restricted Arms Are Used For Self-Defense In The Home ....... 13

22         3.  The Purchase Restriction Is Categorically Unconstitutional. ........................ 14

           4.  The Restriction Impermissibly Burdens Second Amendment Rights. ........... 15
23
       C.  The Interstate Sales Ban Violates The Commerce Clause...................................... 16
24
       D.  The Plaintiffs Are Entitled to an Award of Attorney's Fees ....................................... 18

25 IV.  CONCLUSION ................................................................................... 18

26

27

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - ii
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

# TABLE OF AUTHORITIES

## CASES

*Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017) ............................................................ 15

*Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573 (1986) .................... 16

*Caetano v. Massachusetts*, 136 S.Ct. 1027 (2016) ........................................................... 11

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564 (1997) .................... 16, 17

*Department of Revenue of Ky. v. Davis*, 553 U.S. 328 (2008) ............................................. 17

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................................... passim

*Ex Parte Young*, 209 U.S. 123 (1908) .......................................................................... 18

*Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1 (1928) ................................................. 17

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ...................... 7

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) .............................................................. 13

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ......................................................... 6

*Mahoney v. Sessions*, 871 F.3d 873 (9th Cir. 2017) ......................................................... 15

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................................................. 8, 9, 15

*Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978) ................................. 18

*Nationwide Biweekly Administration, Inc. v. Owen*, 873 F.3d 716 (9th Cir. 2017) .................... 18

*New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982) ..................................... 17

*New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) .................. 12

*Oregon Waste Systems, Inc. v. Department of Environmental Quality of State of Or.*, 511 U.S. 93 (1994) ................................................................................................ 16

*Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016) ................................................... passim

*State v. Trump,* 2020 WL 949934 (W.D. Wash. 2020) ..................................................... 6

*U.S. v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) .............................................................. 14

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019) ............................................................. 12

## STATUTES

18 U.S.C. § 922(b)(1) ............................................................................................. 14

42 U.S.C. § 1983 .................................................................................................. 18

H.R. 3355, Pub.L. 103–322 .................................................................................... 10

RCW 9.21.124 ....................................................................................................... 2

RCW 9.41.010 ....................................................................................................... 2

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

RCW 9.41.240 ......................................................................................................... 2, 14

CONSTITUTIONAL PROVISIONS

U.S. Const. Am. 2. ...................................................................................................1, 7

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

## I.   INTRODUCTION

The Second Amendment provides that "the right of the people to keep and bear Arms . . . shall not be infringed." U.S. Const. Am. 2. Infringing that right, Washington state forbids 18 to 20 year old adults from purchasing semi-automatic rifles. Today, Washington residents aged 18 to 20—otherwise treated as adults—cannot legally purchase the most commonly owned long rifles. This is the broadest, most expansive firearms ban anywhere in the nation. In Washington, a 19 year old woman can only exercise her fundamental, enumerated, Constitutional right to keep and bear common, lawful arms if she happens to have an older relative willing to give her the firearm as a gift. The Constitution does not require any adult to secure her parent's permission as the condition of exercising her Constitutional rights. Washington's ban on purchases of the most commonly owned type of rifle in the country—rifles which are "typically possessed for lawful purposes" of all protected types—infringes the Second Amendment. *See, i.a.*, *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008).

In *Heller*, the Court made clear that the state cannot ban entire classes of common arms. Such a ban is unconstitutional *per se*, making it irrelevant whether the state can proffer appealing policy reasons for enacting such a ban, such as by citing isolated examples of crimes committed with firearms of the same class, or can reassure this Court that there remain other means by which a citizen can protect himself or herself—just as a ban on adults from using Twitter could not be justified by pointing to other avenues by which they could express themselves. No attempt at justification can survive the constitutional prohibition against banning an entire class of rifles which millions of Americans, and Washingtonians, have safely and lawfully owned and used for decades.

An additional constitutional infirmity is the state's ban on interstate sales of these same long guns, a textbook violation of the interstate commerce clause. The interstate sales ban serves no purpose at all, and cannot survive the exacting scrutiny required, no matter what *post hoc* justifications the state proffers in defense.

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

## II.   FACTUAL BACKGROUND

### A.  The Banned Firearms

Initiative No. 1639 added a definition to Washington law:

'Semiautomatic assault rifle' means any rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge.

RCW 9.41.010. The Initiative banned sales of so-called "semiautomatic assault rifles" to persons age 18, 19, or 20, *see* RCW 9.41.240, and to anyone who does not reside in Washington state. *See* RCW 9.21.124.

Every "rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge" is a semi-automatic rifle. Mitchell Decl. ¶ 5. The statutory definition that adds the word "assault" to the commonly known and previously understood definition which describes the mode of operation of any semi-automatic action adds nothing informative. Just like rifles, a shotgun "which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge" is a semi-automatic shotgun, a common firearm. Mitchell Decl. ¶ 9. A handgun "which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge" is a semi-automatic pistol, and perhaps the most common firearm of any sort. Mitchell Decl. ¶ 10. Thus, this new statutory definition covers every semi-automatic rifle model, of every visual appearance, with or without any particular feature or set of features. Each such rifle operates by using cartridge energy to load a new cartridge. Every rifle that fits this definition is semi-automatic, meaning, it requires a separate trigger pull to fire each round.

### B.  Semi-automatic Rifle Sales Are Governed By Extensive Safety Regulation.

Dan Mitchell and Robin Ball are licensed by both the federal government and the state to sell firearms. Mitchell Decl. ¶ 2; Ball Decl. ¶ 2. Before selling any firearm, Mitchell and Ball require the purchaser to pass the legally mandated background check process. The process begins by

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 2
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

running the purchaser's name, date of birth, government issued ID number, and other information through the federally-maintained National Instant Check System, or NICS. Mitchell Decl. ¶ 19; Ball Decl. ¶ 10. The NICS system checks various databases to determine if the prospective purchaser is forbidden to own or possess a firearm. Mitchell Decl. ¶ 20. Neither Mitchell nor Ball ever complete a firearm sale unless and until the NICS check confirms that there is no reason to believe the person is forbidden to purchase or possess the firearm. Mitchell Decl. ¶ 22; Ball Decl. ¶ 11.

After the passage of I-1639, the background check became more involved. While the prospective customer uses the same BATF form today as prior to passage, the application to purchase a semi-automatic rifle is sent to the local law enforcement agency in the jurisdiction of the buyer's residence. That agency then runs the NICS check, and also checks with Washington Department of Social and Health Services for involuntary commitments (although those are supposed to already be reported to the NICS system by the state), and checks for open restraining orders or pending criminal charges in local court. The rifle is tagged for mandatory 10 business day storage. Upon receiving an "approved" SAR application, the customer is contacted to pick up their rifle. To pick up the rifle, the customer reviews and reaffirms that nothing on the BATF form has changed since its original date of signature. At that point, the rifle is delivered. Mitchell Decl. ¶¶ 29-36.

Prior to the passage of I-1639, Mitchell routinely sold semi-automatic rifles to purchasers in other states. Mitchell Decl. ¶ 17. Such sales were only made by Michell after performing a NICS check or through a person holding a FFL in the purchaser's state. Mitchell Decl. ¶¶ 37-38. Any person who found a semi-automatic rifle in Mitchell's stock that she wanted to purchase could do so either in person after a successful NICS check, or by having Mitchell ship the firearm to a designated FFL in the purchaser's state. Mitchell Decl. ¶ 38. The receiving FFL would process the necessary background check, consistent with federal and any applicable state law Mitchell Decl. ¶ 38. Thus, all interstate firearms sales by Mitchell were subject to background checks. Prior to the passage of I-1639, Mitchell estimates that as much as 30% of his sales were of semi-automatic

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

rifles to purchasers in other states. Mitchell Decl. ¶ 17. He has lost significant business due to the interstate sales ban. Mitchell Decl. ¶ 17. He still receives occasional inquiries for interstate sales of semi-automatic rifles, and must always turn them down. Mitchell Decl. ¶¶ 18-21.

### C. The Banned Firearms Are In Common, Lawful Use In America And Washington State

Semi-automatic rifles are, by any estimate and any definition, in common and lawful use. The most recent data from the Bureau of Alcohol, Tobacco, and Firearms shows that 2,504,092 rifles were manufactured in the United States in 2017. Ard Decl. Exh. A at 1. 158,871 of those were exported, *id.* at 3, while another 572,309 were imported. *Id.* at 5. This tallies to a net domestic increase of 2,917,530 rifles in 2017 alone. Prior years show similar increases, numbering in the millions each year. American ownership of rifles increased by 4,821,743 in 2016; by 4,347,909 in 2015, by 3,963,507 in 2014, and by 5,355,628 in 2013. All told, in the 20 years from 1998 to 2017, Americans imported and manufactured for domestic purchase over ***55 million rifles***.

No entity tracks rifles by action type, making it impossible to procure a similarly exact number for the percentage of those fifty five million rifles that have a semi-automatic action, as opposed to bolt, lever, pump, or break action. The closest available estimate comes from the National Shooting Sports Foundation, which estimates the number of modern sporting rifles[1] manufactured in America each year. This subset of all semi-automatic rifles nonetheless represents over half of all rifles manufactured in the United States in 2017. Ard Decl. Exh. B. Given that 52% of all rifles manufactured for U.S sales in 2017 were one specific type of semi-automatic rifle, the fraction of all rifles that are semi-automatic in operation must be higher. Even if modern sporting rifles constituted the only semi-automatic rifles available in the United States, in 2017 alone, Americans purchased over one and a half million of those semi-automatic rifles.

---

[1] Modern Sporting Rifle is the industry's name for AR style semi-automatic rifles, used to distinguish this specific type of semi-automatic rifle from other rifles. *See, e.g.*, https://www.nssf.org/msr/.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

This preference for semi-automatic rifles is long standing. For example, the Civilian Marksmanship Program[2] has for years sold U.S. military surplus M1 Garand rifles to civilians. The M1 Garand is a semi-automatic rifle, newly banned in Washington state, despite that the federal government has sold them to the public through FFLs for decades. They remain available today, and an interested person can begin the purchase process on the website of the CMP at https://thecmp.org/sales-and-service/m1-garand/.

Washington state is representative of the country as a whole. As both Mitchell and Ball testify, they routinely sell many, many semi-automatic rifles. Mitchell Decl. ¶ 14; Ball Decl. ¶ 7. Semi-automatic rifles constitute a majority of the rifles they sell to Washington residents. Mitchell Decl. ¶ 15; Ball Decl. ¶ 8. By any standard that has been employed by a federal court in assessing firearms regulations, all rifles, and even the subset of semi-automatic rifles are in common use.

Furthermore, the overwhelming use of these common firearms is lawful. No one can draw any other conclusion from their prevalence compared to the miniscule amount of crime committed with rifles of all sorts. In every year from 2014 to 2018, for example, homicides with rifles numbered fewer than homicides committed with blunt weapons or with hands and feet. Ard Decl. Exh. C. Regardless of how many individual tragedies the state identifies, it is literally impossible to show that any statistically significant fraction of all rifles, or even semi-automatic rifles, are used in any kind of crime. Even if every rifle used in a homicide in 2017 was also sold in 2017, that would constitute only 390/2,917,530 or 0.013% of rifles used to commit murder. The state cannot cobble together any crime statistic that rebuts the truth: the vast majority—well over 99.9%—of all semi-automatic rifle owners in the United States are law-abiding citizens who use their lawfully possessed semi-automatic rifles in lawful ways.

---

[2] The CMP first existed within the Department of War, then the Department of the Army, and now is a federally chartered 501(c)(3). *See* https://thecmp.org/about/.

Plaintiffs' Motion for Summary Judgment - 5
No. 3:19-cv-05106-RBL

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

# III.   ARGUMENT

## A.  Each Plaintiff Has Established Standing

In order to establish standing, a plaintiff must allege: (1) plaintiff has suffered a distinct and palpable injury as a result of the defendant's conduct; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed if the requested relief is granted. *State v. Trump,* 2020 WL 949934 (W.D. Wash. 2020); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The record in this case demonstrates that each group of plaintiffs, and each plaintiff within each group, has satisfied the threshold requirements for standing.

### 1.  The Under-21 Plaintiffs Have Standing

#### a)   Each Plaintiff Has Suffered an Injury In Fact

Each of the plaintiffs who was denied the right to purchase a firearm due to I-1639 has been deposed, and during their depositions each described the injury suffered as a result of the challenged law:

*Matthew Wald* testified that he intended to purchase a semi-automatic rifle, and when he sought out a dealer from whom to purchase the rifle, he was refused. Ard Decl. Exh. E. *Luke Rettmer* and *Nathaniel Casey* faced the same bar. Ard Decl. Exh. F and G. Unlike cases in which the plaintiff fears some future harm, and the court rejected that injury as merely speculative, the plaintiffs who were denied purchases in this case have already suffered an injury in fact.

#### b)   The Injury Is "Fairly Traceable" To I-1639

It is similarly undisputed in this case that the refusal of gun dealers to sell a semi-automatic rifle to these plaintiffs is the reason that they were unable to purchase them. As with the injury-in-fact requirement this case differs from cases in which courts have denied standing based upon the failure to establish a causal relationship between the injury suffered and the actions taken by the defendants. The testimony of the gun dealers themselves establishes that they refrained from making an otherwise profitable sale of semi-automatic rifles because of I-1639. Mitchell Decl. ¶ 22.

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1              c)      **The Remedy Sought Will Remove the Obstacle**

2          The last element of the standing test is also clear: if this Court declares that I-1639 violates

3   the Second Amendment, the plaintiffs' rights will be restored and they will be able to purchase the

4   firearms that they have chosen from Ball and Mitchell. Mitchell will be able to resume interstate

5   sales of those same firearms, subject to background checks as required.

6          **2.   The Dealer Plaintiffs Have Standing**

7          This court has already determined that the dealer plaintiffs have standing: "It is difficult to

8   see how the Dealers could sustain a more concrete form of injury without actually violating the

9   law, which they are not required to do. The standing and ripeness requirements have therefore

10  been satisfied." Dkt 044 Order on Motions to Dismiss, 7:15-18.

11         **3.   The Organizational Plaintiffs Have Standing**

12         It is well established that an organization representing the interests of individual plaintiffs

13  who themselves have standing may sue to protect the interests of the individuals whom they

14  represent. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81

15  (2000). In this case the individual plaintiffs also have standing, the interests at stake are germane

16  to the organizations' purposes, and the participation of individual plaintiffs is not required to award

17  the requested relief.

18         **B.  The Under-21 Sales Ban Infringes Second Amendment Rights.**

19         The Second Amendment provides that "the right of the people to keep and bear Arms . . .

20  shall not be infringed." U.S. Const. Am. 2. This protects the right of people to own and bear those

21  types of firearms that are in common use by law abiding citizens for lawful purposes. *See generally*,

22  *Heller*, 554 U.S. 570. This right includes the "individual right to possess and carry weapons" for

23  lawful purposes, including self-defense. *Id.* at 592. In *Heller*, the Court invalidated a broad ban on

24  an entire category of firearms, finding that it could not survive under "any of the standards of

25  scrutiny that we have applied to enumerated constitutional rights." *Id.* at 628 and n.27. In other

26  words, this categorical ban fails to satisfy the applicable standard, which must face at least

27  intermediate scrutiny, but should face a much more stringent test.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

The Court subsequently held in *McDonald v. City of Chicago*, 561 U.S. 742 (2010) that the right to keep and bear arms is protected against infringement by the states, just as against the federal government. *Id.* at 750. The Court described it as "among those fundamental rights necessary to our system of ordered liberty." *Id.* at 778. Washington state may not simply "enact any gun control law that [it] deem[s] to be reasonable." *Id.* at 783 (plurality opinion).

The Ninth Circuit reviews firearms regulation by finding certain regulations "unconstitutional under any level of scrutiny" and adopting tiers of scrutiny for others:

> A law that imposes such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny. . . A law that implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny. . . Otherwise, intermediate scrutiny is appropriate. If a challenged law does not implicate a core Second Amendment right, or does not place a substantial burden on the Second Amendment right, the court may apply intermediate scrutiny.

*Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016) (internal citations and alterations omitted). Here, quite plainly the ban is unconstitutional under any level of scrutiny. Unlike bans which have received strict or intermediate scrutiny, this ban amounts to a destruction of the Second Amendment right for the adults it affects. However reasonable Washington considers its ban— forbidding the purchase of the most common type of rifle that has been made, used, and sold in the United States in enormous numbers for many decades—it may not simply make the exercise of this fundamental right contingent on the permission of an adult's older relative.

### 1. The Scope Of This Ban Renders It Unconstitutional Under Any Level Of Scrutiny, Without Any Means-Ends Or Balancing Test

*Heller* and *McDonald* establish a presumption that ownership and use of firearms protected by the Second Amendment "shall not be infringed," and that the government bears the burden of proving a sufficiently robust justification for restrictions. To satisfy its high burden, the state must show the restriction falls within the text of the Amendment, as informed by the history and tradition of firearms ownership, use, and restrictions in the United States. *See Heller*, 554 U.S. at 634-36. The *Heller* Court specifically rejected the invitation to apply "intermediate scrutiny" and rejected the interest balancing test proposed by the dissent. 554 U.S. at 634-35. The *McDonald*

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1   Court reiterated this standard, again rejecting a role for "judges to assess the costs and benefits of

2   firearms restrictions and thus to make difficult empirical judgments in an area in which they lack

3   expertise." *McDonald*, 561 U.S. at 790–91. Thus, this Court's review should determine whether

4   Washington's law restricts the right to keep and bear arms as it was understood by the drafters and

5   enactors of both the Second and Fourteenth Amendments. *Heller*, 554 U.S. at 626-34. It will find

6   that the law "imposes such a severe restriction on the fundamental right of self defense of the home

7   that it amounts to a destruction of the Second Amendment right [and] is unconstitutional under

8   any level of scrutiny." *Silvester*, 843 F.3d at 281. The law bars 18, 19, and 20 year old adults from

9   purchasing any model of semi-automatic rifle, akin to the blanket handgun ban at issue in *Heller*, a

10  ban which the Supreme Court agreed failed any degree of scrutiny.

11      The state's decision to call all these common rifles "assault" rifles has no basis in the

12  classification of firearms. It was adopted to make the passage of I-1639 more likely, and to obfuscate

13  the immense and unprecedented scope of the ban. This plain fact was conceded by the Violence

14  Policy Center:[3]

15      Defining an assault weapon—in legal terms—is not easy. It's not merely a matter of going
        after guns that are 'black and wicked looking.' Although those involved in the debate know
16      the weapons being discussed, it's extremely difficult to develop a legal definition that
        restricts the availability of assault weapons without affecting legitimate semi-automatic
17      guns.[4]

18  *See* http://www.vpc.org/studies/awaconc.htm. Thus, rather than clarify the scope of the law's

19  restriction, the phrase "semiautomatic assault rifle" serves the purpose of confusing the public

20  about the scope of the law's restriction:

21      Assault weapons—just like armor-piercing bullets, machine guns, and plastic firearms—
        are a new topic. The weapons' menacing looks, coupled with the public's confusion over
22      fully automatic machine guns versus semi-automatic assault weapons—anything that looks
        like a machine gun is assumed to be a machine gun—can only increase the chance of public
23      support for restrictions on these weapons.

24

25

---

26  [3] The Violence Policy Center claims that it "works to stop gun death and injury through research, education, advocacy,
       and collaboration." *See* http://vpc.org/about-the-vpc/.

27  [4] All semi-automatic guns are legitimate, whatever the Violence Policy Center thinks.

ARD LAW GROUP PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

*Id.* In other words, the state selected this additional word for the definition to make the banned rifles sound politically unpalatable. "Semiautomatic assault rifle" has all the constitutional significance of "dark money" in the First Amendment context. Adding the pejorative label 'assault' onto the existing understood definition of a semi-automatic rifle signifies nothing more than "these are rifles the state does not like." In that, the definition does have constitutional significance, inasmuch as it shows that the purpose of the Second Amendment was to preclude such a law:

> The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.

*Heller*, 554 U.S. at 634–35.

As this Court is well aware, the federal government and several states have at various times banned or restricted "assault rifles," and I-1639 purported to piggy-back on those bans. Perhaps the State will even attempt to convince the court that this ban is like those bans. That is false. The ban at issue in this case is broader than any rifle ban ever attempted by any jurisdiction in the United States. Other "assault weapons" bans restricted a small subset of semi-automatic rifles, often listing specific models or requiring them to have a combination of certain militaristic features such as pistol grips or bayonet lugs or muzzle brakes. *See, e.g.*, H.R. 3355, Pub.L. 103–322. Prior to this ban, no American jurisdiction has ever attempted to simply ban the purchase of all semi-automatic rifles. Adding the word "assault" to the known definition in no way mitigates the breadth of this ban. The ban certainly covers the iconic and wildly popular AR-15 style rifle, but also covers the most popular hunting rifles that decline to include military-looking cues, and even bans purchase of the .22 caliber rifles that might be found at a Boy Scout rifle merit badge clinic.

### 2. The State Bans Arms Which Are Protected By The Second Amendment.

The scope of the protections of the Second Amendment is plain: Washington may not infringe the right of its people to keep and bear firearms that are in common use and are "typically

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 624-25, where there is no history or tradition of bans on those firearms. In fact, "[t]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Heller*, 554 U.S. at 582. Rifles., including semi-automatic rifles, constitute "bearable arms."

Rifles—the subject of this ban, just as "handguns" were the subject of *Heller* and "stun guns" the subject of *Caetano v. Massachusetts*, 136 S.Ct. 1027 (2016)—are in common use, with over 55 million sold in the U.S. in the past twenty years. As such, the state has banned arms protected by the Second Amendment. Even if the state can narrow the relevant category from rifles to semi-automatic rifles, then attempt to ban the subset of these common arms, the narrower category of semi-automatic rifles still fits both these tests perfectly. Quite literally millions of semi-automatic rifles are owned by private citizens in the United States, and they are commonly sold in Washington, with untold thousands at least in circulation. Rifles of every sort are so rarely involved in crime that the likelihood of a semi-automatic rifle being used ***other*** than for a lawful purpose by a law-abiding person is effectively zero.

### a)    The Restricted Arms Are In Common Use.

By any definition, semi-automatic rifles are in common use in the United States and in Washington. Indeed, every court to consider the question has found this result. Even courts which have upheld bans on subcategories of semi-automatic rifles have conceded that this category of rifles is overwhelmingly common in the United States.

The Supreme Court has set a lower bound for determining whether a category of weapon is "in common use." In *Caetano v. Massachusetts*, 136 S.Ct. 1027 (2016), Justice Alito's concurrence made clear that stun guns were in common use in the United States where the undisputed record showed that approximately 200,000 civilians owned stun guns, which were legal in 45 states. *Id.* at 1033. Here, there can be no dispute that semi-automatic rifles are in common use, where the available data show that nearly 10 times as many semi-automatic rifles were sold to private owners in the United States in just 2017. *See* Ard Decl. Exhs. A and B. Following *Caetano*'s use of total ownership as the measure of "common use," the commonality of semi-automatic rifles

Plaintiffs' Motion for Summary Judgment - 11
No. 3:19-cv-05106-RBL

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1   is plain: in just the past decade, multiple millions of semi-automatic rifles have entered private

2   ownership, far beyond the threshold of *Caetano*.

3          Nor can there be any reasonable dispute that semi-automatic rifles are in common use

4   within Washington. The state itself has no idea how many semi-automatic rifles are in private

5   hands in the state. There is no reason to doubt that national trends are equally applicable here. The

6   dealer plaintiffs testified to how routinely they sell semi-automatic rifles. Mitchell Decl. ¶ 17; Ball

7   Decl. ¶ 7-8.

8          Next, when other courts have reviewed bans on much narrower subsets of semi-automatic

9   rifles—for example, those with particular features like pistol grips or removable magazines—they

10  have uniformly found that even defined subsets of semiautomatic rifles constitute rifles in common

11  use. For example, in *New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir.

12  2015), the court reviewed a challenge to a state law that banned ownership of a "semiautomatic

13  firearm that contained at least two listed military-style features, including a telescoping stock, a

14  conspicuously protruding pistol grip, a bayonet mount, a flash suppressor, and a grenade

15  launcher." *Id.* at 248. (This ban, obviously, is broader, covering any semi-automatic rifle,

16  regardless of features.) The court had no trouble concluding that the narrow subset of semi-

17  automatic rifles at issue were nonetheless in common use. *Id.* at 255. Similarly, in *Worman v.

18  Healey*, 922 F.3d 26 (1st Cir. 2019), the Court concluded that where "nearly 5,000,000 people

19  owned at least one" of the defined subset of semi-automatic firearms (again, rifles with certain

20  proscribed features), that subset of rifles was in common use. Here, of course, there are vastly more

21  total semi-automatic rifles in private ownership than any defined subset, and must necessarily be

22  in common use.

23         Other courts have concluded that categories of arms are in common use where very few

24  jurisdictions ban them—a test that also incorporates the Second Amendment's limit on creating

25  new, ahistorical bans. The concurrence in *Caetano* looked to this fact in striking down the stun gun

26  ban, and the Fifth Circuit considered the long-standing and widespread bans on fully automatic

27  machine guns relevant to finding them ***not*** in common use in *Hollis v. Lynch*, 827 F.3d 436 (5th Cir.

2016). Under this test, too, the ban fails. No U.S. jurisdiction—none, anywhere, ever—has attempted to impose a categorical ban on private purchase of all semi-automatic rifles.

### b) The Restricted Arms Are Used By Law Abiding Citizens For Lawful Purposes.

The sheer number of semi-automatic rifles owned by private citizens in the United States demonstrates that this category of firearms is not only in common use, but that they are used by law-abiding citizens for lawful purposes.[5] The amount of crime committed with rifles of all types— a broader category than semi-automatic rifles—is miniscule. For homicide, as an example, killings with rifles are dwarfed by killings with fists and blunt objects. *See* Ard Decl. Exh. C. The overwhelming majority of semi-automatic rifles are quite plainly used only by law-abiding citizens for lawful purposes. Indeed, in any given year for the past decades, it is obvious that the number of semi-automatic rifles purchased exceeds the total number of rifles used for crime by a multiple of thousands. Any comparison of the BATF rifle sales data and FBI crime data compels only one conclusion: the overwhelmingly vast majority, far over 99.9%, of all rifles are used lawfully. This is no new trend, and shows no sign of reversing. Rifles last for years, even for decades. During the useful life of the tens of millions of rifles sold over the last twenty years, the rate of all manner of violent crime has declined, a decline that thankfully continues even today. *See* Ard Decl. Exh. D. In light of the ever-increasing number of semi-automatic rifles in private hands, simple math compels the conclusion that the miniscule percentage of rifles used for any unlawful purposes declines each and every year.

### c) The Restricted Arms Are Used For Self-Defense In The Home

The state's ban amounts to no less than "such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right." *Silvester*, 843 F.3d at 821. First, the banned firearms are used for self-defense in the home. By all

---

[5] Any attempt to limit the scope of the right exclusively to home self-defense misstates the Supreme Court's interpretation of the right in *Heller*. Lawful use of firearms goes far beyond merely home defense. The point is moot here, however, where these firearms are the best home defense tools available to the plaintiffs denied the right to purchase them.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 13
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

accounts, they represent the second most popular choice for in-home self defense. Second, because the state already bans 18, 19, and 20 year old adults from purchasing handguns (the most popular home self-defense weapon), this second ban does, in fact, destroy the Second Amendment right of adults to engage in home self-defense.

### 3.  The Purchase Restriction Is Categorically Unconstitutional.

The restriction overwhelmingly burdens an adult's Second Amendment rights. Even under the narrowest understanding of the scope of the Second Amendment—limiting it to self defense of the home—this ban forbids 18, 19, and 20 year old adults in Washington from purchasing the most popular firearms available to them for that purpose. Already restricted by the state from purchasing handguns, *see* RCW 9.41.240,[6] this new restriction "amounts to a destruction of the Second Amendment right [and] is unconstitutional under any level of scrutiny." *Silvester*, 843 F.3d at 821. As the Ninth Circuit noted, "laws which regulate only the manner in which persons may exercise their Second Amendment rights are less burdensome than those which bar firearm possession completely." *Silvester*, 843 F.3d at 827.

This blanket ban is too strict to face intermediate scrutiny, as seen by the kinds of regulations for which the Ninth Circuit has applied that tier of scrutiny. In *Silvester*, the law at issue did not ban purchases, but imposed a 10 day waiting period, and therefore faced intermediate scrutiny. *Silvester*, 843 F.3d at 818. The Ninth Circuit also applied intermediate scrutiny to a ban on people already found not to be law-abiding, namely, domestic violence misdemeanants. It applied only intermediate scrutiny in part because the challenged law had sufficient exceptions that it did not amount to a complete ban, where an affected person could get his rights restored and lawfully possess firearms. *See U.S. v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013). No such exception applies here, where the law is a complete ban on law-abiding adults purchasing semi-automatic rifles.

---

[6] The federal government barred FFLs from selling handguns to those under 21. *See* 18 U.S.C. § 922(b)(1).

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 14
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

The court also applied intermediate scrutiny to a police use-of-force policy governing use of issued firearms during work for the Seattle Police Department. *See Mahoney v. Sessions*, 871 F.3d 873, 881 (9th Cir. 2017). Plainly, the police officers already had firearms to which the use-of-force policy applied; the regulation did not ban them from possessing firearms or using them in self-defense. Here, these adult plaintiffs cannot purchase firearms. And in *Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017), the court concluded that "intermediate scrutiny is the appropriate standard for analyzing the fee scheme" at issue, which added a challenged $5 fee to purchases. This ban on purchases merits higher scrutiny, the level at which it automatically fails.

The only greater degree of firearms regulation possible in the state would be a complete ban on these adult's ability to purchase all firearms. If a ban this broad does not fail the constitutional test of *Heller*, the Ninth's Circuit's tiered approach demands only intermediate scrutiny for any imaginable regulation of firearms. Such an outcome contradicts not only *Silvester*, but also ignores the Supreme Court's caution in *McDonald* that courts should **not** attempt "to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise." *McDonald*, 561 U.S. at 790–91.

### 4.   The Restriction Impermissibly Burdens Second Amendment Rights.

If the Court does not immediately conclude that the law fails under the *Heller / Silvester* test as "such a severe restriction . . . that it amounts to a destruction of the Second Amendment right," *Silvester*, 843 F.3d at 821, then this law—the most restrictive rifle ban ever imposed in the nation, on the broadest category of firearms, covering 100% of the most popular rifles sold and owned—must face strict scrutiny as a "law that implicates the core of the Second Amendment right and severely burdens that right . . ." *Id*. A ban that deprives 18 to 20 year old adults of the right to purchase virtually any firearm cannot be justified merely as a "reasonable regulation" of the manner of their exercise of rights protected by the Second Amendment.

Here, the state can proffer no reasonable justification for the law in any event. The banned firearms are overwhelmingly common and popular, and are so rarely used in any form of crime that use of one in crime is a statistical anomaly. No one can identify any specific reduction in any crime

Plaintiffs' Motion for Summary Judgment - 15
No. 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

or other negative behavior that will result from the ban. It has no effective relationship to the

supposed purpose put forward by the state: generic public safety. Nor will the State be able to show,

as it must, that there are no less restrictive means to meet the purpose of public safety it suggests

is the reason for the law.

### C.  The Interstate Sales Ban Violates The Commerce Clause.

Plaintiff Dan Mitchell challenges the ban on interstate sales of semi-automatic rifles. This

challenged statute forbids all sales by Mitchell or any other FFL of the subject firearms to any

resident of another sate, whether that resident is present in Washington or located in his home

state. This law forbids Mitchell from transferring a self-loading rifle from his business to the

business of an out-of-state FFL for delivery to a customer in that state. It also forbids any locally

stationed member of the U.S. military whose state of residence is outside Washington from buying

a semi-automatic rifle. It eliminated up to 30% of his sales of semi-automatic rifles. This blanket

ban discriminates against interstate commerce. "State laws discriminating against interstate

commerce on their face are virtually per se invalid." *Camps Newfound/Owatonna, Inc. v. Town of*

*Harrison, Me.*, 520 U.S. 564, 575 (1997) (internal citation omitted). As the Supreme Court has

instructed:

> [T]he first step in analyzing any law subject to judicial scrutiny under the negative Commerce Clause is to determine whether it regulates evenhandedly with only incidental effects on interstate commerce, or discriminates against interstate commerce. . . As we use the term here, "discrimination" simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter. If a restriction on commerce is discriminatory, it is virtually per se invalid.

*Oregon Waste Systems, Inc. v. Department of Environmental Quality of State of Or.*, 511 U.S. 93, 99

(1994) (internal citations and alterations omitted).   Furthermore, this kind of forbidden

"[e]conomic protectionism is not limited to attempts to convey advantages on local merchants; it

may include attempts to give local consumers an advantage over consumers in other States."

*Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 580 (1986). This ban

plainly satisfies the test, because it does not matter whether the state describes the ban as imposing

harmful burdens on its own citizens, the in-state FFLs who can no longer make profitable sales. By

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 16
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

banning interstate commerce, the state has engaged in economic Balkanization that is forbidden by the interstate commerce clause, just like the law in *Brown-Forman* and just like the law challenged in *Town of Harrison*. There, the law taxed in-state businesses more heavily if they catered to out-of-state residents, harming in-state businesses and benefitting in-state consumers. The Supreme Court struck down the law. "By encouraging economic isolationism, prohibitions on out-of-state access to in-state resources serve the very evil that the dormant Commerce Clause was designed to prevent." *Town of Harrison*, 520 U.S. at 578.

The interstate sales ban cannot survive scrutiny under this long-standing rule. "A state is without power to prevent privately owned articles of trade from being shipped and sold in interstate commerce on the ground that they are required to satisfy local demands or because they are needed by the people of the state." *Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1, 10 (1928). Whatever reason the state may eventually produce for why it has banned residents of other states and locally stationed military members from buying semi-automatic rifles from a Washington merchant, it has enacted a ban on "privately owned articles of trade from being shipped and sold in interstate commerce," a ban the state lacks the power to create. *See also New England Power Co. v. New Hampshire*, 455 U.S. 331, 338 (1982) ("Our cases consistently have held that the Commerce Clause of the Constitution, Art. I, § 8, cl. 3, precludes a state from mandating that its residents be given a preferred right of access, over out-of-state consumers, to natural resources located within its borders or to the products derived therefrom"). Because "[a] discriminatory law is virtually per se invalid . . . [it] will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives . . ." *Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008).

"In all but the narrowest circumstances, state laws violate the Dormant Commerce Clause if they mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter. . . State laws that directly discriminate against out-of-state entities can survive only if the state demonstrates both that the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means."

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1    *Nationwide Biweekly Administration, Inc. v. Owen*, 873 F.3d 716, 736 (9th Cir. 2017) (internal

2    citations and alterations omitted). Plaintiffs have shown that the law is facially discriminatory and

3    per se invalid. It falls to the state to invent a justification.

4    **D.  The Plaintiffs Are Entitled to an Award of Attorney's Fees**

5    This Court recognized in its Order on Motions to Dismiss, Dkt 044, that in an action under

6    *Ex Parte Young*, 209 U.S. 123, 156 (1908) against defendants acting in their official capacity, the

7    remedies under 42 U.S.C. § 1983 are available even if the Plaintiff(s) neither seek nor are entitled

8    to damages under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978). Order, at

9    13 n.4: "Fortunately for Plaintiffs, [failure to qualify for damages under *Monell*] does not actually

10   eliminate any of the remedies available to them. Plaintiffs only ask for declaratory and injunctive

11   relief, which is already available in an *Ex Parte Young* action."

12   Plaintiff will present a supplemental motion for an award of attorney's fees when this Court

13   determines that Plaintiffs have established a violation of their civil rights pursuant to 42 U.S.C.

14   § 1983.

15   **IV.  Conclusion**

16   I-1639 prohibits Washington citizens from purchasing a firearm that is in common use by

17   law-abiding persons for law-abiding purposes. It also discriminates between in-state and out-of-

18   state purchasers in violation of the interstate commerce clause. I-1639 is not a reasonable regulation

19   narrowly tailored to promote the public safety while respecting the most basic and fundamental

20   right to self-defense. Instead, it subjects a category of particularly useful and popular firearms to

21   flat prohibition, and discriminates against out-of-state purchasers in clear violation of the interstate

22   commerce clause. Declaratory and injunctive relief should issue.

23   ///

24   ///

25   ///

26   ///

27   ///

Plaintiffs' Motion for Summary Judgment - 18
No. 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

March 10, 2020.

ARD LAW GROUP PLLC

By: _____
Joel B. Ard, WSBA # 40104
P.O. Box 11633
Bainbridge Island, WA 98110
(206) 701-9243
Attorneys for Plaintiffs

ALBRECHT LAW PLLC

By: _____
Matthew C. Albrecht, WSBA #36801
David K. DeWolf, WSBA #10875
421 W. Riverside Ave., Ste. 614
Spokane, WA 99201
(509) 495-1246
Attorneys for Plaintiffs

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 19
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243