The Honorable Ronald B. Leighton

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

DANIEL MITCHELL, *et al.*,

         Plaintiffs,

 v.

CHARLES ATKINS, *et al.*,

         Defendants,

 and

SAFE SCHOOLS SAFE COMMUNITIES,

      Intervenor-Defendant.

NO. 3:19-cv-5106

DEFENDANTS AND INTERVENOR-DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**NOTED ON MOTION CALENDAR:  APRIL 24, 2020**

**ORAL ARGUMENT REQUESTED**

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**TABLE OF CONTENTS**

I.    INTRODUCTION ....................................................................................... 1

II.   FACTS IN SUPPORT OF MOTION ......................................................... 3

      A.   Gun Violence, Including Mass Shootings, Significantly Impacts Public Safety
           in Washington and the United States ................................................................. 3

      B.   I-1639 is Designed to Reduce Gun Violence and Increase Public Safety by
           Extending Federal and State Laws that Apply to Handguns to SARs ...................... 6

           1.   The Age Provision .................................................................... 6

           2.   The Background Check Provision ................................................. 7

           3.   The Nonresident Sales Provision ................................................. 9

      C.   Plaintiffs Challenge Only the Age Provision and the Nonresident Sales
           Provision ....................................................................................... 10

III.  ARGUMENT ....................................................................................... 10

      A.   Standard of Review ......................................................................... 10

      B.   The Age Provision Does Not Violate the Second Amendment ........................... 10

           1.   The Second Amendment framework .............................................. 10

           2.   The Age Provision does not burden Second Amendment rights .................... 11

                a.   "Longstanding" firearm laws fall outside the Second Amendment ......... 11

                b.   Minimum age laws for firearms are historically longstanding ................ 12

                     i.    The age of majority was 21 until the 1970s ................................ 12

                     ii.   Laws have restricted under-21 firearm sales since the 1800s ......... 13

                     iii.  An emerging consensus among the courts is that firearm
                           minimum age restrictions fall outside the Second Amendment ..... 14

           3.   The Age Provision withstands intermediate scrutiny ...................................... 16

                a.   Intermediate scrutiny applies because the Age Provision does not
                     severely burden a core Second Amendment right ................................... 16

                     i.    The Age Provision does not burden the "core right" of
                           "responsible individuals" to defend themselves in the home ......... 16

                     ii.   Any burden imposed by the Age Provision is not "severe" ......... 17

b.  The Age Provision satisfies intermediate scrutiny ..................................20

i.  I-1639 addresses significant government interests .......................20

ii.  Restricting SAR sales to 18- to 20-year olds has a "reasonable fit" with reducing gun violence and increasing public safety ........21

(a)  The regions of the brain that govern impulsivity and judgment do not fully mature until the twenties ..................21

(b)  Individuals 18 to 20 disproportionately commit violent crimes ...................................................................................22

(c)  Minimum age laws have proven effective in addressing health and safety concerns ...................................................23

(d)  SARs are more dangerous and used more frequently in mass shootings than other firearms ......................................24

C.  The Nonresident Sales Provision Does Not Violate the Dormant Commerce Clause ................................................................................................................26

1.  Dormant Commerce Clause framework .....................................................27

2.  The Nonresident Sales Provision is non-discriminatory because it does not involve economic protectionism ..........................................................27

3.  The Nonresident Sales Provision meets the *Pike* balancing test ....................31

4.  The Nonresident Sales Provision would meet strict scrutiny if it applied ........32

5.  Congress has authorized states to restrict sales of rifles to nonresidents .........35

D.  Plaintiffs' Claims Are Not Justiciable .................................................................37

1.  Plaintiffs Casey's and Rettmer's Second Amendment claims are moot .........38

2.  Plaintiff Wald lacks standing ....................................................................38

3.  The Organizational Plaintiffs lack standing to challenge the Age Provision .....................................................................................................38

4.  Plaintiff Mitchell lacks standing to challenge the Nonresident Sales Provision .....................................................................................................39

E.  Plaintiffs' Request for Attorney Fees Should Be Denied .......................................40

IV.  CONCLUSION ................................................................................................................40

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

ii

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

## TABLE OF AUTHORITIES

2

### <u>Cases</u>

3

*Am. Civil Liberties Union of Nev. v. Lomax,*
4     471 F.3d 1010 (9th Cir. 2006) ..................................................................................37

*Bayer v. Neiman Marcus Grp., Inc.,*
5     861 F.3d 853 (9th Cir. 2017) ....................................................................................38

6
*Brown-Forman Distillers Corp. v. New York State Liquor Authority,*
    476 U.S. 573 (1986) ...........................................................................................30, 31
7

*C & A Carbone, Inc. v. Town of Clarkstown,*
8     511 U.S. 383 (1994) ...................................................................................28, 32, 34

9 *Camps Newfound/Owatonna, Inc. v. Town of Harrison,*
    520 U.S. 564 (1997) .................................................................................................29
10

*Celotex Corp. v. Catrett,*
11     477 U.S. 317 (1986) .................................................................................................11

12 *City of New York v. U.S. Dep't of Def.,*
    913 F.3d 423 (4th Cir. 2019) .....................................................................................8
13

*City of Phila. v. New Jersey,*
14     437 U.S. 617 (1978) .................................................................................................28

15 *Cohen v. R.I. Tpk. & Bridge Auth.,*
    775 F. Supp. 2d 439 (D.R.I. 2011)...........................................................................29
16

*Colacurcio v. City of Kent,*
17     163 F.3d 545 (9th Cir. 1998) ...................................................................................20

18 *Coleman v. State,*
    32 Ala. 581 (1858) ...................................................................................................13
19

*Conservation Force, Inc. v. Manning,*
20     301 F.3d 985 (9th Cir. 2002) ...................................................................................27

21 *Craig v. Boren,*
    429 U.S. 190 (1976) .................................................................................................38
22

*District of Columbia v. Heller,*
23     554 U.S. 570 (2008) ...........................................................................................passim

24 *Doe v. Virginia Dep't of State Police,*
    713 F.3d 745 (4th Cir. 2013) ...................................................................................38
25

*Ecumenical Ministries v. Oregon State Lottery Comm'n,*
26     871 P.2d 106 (Or. 1994)............................................................................................3

DEFS.' CROSS-MSJ AND OPP. TO         iii          ATTORNEY GENERAL OF WASHINGTON
PLFS.' MSJ                                                  800 5th Ave. Suite 2000
CAUSE NO. 3:19-CV-5106                                    Seattle, WA 98104-3188
                                                         (206) 464-7744

*Farrar v. Hobby*,
   506 U.S. 103 (1992) ........................................................................................40

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015) .........................................................................25

*Friend v. Kolodzieczak*,
   72 F.3d 1386 (9th Cir. 1995) ..........................................................................40

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
   528 U.S. 167 (2000) ........................................................................................39

*Fyock v. Sunnyvale*,
   779 F.3d 991 (9th. Cir. 2015) ........................................................ 11, 15, 16, 20

*Gen. Motors Corp. v. Tracy*,
   519 U.S. 278 (1997) ........................................................................................29

*Graham v. Florida*,
   560 U.S. 48 (2010) ..........................................................................................22

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) ......................................................................25

*Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
   417 F. Supp. 3d 747 (W.D. Va. 2019) ....................................................... 12, 15

*Hirst v. Skywest*, 910 F.3d 961 (7th Cir. 2018) ..................................................37

*Horsley v.* Trame,
   61 F. Supp. 3d 788 (S.D. Ill. 2014), *aff'd*, 808 F.3d 1126 (7th Cir. 2015) ..........................22

*Horsley v. Trame*,
   808 F.3d 1126 (7th Cir. 2015) .....................................................................3, 21

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
   803 F.3d 389 (9th Cir. 2015) .....................................................................26, 28

*Jackson v. City & Cty. of S.F.*,
   746 F.3d 953 (9th Cir. 2014) ......................................................... 16, 18, 20

*Kachalsky v. Cty. of Westchester*,
   701 F.3d 81 (2d Cir. 2012) .............................................................................33

*Kolbe v. Hogan*,
   849 F.3d 114 (4th Cir. 2017) ...................................................... 15, 21, 25

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................38

*Mahoney v. Sessions*,
   871 F.3d 873 (9th Cir. 2017) ..........................................................................20

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

iv

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

*Maine v. Taylor,*
   477 U.S. 131 (1986) .................................................................. 27, 33, 35

*Mance v. Sessions,*
   896 F.3d 699 (5th Cir. 2018) (per curiam) ....................................... 9, 32, 33, 34

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) ................................................................................ 12

*N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York,*
   883 F.3d 45 (2d Cir. 2018), *cert. granted sub nom.* 139 S. Ct. 939 (2019) ......................... 33

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
   804 F.3d 242 (2d Cir. 2015) ................................................................ 11, 21, 25

*Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown,*
   567 F.3d 521 (9th Cir. 2009) ................................................................... 31

*Nat'l Ass'n of Optometrists & Opticians v. Harris,*
   682 F.3d 1144 (9th Cir. 2012) ............................................................... 27, 31

*Nat'l Rifle Ass'n v. Bur. of Alcohol, Tobacco, Firearms & Explosives,*
   700 F.3d 185 (5th Cir. 2012) ............................................................... passim

*Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.,*
   472 U.S. 159 (1985) ................................................................................ 35

*New England Power Co. v. New Hampshire,*
   455 U.S. 331 (1982) ................................................................................ 30

*Norfolk S. Corp. v. Oberly,*
   632 F. Supp. 1225 (D. Del. 1986), *aff'd,* 822 F.2d 388 (3d Cir. 1987) ........................... 37

*NRA v. McCraw,*
   719 F.3d 338 (5th Cir. 2013) ............................................................. 14, 18, 21, 38

*Or. Waste Sys., Inc. v. Dep't of Envtl. Quality,*
   511 U.S. 93 (1994) ................................................................................. 28

*Oregon v. Mitchell,*
   400 U.S. 112 (1970) ................................................................................ 13

*Pena v. Lindley,*
   898 F.3d 969 (9th Cir. 2018) ............................................................. 16, 18, 20

*Penn Advert. of Baltimore, Inc. v. Mayor & City Council of Baltimore,*
   63 F.3d 1318 (4th Cir. 1995), *cert. granted, judgment vacated on other grounds sub*
   *nom. Penn Advert. of Baltimore, Inc. v. Schmoke,* 518 U.S. 1030 (1996), and *adopted*
   *as modified,* 101 F.3d 332 (4th Cir. 1996) ........................................................ 3

*People v. Mosley,*
   33 N.E.3d 137 (Ill. 2015) ........................................................................ 15

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

v

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

*Pike v. Bruce Church, Inc.*,
  397 U.S. 137 (1970) ............................................................................................27, 31

*Powell v. Tompkins*,
  926 F. Supp. 2d 367 (D. Mass. 2013), *aff'd*, 783 F.3d 332 (1st Cir. 2015) ...................15, 26

*Prete v. Bradbury*,
  438 F.3d 949 (9th Cir. 2006) ..........................................................................................3

*Raymond Motor Transp., Inc. v. Rice*,
  434 U.S. 429 (1978) ......................................................................................................27

*Rocky Mtn. Farmers Union v. Corey*,
  730 F.3d 1070 (9th Cir. 2013) ..........................................................................28, 31, 33

*Rosenblatt v. City of Santa Monica*,
  940 F.3d 439 (9th Cir. 2019) ........................................................................................31

*S.-Cent. Timber Dev. v. Wunnicke*,
  467 U.S. 82 (1984) ........................................................................................................27

*Schrader v. Holder*,
  704 F.3d 980 (D.C. Cir. 2013) ......................................................................................18

*Silvester v. Harris*,
  843 F.3d 816 (9th Cir. 2016) ...................................................................................16, 21

*State v. Callicutt*,
  69 Tenn. 714 (1878) ......................................................................................................14

*Stiles v. Blunt*,
  912 F.2d 260 (8th Cir. 1990) ........................................................................................19

*Sullivan v. Oracle Corp.*,
  662 F.3d 1265 (9th Cir. 2011) ......................................................................................27

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ......................................................................................................39

*Swanson Grp. Mfg. LLC v. Jewell*,
  790 F.3d 235 (D.C. Cir. 2015) ......................................................................................39

*Teixeira v. Cty. of Alameda*,
  873 F.3d 670 (9th Cir. 2017) (en banc) ........................................................................11

*Tenn. Wine & Spirit Retailers Ass'n v. Thomas*,
  139 S. Ct. 2449 (2019) ..................................................................................................26

*Town of Southold v. Town of E. Hampton*,
  477 F.3d 38 (2d Cir. 2007) ...........................................................................................29

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

vi

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.,*
  550 U.S. 330 (2007)................................................................................27

*United States v. Booker,*
  644 F.3d 12 (1st Cir. 2011) .....................................................................18

*United States v. Chovan,*
  735 F.3d 1127 (9th Cir. 2013) ...............................................11, 16, 26

*United States v. Decastro,*
  682 F.3d 160 (2d Cir. 2012) ...................................................................18

*United States v. Marzzarella,*
  614 F.3d 85 (3d Cir. 2010) .....................................................................12

*United States v. Redus,*
  469 F.2d 185 (9th Cir. 1972) ....................................................................9

*United States v. Rene E.,*
  583 F.3d 8 (1st Cir. 2009) .......................................................................15

*United States v. Reese,*
  627 F.3d 792 (10th Cir. 2010) ................................................................18

*United States v. Torres,*
  911 F.3d 1253 (9th Cir. 2019) ................................................................16

*W. Lynn Creamery, Inc. v. Healy,*
  512 U.S. 186 (1994) ..........................................................................29, 33

*White v. Mass. Council of Const. Employers, Inc.,*
  460 U.S. 204 (1983) ................................................................................37

*Wilson v. Cook Cty.,*
  937 F.3d 1028 (7th Cir. 2019) (per curiam) ..........................................25

## **Constitutional Provisions**

U.S. Const. amend. II ................................................................................passim

U.S. Const. Art. 1, § 8, cl. 3.........................................................................26

## **Statutes**

18 U.S.C. § 921..........................................................................................1, 7

18 U.S.C. § 922......................................................................................passim

18 U.S.C. § 927...........................................................................................37

42 U.S.C. § 1988.........................................................................................40

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

vii

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

RCW 9.41.010 ....................................................................................... 1, 6, 7, 17

RCW 9.41.042 ........................................................................................... 7, 17, 19

RCW 9.41.060 ....................................................................................................... 7

RCW 9.41.090 .................................................................................................... 8, 9

RCW 9.41.092 ....................................................................................................... 6

RCW 9.41.124 ................................................................................................... 9, 37

RCW 9.41.240 ......................................................................................... 7, 14, 17, 19

RCW 9.41.360 ....................................................................................................... 6

RCW 19.70.020 ................................................................................................ 9, 36

RCW 26.28.080 ................................................................................................... 24

1970 Wash. Sess. Laws, ch. 74, § 2 ................................................................. 9, 36

1994 Wash. 1st Spec. Sess. Laws, ch. 7, § 423 ....................................................... 7

Initiative Measure No. 1639 ....................................................................... passim

43.430 Ill. Comp. Stat. 65/2 ............................................................................... 14

43.430 Ill. Comp. Stat. 65/4 ............................................................................... 14

430 Ill. Comp. Stat. 65/3 .................................................................................... 14

430 Ill. Comp. Stat. 65/4 .................................................................................... 14

Firearm Owners Protection Act ("FOPA"),
    Pub. L. No. 99-308, § 102(4)(B), 100 Stat. 449, 451 (1986) ............................... 36

Gun Control Act of 1968, Pub. L. 90-618,
    82 Stat. at 1213 ............................................................................................... 7

Act of April 7, 1921, § 2, 1921 Mo. Laws 692 ...................................................... 36

Act of Aug. 12, 1910, No. 432, 1910 Ga. Laws 134 .............................................. 36

Act of Feb. 16, 1909, ch. 51, 1909 W. Va. Acts 394 ............................................. 36

Act of Feb. 20, 1918, ch. 2, §§ 1-3, 8, 1918 Mont. Laws 6 ................................... 36

Act of Feb. 21, 1935, ch. 63, §§ 1, 3, 5, 1935 Ind. Laws 159 ................................. 36

Act of Feb. 25, 1939, ch. 14, 1939 Me. Acts 53 .................................................... 36

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

viii

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Act of Feb. 26, 1913, ch. 256, § 1, 1913 Or. Laws 497 ...........................................................36

Act of July 11, 1919, § 4, 1919 Ill. Laws 431 .......................................................................36

Act of June 2, 1927, ch. 372, §§ 2, 6, 1927 Mich. Acts 887 .................................................36

Act of Mar. 2, 1937, No. 190, § 1, 1937 Ala. Laws 223, 223 ...............................................36

Act of March 10, 1919, ch. 197, §§ 1-2, 1919 N.C. Laws 397 .............................................36

Act of March 11, 1924, ch. 137, §§ 1-2, 1924 N.J. Acts 305................................................36

Act of March 19, 1923 §§ 1, 3, 1923 Ark. Acts 379.............................................................36

Act of March 3, 1919, ch. 74, § 5, 1919 Mont. Acts 147......................................................36

Act of May 2, 1910, ch. 591, § 1, 1910 R.I. Acts 156 ..........................................................36

Act of May 21, 1913, ch. 608, § 1, 1913 N.Y. Laws 1627 ...................................................36

Act of May 29, 1922, ch. 485, § 9, 1922 Mass. Acts 560 .....................................................36

Cal. Penal Code § 27505(a)....................................................................................................14

Cal. Penal Code § 27510(a)....................................................................................................14

Conn. Gen. Stat. § 29-34(b)....................................................................................................14

D.C. Code Ann. § 22-4507 .....................................................................................................14

Del. Code Ann. tit. 24, § 903 ..................................................................................................14

Fla. Stat. § 790.065(13) ..........................................................................................................14

Haw. Rev. Stat. Ann. § 134-2(a) .............................................................................................14

Iowa Code § 724.22(2) ...........................................................................................................14

Mass. Gen. Laws ch. 140, § 130 .............................................................................................14

Md. Code Ann., Crim. Law § 4-301(c)...................................................................................25

Md. Code Ann., Pub. Safety § 5-134(d)..................................................................................14

N.J. Stat. Ann. § 2C:58............................................................................................................14

N.Y. Penal Law § 265.00 ........................................................................................................26

N.Y. Penal Law § 400.00 ........................................................................................................14

Neb. Rev. Stat. § 69-2403 .......................................................................................................14

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

ix

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Neb. Rev. Stat. § 69-2404 ...........................................................................................14

Ohio Rev. Code Ann. § 2923.21 .................................................................................14

R.I. Gen. Laws § 11-47-35 .........................................................................................14

R.I. Gen. Laws § 11-47-37 .........................................................................................14

Vt. Stat. Ann. tit. 13, § 4020 ......................................................................................14

Wyo. Stat. Ann. § 6-8-404 ..........................................................................................14

**Legislative History**

131 Cong. Rec. S9149
    (daily ed. July 9, 1985) .........................................................................................36

145 Cong. Rec. 18119 (1999) .....................................................................................22

99th Cong. (1st and 2d Sess.) Pt. 1, Serial No. 131 ....................................................36

H.R. Rep. No. 90-1577 (1968),
    *reprinted in* 1968 U.S.C.C.A.N. 4410 ...........................................................35, 36

S. Rep. No. 90-1097,
    *reprinted in* 1968 U.S.C.C.A.N. 2112 (1968) ......................................................36

S. Rep. No. 90-1501 (1968) ........................................................................................35

S. Rep. No. 98-583 (1984) ..........................................................................................36

**Regulations**

27 C.F.R. § 478.99 ..........................................................................................9, 35, 37

28 C.F.R. § 25.1 ...........................................................................................................8

**Rules**

Fed. R. Civ. P. 56(c) ...................................................................................................10

**Other Authorities**

"Initiative 1639: Frequently Asked Questions,"
    Wash. Office of the Att'y Gen. ............................................................................9, 35

1 William Blackstone,
    *Commentaries* *463 .............................................................................................13

2017 Crime in the United States,
    FBI, Table 38 ........................................................................................................22

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

x

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

2018 General Election Voters' Pamphlet,
Wash. Sec'y of State ...................................................................................6

A Study of Active Shooter Incidents in the United States Between 2000 and 2013 ................23

*Analysis of the Involvement of 18-20 Year Olds in Firearm Violence and the Special*
*Problem of Semi-Automatic Weapons,*
Firearm Injury and Policy Research Program, et al. (June 2019)..................23, 25

Anderson, Rick
*Stroke of luck and gun laws kept Washington state mall shooting from being much*
*worse, police say,* Dec. 15, 2016 ........................................................3

Barnett, Larry D.,
*The Roots of Law,* 15 Am. U.J. Gender Soc. Pol'y & L. 613 (2007) ...................13

Cooley, Thomas M.,
*Treatise on Constitutional Limitations* 740 (5th ed. 1883) ..................................13

DeJong, William, et al.,
*Case Closed: Research Evidence on the Positive Public Health Impact of the Age 21*
*Minimum Legal Drinking Age in the United States,*
75 J. Stud. on Alcohol & Drugs 108 (2014)..................................................24

Dep't of Treasury,
*Study on the Sporting Suitability of Modified Semi-automatic Assault Rifles* 34
(1998) .............................................................................................25

*Federal Firearms Regulations Reference Guide,*
U.S. Dep't of Justice (2014) ......................................................................9, 35

*Federal Firearms Licensee Quick Reference and Best Practices Guide,*
U.S. Dep't of Justice (2010) ......................................................................9

Green, Sara Jean,
*Shooting suspect jealous over ex, bought rifle a week ago, police say,*
Seattle Times, Aug. 2, 2016 ......................................................................3

Hepler, Lauren, Amy Harmon, and Richard A. Oppel Jr.,
*Gilroy Shooting: Two Children Among the Dead at California Festical,*
N.Y. Times, July 29, 2019 ........................................................................33

Indermaur, John,
*Principles of the Common Law* 195
(Edmund H. Bennett ed., 1st Am. ed. 1878) ..................................................13

*Infant, Black's Law Dictionary* 847
(9th ed. 2009).....................................................................................13

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

xi

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Koper, Christopher S. et al.,
*Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms:*
*An Updated Examination of Local and National Sources,*
95 J. Urb. Health 313 (Oct. 2017)) ....................................................................4

Koper, Christopher S. et al.,
U. Penn. Jerry Lee Ctr. of Criminology, *An Updated Assessment of the*
*Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–*
*2003* (2004)........................................................................................................25

Lopez, German and Kavya Sukumar,
*After Sandy Hook, we said never again. And then we let 2,408 mass shootings*
*happen,* Vox, Mar. 27, 2020 ..............................................................................3

Marjory Stoneman Douglas High Sch. Public Safety Comm'n, Initial Report,
Jan. 2, 2019 ........................................................................................................4

Mickle, Tripp,
*Study Supports Raising Tobacco-Purchase Age to 21,*
Wall St. J., Mar. 12, 2015 ................................................................................24

NICS Participation Map, Fed. Bur. of Investigation,
https://www.fbi.gov/file-repository/nics-participation-map.pdf/view (last updated
July 2019) ..........................................................................................................8

Nov. 6, 2018 General Election Results:
Initiative Measure No. 1639 ..............................................................................6

Ortiz, Adam,
*Adolescence, Brain Development, and Legal Culpability*, Am. Bar. Ass'n, Juvenile
Justice Ctr. (Jan. 2004)......................................................................................4

*Public Health Implications of Raising the Minimum Age of Legal Access to Tobacco*
*Products*, Inst. of Medicine of the Nat'l Academies
(Richard J. Bonnie, et al., eds. 2015) ...............................................................24

Rhee, Peter M. et al.,
*Gunshot Wounds: A Review of Ballistics, Bullets, Weapons, and Myths,*
80 J. Trauma & Acute Care Surgery 853 (2016) ........................................3, 4, 24

Schmidt, Michael S.,
*State Law Prevented Sale of Assault Rifle to Suspect Last Week, Officials Say,*
N.Y. Times, Sept. 13, 2013 ..............................................................................34

Spitzer, Robert J.,
*Gun Law History in the United States and Second Amendment Rights,*
80 Law & Contemp. Probs. 55 (2017) ..............................................................15

State's Att'y Rep. on the Shootings at Sandy Hook Elem. Sch.,
Nov. 25, 2013....................................................................................................4

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

xii

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

U.S. Census Bur.,
    2010–2018 Annual Estimates of U.S. Population by Age,
    https://www2.census.gov/programs-surveys/popest/tables/2010-
    2018/national/asrh/PEPALL6N.pdf ...................................................................4

U.S. Dep't of the Treasury & U.S. Dep't of Justice,
    *Gun Crime in the Age Group 18–20* (June 1999) ............................................22

U.S. Department of Justice,
    2018 Crime in the United States, Arrests, by Age, Tbl. 38,
    https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-
    pages/tables/table-38 .................................................................................4, 22

Violent Crime Control and Law Enforcement Act of 1994,
    Pub L. No.103 § 110102(b), 108 Stat 1796, 1997–98 ......................................25

White, J.,
    *When Lawmakers Try to Ban Assault Weapons, Gunmakers Adapt,*
    N.Y. Times, July 31, 2019 ...................................................................................6

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

xiii

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

# I.    INTRODUCTION

Gun violence devastates individual lives, families, and communities across our country. Mass shootings alone have killed more than 2,700 Americans and injured over 10,000 others since 2012. Newtown, Connecticut: 20 schoolchildren and 6 adults killed at Sandy Hook Elementary School. Parkland, Florida: 17 killed and 17 injured at Marjory Stoneman Douglas High School. And locally, Burlington, Washington: five killed while shopping in the Cascade Mall. Those tragedies, among others, share a common feature: each of the gunmen was between 18 and 20 years old and used a semiautomatic assault rifle ("SAR") to carry out his attack.

The people of Washington took action to reduce gun violence and increase public safety by adopting Initiative Measure No. 1639 ("I-1639" or the "Initiative").[1] I-1639 takes a simple and commonsense approach: extend three longstanding statutory restrictions on handguns to the weapon often favored by mass shooters: SARs.[2] I-1639 mirrors existing federal and state restrictions on handguns by (1) prohibiting individuals under 21 from purchasing SARs (the "Age Provision"); (2) requiring an enhanced background check—a comprehensive records search conducted by local law enforcement—for SAR purchases (the "Background Check Provision"); and (3) prohibiting in-person sales of SARs to non-Washington residents (the "Nonresident Sales Provision").

Plaintiffs challenge the Age Provision under the Second Amendment and the Nonresident Sales Provision under the dormant Commerce Clause. Plaintiffs' claims fail as a matter of law.

First, the Age Provision falls outside the scope of the Second Amendment because laws regulating access to firearms by those under 21 are longstanding and historical. But even if the Age Provision were within the Second Amendment's scope, it would pass intermediate scrutiny. Far from the "firearms ban" that Plaintiffs mischaracterize it as, the Age Provision is a narrow

---

[1] Declaration of R. July Simpson ("Simpson Decl."), Ex. A at 2 (I-1639 § 1, approved Nov. 6, 2018).

[2] The terms "handgun" and "pistol" are often used interchangeably. Pistols are commonly understood to be a subset of handguns, but Washington law defines "pistol" more broadly as "any firearm with a barrel less than sixteen inches in length, or is designed to be held and fired by the use of a single hand." RCW 9.41.010(23). *Cf.* 18 U.S.C. § 921(a) (defining "handgun" as "(A) a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and (B) any combination of parts from which a firearm described in subparagraph (A) can be assembled"). Defendants use the term "handgun" herein unless in reference to Washington law.

DEFS.' CROSS-MSJ AND OPP. TO PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

1

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

restriction that applies only to sales to 18- to 20-year-olds and only to one type of firearm. Eighteen- to twenty-year-olds may still possess multiple firearms, including SARs, for self-defense in their homes, property, and places of business, as well as for hunting, target shooting, and various other lawful purposes. The law does not burden core Second Amendment rights.

Second, the Age Provision reasonably fits with Washington's substantial interest in reducing gun violence and promoting public safety. The structures of the human brain that govern impulsivity and judgment do not fully mature until well after age 20. And older adolescents (*i.e.*, those 18 to 20 years of age) disproportionately commit violent crimes. Like the corresponding federal age restriction on handguns, I-1639's Age Provision is constitutional.

Third, the Nonresident Sales Provision does not violate the dormant Commerce Clause because it does not advance economic protectionism. Rather, the provision promotes public safety by ensuring that sales of SARs comply with Washington's enhanced background check requirements, which cannot adequately be conducted on nonresidents. Alternative channels for nonresident purchases of SARs, such as through licensed dealers, remain open. The law therefore does not discriminate under the Commerce Clause and satisfies the *Pike* balancing test. Further, Congress has authorized states to prohibit sales of firearms to nonresidents, precluding any claim against the Nonresident Sales Provision under the dormant Commerce Clause.

Finally, several of Plaintiffs' claims are not justiciable, either because Plaintiffs lack standing or their claims are moot.

Gun violence is a scourge in our society. The people of Washington acted within constitutional bounds when they decided to regulate sales of SARs in the same ways that long have been in place for handguns. The voters' action is constitutional under the U.S. Supreme Court's and this Circuit's clear precedents. Defendants and Intervenor-Defendant (collectively, "Defendants") are therefore entitled to summary judgment as a matter of law.

DEFS.' CROSS-MSJ AND OPP. TO PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

2

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

## II.     FACTS IN SUPPORT OF MOTION

### A.     Gun Violence, Including Mass Shootings, Significantly Impacts Public Safety in Washington and the United States

Every year, "approximately 111,000 Americans are shot and 33,800 die as a result of [firearm] injuries, which equates to 93 deaths caused by firearms every day."[3] Since December 2012, when a gunman shot and killed 20 young children at Sandy Hook Elementary School, more than 2,700 Americans have been killed and over 10,000 injured in mass shootings alone.[4]

Mass shootings in particular—many committed by older adolescents using SARs— wreak havoc on communities.[5] In 2016, a 19-year-old sat in his car in Mukilteo, Washington, to study the owner's manual for a newly purchased AR-15-style SAR before entering a party, opening fire, and killing multiple people.[6] Likewise, the 2016 shooter in Burlington, Washington, was 20 years old and used a Ruger 10/22 SAR to kill five people at a Macy's.[7] The same is true for some of our nation's most horrific mass shootings, such as Sandy Hook (shooter age 20 used a SAR)[8] and Parkland (shooter age 19 used a SAR).[9]

---

[3] Simpson Decl., Ex. B at 853 (Peter M. Rhee et al., *Gunshot Wounds: A Review of Ballistics, Bullets, Weapons, and Myths*, 80 J. Trauma & Acute Care Surgery 853 (2016)). The articles, government reports, scholarly literature and related materials cited herein constitute "legislative facts" supporting Washington voters' decision to adopt I-1639. *See, e.g., Prete v. Bradbury*, 438 F.3d 949, 969 (9th Cir. 2006) (citing *Ecumenical Ministries v. State Lottery Comm'n*, 871 P.2d 106, 111 n.8 (Or. 1994) for the proposition that "[i]n considering the history of a constitutional provision adopted through the initiative process, [courts] examine[ ], as legislative facts, other sources of information that were available to the voters at the time the measure was adopted and that disclose the public's understanding of the measure . . . .); *see also Nat'l Rifle Ass'n v. Bur. of Alcohol, Tobacco, Firearms & Explosives* (*NRA*), 700 F.3d 185, 207–11 (5th Cir. 2012) (relying on legislative facts in upholding firearm restriction); *Horsley v. Trame*, 808 F.3d 1126, 1133–34 (7th Cir. 2015) (same); *see generally Penn Advert. of Baltimore, Inc. v. Mayor & City Council of Baltimore*, 63 F.3d 1318, 1323 (4th Cir. 1995), *cert. granted, judgment vacated on other grounds sub nom. Penn Advert. of Baltimore, Inc. v. Schmoke*, 518 U.S. 1030 (1996), and *adopted as modified*, 101 F.3d 332 (4th Cir. 1996) (government may defend law "by pointing to legislative facts, studies, history, or common sense").

[4] Simpson Decl., Ex. C (German Lopez and Kavya Sukumar, *After Sandy Hook, we said never again. And then we let 2,408 mass shootings happen*, Vox, Mar. 27, 2020).

[5] Simpson Decl., Ex. A at 1 (I-1639 § 1), Ex. D (Mass Killings Table).

[6] Declaration of Paul Kramer ("Kramer Decl.") ¶¶ 4, 17; Simpson Decl., Ex. E (Sara Jean Green, *Shooting suspect jealous over ex, bought rifle a week ago, police say*, Seattle Times, Aug. 2, 2016).

[7] Simpson Decl., Ex. D at 2 (Mass Killings Table), Ex. F at YY (Rick Anderson, *Stroke of luck and gun laws kept Washington state mall shooting from being much worse, police say*, Dec. 15, 2016).

[8] Simpson Decl., Ex. G (State's Att'y Rep. on the Shootings at Sandy Hook Elem. Sch., Nov. 25, 2013).

[9] Declaration of April Schentrup ("Schentrup Decl.") ¶ 4; Simpson Decl., Ex. H (Marjory Stoneman Douglas High Sch. Public Safety Comm'n, Initial Report at 231, 262–63, Jan. 2, 2019).

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

3

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Mass shooters often favor SARs and other high-capacity firearms.[10] As explained by Defendants' law enforcement expert Mark Jones—a former special agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives—"mass shootings . . . are demonstrably more lethal when the assailant uses a [SAR] than when other firearms are used."[11] In each of the five deadliest mass shootings in the United States between 2009 and 2018, the assailant used a SAR.[12] It is no mystery why: in general, SARs are easy to use and fire more rapidly than handguns and non-semiautomatic firearms (and often at approximately four times the muzzle velocity).[13] Anyone can quickly shoot a fusillade of bullets, maximizing lethality.[14]

The young age of these mass shooters matches statistical evidence showing disproportionate participation in criminal activity by older adolescents. Arrests for violent crimes peak from ages 17 to 20.[15] While people age 18 to 20 make up only 4.4% of the population, they account for 20% of homicide and manslaughter arrests.[16] One reason older adolescents disproportionately commit gun violence is because they often lack the adult ability to "govern impulsivity, judgment, planning for the future, [and] foresight of consequences."[17] As Defendants' unrebutted neuroscience expert Dr. Elizabeth Aylward explains, "brain development, both structural and functional, lasts well into adulthood, and the regions that are the last to mature are those associated with executive control."[18] Dr. Sara Johnson, Defendants'

---

[10] *See* Declaration of Fred Rivara ("Rivara Decl."), Ex. A at 3–4 (Rivara Rep.); Simpson Decl., Ex. I at 319 (Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, 95 J. Urb. Health 313 (Oct. 2017)).

[11] Jones Decl., Ex. A (Jones Rep. at 10–11).

[12] *Id.*

[13] *Id.*; Simpson Decl., Ex. J (Casey Dep. 77:15–18), Ex. K (Ball Dep. 59:17–25; 132:14–25; 133:23–134:15, Ex. B at 859 (Rhee et al., *Gunshot Wounds*, 80 J. Trauma & Acute Care Surgery 853 (2016)).

[14] Declaration of Mark Jones ("Jones Decl."), Ex. A at 11 (Jones Rep.).

[15] Declaration of Sara Johnson ("S. Johnson Decl."), Ex. A at 10 (Johnson Rep.); Simpson Decl., Ex. L (U.S. Department of Justice, 2018 Crime in the United States, Arrests, by Age, Tbl. 38, https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/tables/table-38).

[16] *Id.*; Simpson Decl., Ex. M at 1 (U.S. Census Bur., 2010–2018 Annual Estimates of U.S. Population by Age, https://www2.census.gov/programs-surveys/popest/tables/2010-2018/national/asrh/PEPALL6N.pdf).

[17] Simpson Decl., Ex. N (Adam Ortiz, *Adolescence, Brain Development, and Legal Culpability*, Am. Bar. Ass'n, Juvenile Justice Ctr., at 2 (Jan. 2004)); *see also id.*, Ex. A at 2 (I-1639 § 1) ("[S]tudies show that eighteen to twenty year olds commit a disproportionate number of firearms homicides in the United States and research indicates that the brain does not fully mature until a later age.").

[18] Declaration of Elizabeth Aylward ("Aylward Decl."), Ex. A at 9 (Aylward Rep.).

DEFS.' CROSS-MSJ AND OPP. TO PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

4

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

unrebutted developmental psychology expert, agrees, describing older adolescence as a period of "developmental vulnerability" when individuals are still "maturing in important ways, psychologically, cognitive, and neurologically."[19]

Mass shootings are a significant public safety concern in and of themselves. But they represent only a fraction of the gun violence in our society. In general, gun violence presents an extraordinary public health problem.[20] This is true not only because of the direct fatalities and physical injuries suffered, but also because of the mental health problems and trauma that survivors and the community experience after the shooting is over.[21] April Schentrup, whose 16-year-old daughter Carmen was shot four times with a SAR—including a fatal shot to the back of the head as she tried to hide in a "safe corner" of her classroom during the Parkland, Florida, mass shooting—describes defining her life as "before and after Carmen's death."[22] Understandably, she notes that "[w]ords are not enough to express how my and my family's lives have been devastated by this act of gun violence."[23] It took the Parkland shooter only about two minutes to kill or injure 24 students and staff on the level of Carmen's school where she was shot before the shooter moved on to other areas of the building.[24] Similarly, Paul Kramer, whose son Will was shot in the Mukilteo shooting, describes the experience as a "nightmare" that left the community to "live with grief and fear."[25] Kramer sponsored I-1639 so that no other family has "to go through the same type of tragedy that mine has."[26]

---

[19] S. Johnson Decl., Ex. A at 12 (Johnson Rep.).
[20] Rivara Decl., Ex. A at 2–3 (Rivara Rep.).
[21] *Id*. at 7–8.
[22] Schentrup Decl. ¶ 35.
[23] *Id*. ¶ 39.
[24] *Id*. ¶ 33.
[25] Kramer Decl. ¶ 23.
[26] *Id*. ¶ 23.

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

5

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**B.     I-1639 is Designed to Reduce Gun Violence and Increase Public Safety by Extending Federal and State Laws that Apply to Handguns to SARs**

In 2018, Washington voters decided "[e]nough is enough" when it comes to the problem of gun violence.[27] The people of Washington adopted I-1639, with over 59% of voters supporting the measure, to "increase public safety and reduce gun violence."[28] Given the prominent use of SARs in mass shootings, I-1639 is primarily directed at regulating that type of firearm. The Initiative defines a SAR as "any rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge."[29] I-1639's "common sense" approach was to "require[] the same standards for purchasing semi-automatic assault rifles that are already required for handguns."[30] The Initiative does so in three respects.

**1.     The Age Provision**

First, I-1639's Age Provision extends longstanding federal and state restrictions on the sale and possession of handguns to persons under 21 to SARs. The Gun Control Act of 1968, Pub. L. 90-618, 82 Stat. 1213 (codified as amended at 18 U.S.C. §§ 921 *et seq.*) (the "GCA"), comprehensively regulates interstate and foreign commerce in firearms, imposing strict licensing

---

[27] Simpson Decl., Ex. A at 2 (I-1639 § 1).

[28] *Id.*; Simpson Decl., Ex. O (Nov. 6, 2018 General Election Results: Initiative Measure No. 1639).

[29] Simpson Decl., Ex. A at 27 (I-1639 § 16(25), codified at RCW 9.41.010(27)); *id.* (I-1639 § 1) (SARs "are specifically designed to kill quickly and efficiently and have been used in some of the country's deadliest mass shootings"). A SAR "does not include antique firearms, any firearm that has been made permanently inoperable, or any firearm that is manually operated by bolt, pump, lever, or slide action." *Id.* at 27–28 (codified at RCW 9.41.010(27)). The definition focuses on the semiautomatic action of the rifle rather than a military features test or a list of firearm models. Gun manufacturers regularly and routinely work to design new firearms that "comply with the law [regulating features] while still offering consumers a similar product with all the same accessories." Simpson Decl., Ex. P (J. White, *When Lawmakers Try to Ban Assault Weapons, Gunmakers Adapt*, N.Y. Times, July 31, 2019). Plaintiffs' objections to the use of the word "assault" in the term is an irrelevant aside. *See* Plaintiffs' Motion for Summary Judgment, Dkt. 76, at 9–10. The word "assault" is not part of this legal challenge. Further, Plaintiffs' extensive quotation of the opinion of the Violence Policy Center in an attempt to (without citation) suggest the state acted improperly in adopting I-1639 is misleading. *Id.* The Violence Policy Center had nothing to do with I-1639's creation or passage, nor is it a party to this lawsuit.

[30] Simpson Decl., Ex. Q at 26 (2018 General Election Voters' Pamphlet, Wash. Sec'y of State). Although not challenged here, I-1639 also requires firearms safety training and a waiting period prior to purchasing a SAR, *id.* Ex. A at 9 (I-1639 § 4, codified at RCW 9.41.092), and provides criminal penalties if a firearm is stored unsafely and is obtained by a person who cannot legally possess it, *id.* at 10 (I-1639 § 5, codified at RCW 9.41.360).

---

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

6

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

requirements.[31] The GCA prohibits a federal firearms licensee ("FFL") from selling a handgun to anyone under the age of 21. *Id.* § 102, 82 Stat. at 1218 (codified as amended at 18 U.S.C. § 922(b)(1)). Since 1994, Washington State law has prohibited 18- to 20-year-olds from possessing pistols, except in their home or in a variety of other enumerated situations. 1994 Wash. 1st Spec. Sess. Laws, ch. 7, § 423 (codified as amended at RCW 9.41.240).

Under I-1639's Age Provision, the minimum age requirements for purchase of SARs and pistols are identical: a person under 21 "may not purchase a pistol or semiautomatic assault rifle." RCW 9.41.240(1). Likewise, I-1639 limits possession of SARs by 18- to 20-year-olds in parallel circumstances to those long in place for pistols. RCW 9.41.240(3). Despite Plaintiffs' false characterization of I-1639 as a "blanket ban," Dkt. 76 at 14, the Age Provision does not preclude 18- to 20-year-olds from accessing SARs. Its exceptions permit 18- to 20-year-olds to possess SARs in a variety of situations, including: (1) in their home or business; (2) on real property they control; (3) at competitions or shooting ranges; (4) hunting; (5) anywhere shooting is legal; (6) while on duty in the armed forces; or (7) traveling to or from a place they may legally possess such weapons. RCW 9.41.240(2), 9.41.042, 9.41.060. Further, 18- to 20-year-olds may still legally buy shotguns and non-semiautomatic rifles for any and all legal purposes. *See* RCW 9.41.010(27); 18 U.S.C. § 922(b)(1). Plaintiffs concede that those firearms are suitable for self-defense.[32]

## 2. The Background Check Provision

Second, I-1639's Background Check Provision requires local law enforcement agencies to conduct the same enhanced background checks on prospective purchasers of SARs that they long have performed for pistols. RCW 9.41.090(2)(b).

Basic background check requirements apply to most firearm sales. Federal law requires FFLs to conduct background checks on potential firearm purchasers. 18 U.S.C. § 922(s). It also requires the FBI to maintain the National Instant Criminal Background Check System ("NICS"),

---

[31] The GCA is today used to refer to the statutes codified at 18 U.S.C. §§ 921–27, app. §§ 1201–03 (1985), originally two separate 1968 enactments.

[32] Simpson Decl., Ex. R (Mitchell Dep. 110:5–6, 168:17–25); Ex. S (Casey Dep. Ex. 95); Ex. T (Wald Dep. 71:22–72:2).

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

7

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

a centralized catalog of records comprising three separate national databases. 18 U.S.C. § 922 note. States' participation in NICS is voluntary, and the quantity and quality of records shared with NICS varies widely across states.[33] By one count, "at least 25% of felony convictions" in the United States "are not available" in NICS.[34]

By default, an FFL will contact the FBI's NICS Section when performing a potential firearm transaction. 18 U.S.C. § 922(t). States may also designate a law enforcement agency "point of contact" to initiate the NICS check and to search any other state and local databases required under state law. *See* 28 C.F.R. §§ 25.1–.2, 25.6(d).[35]

Washington is a "partial" point-of-contact state.[36] Before I-1639, FFLs contacted the FBI for NICS checks on sales of all firearms except pistols.[37] For pistols, Washington law enforcement agencies conduct "enhanced background checks." In such a check, law enforcement queries not only the NICS databases to determine a purchaser's eligibility, but also various state and local databases, including: (1) the Washington Crime Information Center (which may disclose state arrest warrants not in the NICS databases); (2) the DOL Firearms System (which reflects whether the purchaser has a concealed pistol license and whether it has been revoked); (3) Washington court databases; (4) the Department of Corrections database; (5) local records management systems; and (6) the Washington Health Care Authority's mental health records.[38] It is undisputed that the enhanced background check is more comprehensive than a NICS check alone.[39] This helps prevent ineligible purchasers from falling through the cracks. I-1639 now requires local law enforcement to conduct enhanced background checks for SARs as well.[40]

---

[33] Declaration of Kateri Candee ("Candee Decl.") ¶ 8; Declaration of Brandi Belcher ("Belcher Decl.") ¶ 6; Declaration of Terri Johnson ("T. Johnson Decl.") ¶ 6; *see also City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 427 (4th Cir. 2019) ("states are not required to perform any functions associated with the Brady Act").

[34] Candee Decl. ¶ 8, Ex. B.

[35] *See* Simpson Decl., Ex. U at 1 (FBI, *About NICS*); Candee Decl. ¶ 10.

[36] Candee Decl. ¶ 11.

[37] *See* RCW 9.41.090(1); Candee Decl. Ex. C at 1 (FBI, NICS Participation Map).

[38] Candee Decl. ¶¶ 14–17.

[39] *See, e.g.*, Simpson Decl., Ex. R (Mitchell Dep. 119:18-120:16), Ex. V (Knezovich Dep. 107:25–108:3); Belcher Decl. ¶¶ 6–7; Candee Decl. ¶¶ 15–18; T. Johnson Decl. ¶¶ 6–7.

[40] Simpson Decl., Ex. A at 4 (I-1639 § 3) (codified at RCW 9.41.090(2)).

DEFS.' CROSS-MSJ AND OPP. TO PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

8

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

### 3. The Nonresident Sales Provision

Third, federal law has long prohibited in-person handgun sales to nonresidents of a state. I-1639 mirrors that requirement for SARs. Under the GCA, it is unlawful for anyone to sell a handgun in person to a nonresident. 18 U.S.C. § 922(a)(5)(A), (b)(3). All interstate transfers of firearms must take place through an FFL, *id.* § 922(a)(1)–(5), and only FFLs may "engage in the business of . . . dealing in firearms" (interstate or otherwise), *id.* § 922(a)(1)(A); *see United States v. Redus*, 469 F.2d 185, 187 (9th Cir. 1972). To buy a handgun from an out-of-state FFL, a nonresident may arrange for its delivery to an in-state FFL, from whom the buyer may retrieve the gun. 18 U.S.C. § 922(b).[41] This process is known as "FFL-to-FFL transfer." To purchase a rifle or shotgun from an out-of-state FFL, the buyer may do so in person—provided that the sale "compl[ies] with the legal conditions of sale in both such States." *Id.* § 922(b)(3).

Shortly after the GCA's enactment, Washington legalized the in-person sale of rifles and shotguns to nonresidents. 1970 Wash. Sess. Laws, ch. 74, § 2 (originally codified at RCW 19.70.020, codified as amended at RCW 9.41.124). In I-1639, Washington narrowed the scope of that permission by removing SARs from the category of "rifles and shotguns" that legally may be purchased in person by nonresidents. RCW 9.41.124. The effect of this provision is that SARs are treated the same as handguns: they may not be purchased by nonresidents in person. But just as for handguns, a nonresident may still purchase a SAR through an FFL-to-FFL transfer.[42]

The Nonresident Sales Provision is a logical corollary to the Background Check Provision. Because enhanced background checks query an array of state and local databases, it is difficult if not impossible for law enforcement agencies to effectively conduct such checks on nonresidents.[43]

---

[41] *See also* 27 C.F.R. § 478.99(a); *Mance v. Sessions*, 896 F.3d 699, 709 (5th Cir. 2018) (per curiam); Simpson Decl., Exs. W at 203 (*Federal Firearms Regulations Reference Guide*, U.S. Dep't of Justice (2014)), PP at 6 (*Federal Firearms Licensee Quick Reference and Best Practices Guide*, U.S. Dep't of Justice (2010)).

[42] Simpson Decl., Ex. X at 8 ("Initiative 1639: Frequently Asked Questions," Wash. Office of the Att'y Gen.)

[43] Candee Decl. ¶¶ 17–18; Belcher Decl. ¶¶ 8–9; T. Johnson Decl. ¶ 9.

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

9

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

C.    **Plaintiffs Challenge Only the Age Provision and the Nonresident Sales Provision**

Plaintiffs were political opponents of I-1639. Dkt. 22 at 4–6. Plaintiffs Daniel Mitchell and Robin Ball are FFLs in Washington. Plaintiffs Nathaniel Casey, Luke Rettmer, and Matthew Wald were between 18 and 20 years old when I-1639 was enacted. Casey and Rettmer have since turned 21.[44] Each older adolescent plaintiff already owns at least one SAR.[45] Plaintiffs also include two gun rights organizations, the Second Amendment Foundation ("SAF") and the National Rifle Association ("NRA") (together, "the Organizational Plaintiffs"), which organized and are directly funding this lawsuit.[46]

Plaintiffs challenge two specific provisions of I-1639. First, all Plaintiffs allege that the Age Provision violates the Second Amendment. Dkt. 17 ¶¶ 117–19. Second, Mitchell alleges that the Nonresident Sales Provision violates the dormant Commerce Clause. *Id*. ¶ 120.

### III.    ARGUMENT

A.    **Standard of Review**

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the opposing party must then set forth specific facts showing a genuine issue for trial in order to defeat the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). If the nonmoving party fails to make this showing, "Rule 56(c) mandates the entry of summary judgment." *Id.* at 322.

B.    **The Age Provision's Restriction on Sales Does Not Violate the Second Amendment**

1.    **The Second Amendment framework**

In *District of Columbia v. Heller*, 554 U.S. 570, 573–74 (2008), the Supreme Court struck down under the Second Amendment a city's "total ban" on the "possession of usable handguns

---

[44] Simpson Decl., Ex. J (Casey Dep. 64:12–18), Ex. Y (Rettmer Dep. 9:18–19). Armen Tooloee, originally a plaintiff in this lawsuit, was voluntarily dismissed as a party last month. Dkt. 75.

[45] Simpson Decl., Ex. Z at ¶¶ 24, 33 (*Mitchell I* Compl.), Ex. Y (Rettmer Dep. 13: 5–19), Ex. T (Wald Dep. 21:1–15), Ex. J (Casey Dep. 28:11–29:5).

[46] *Id.*, Ex. R (Mitchell Dep. 135:4–136:1), Ex. AA (Mitchell Dep. Ex. 8), Ex. Y (Rettmer Dep. at 16:25–17:6).

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

10

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

in the home." In the wake of *Heller*, nearly every circuit (including the Ninth) has adopted a two-part test for Second Amendment claims. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo* (*Cuomo*), 804 F.3d 242, 254 (2d Cir. 2015); *see, e.g.*, *Fyock v. Sunnyvale*, 779 F.3d 991, 996 (9th. Cir. 2015). The court first "'asks whether the challenged law burdens conduct protected by the Second Amendment.'" *Fyock*, 779 F.3d at 996 (quoting *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013)). If the law does not burden protected conduct, "the inquiry is complete" and the law "passes constitutional muster" without further analysis. *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (en banc) (internal quotation marks and citations omitted). If there is a burden, the court proceeds to step two, asking "what level of scrutiny should be applied" and evaluating the law in question. *Fyock*, 779 F.3d at 996. Plaintiffs fail to engage in substantive analysis of this inquiry in their Motion. But a straightforward application of the test demonstrates that the Age Provision does not violate the Second Amendment.

### 2. The Age Provision does not burden Second Amendment rights

The first step of the Second Amendment test requires the court to consider whether the challenged law burdens protected conduct, because not every firearm regulation does.

### a. "Longstanding" firearm laws fall outside the Second Amendment

The Supreme Court has set forth a non-"exhaustive" list of "presumptively lawful [firearm] regulatory measures," *Heller*, 554 U.S. at 627 & n.26, that "are outside the ambit of the [Second] [A]mendment," *United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010). Those exceptions include "laws imposing conditions and qualifications on the commercial sale of arms" and certain "longstanding prohibitions on the possession of firearms." *Heller*, 554 U.S. at 626–27 & n.26. The Supreme Court later "repeat[ed] those assurances" and reiterated that *Heller* had invalidated a broad ban on handgun possession in the home while simultaneously "recogniz[ing] that the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (quoting *Heller*, 554 U.S. at 626). To determine whether a

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

11

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

law is so historically rooted as to fall outside the scope of the Second Amendment, courts assess "a variety of legal and other sources to determine the public understanding of [the] legal text in the period after its enactment or ratification." *Heller*, 554 U.S. at 600. Under this analysis, the Age Provision does not burden Second Amendment conduct and must be upheld.

### b.   Minimum age laws for firearms are historically longstanding

Plaintiffs' repetitive denunciation of the Age Provision as a "ban" ignores its fundamental feature: it applies only to 18- to 20-year-olds. Thus, the question is not whether a type of firearm falls within the Second Amendment's protection. Rather, it is whether sales of such firearms to 18- to 20-year-olds fall within the Second Amendment's protection. They do not. Laws restricting sales to this age group have been widespread since the 19th century. Plaintiffs' singular focus on the alleged "overwhelmingly common and popular" use of SARs, Dkt. 76 at 15—which they fail to support with any actual evidence—is irrelevant to the inquiry.[47]

### i.   The age of majority was 21 until the 1970s

For most of our country's history, 18- to 20-year-olds were considered minors or "infants" without the full legal rights of adulthood. At common law and at the time of the adoption of the Constitution, the age of majority was 21 years. *See, e.g.*, 1 William Blackstone, *Commentaries* *463 ("So that full age in male or female, is twenty one years . . . , who till that time is an infant, and so styled in law.");[48] *Infant*, *Black's Law Dictionary* 847 (9th ed. 2009) ("An infant in the eyes of the law is a person under the age of twenty-one years, and at that period . . . he or she is said to attain majority . . . .") (quoting John Indermaur, *Principles of the*

---

[47] The only direct evidence in the record probative of SARs' popularity indicates that Washingtonians purchase just one-tenth as many SARs as pistols. *See* Declaration of Jennifer Richards ("Richards Decl."), Ex. B (DOL data comparing SAR sales to pistol sales). And Plaintiffs cite no evidence whatsoever as to the popularity of SARs among 18- to 20-year olds. Regardless, even if it were true that SARs are "the second most popular choice" of firearm, Dkt. 76 at 18, Plaintiffs never explain how prohibiting sales of SARs to 18- to 20-year-olds could be unconstitutional when the parallel federal age prohibition on sales of handguns—the *most* common and popular firearm and "the quintessential self-defense weapon," *Heller*, 554 U.S. at 629—has uniformly withstood Second Amendment challenges. *See NRA*, 700 F.3d at 188; *Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 417 F. Supp. 3d 747, 755–56 (W.D. Va. 2019). A fortiori, I-1639's Age Provision is constitutional, too.

[48] Blackstone "constituted the preeminent authority on English law for the founding generation." *Heller*, 554 U.S. at 593–94 (citation and quotation marks omitted).

DEFS.' CROSS-MSJ AND OPP. TO PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

12

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

*Common Law* 195 (Edmund H. Bennett ed., 1st Am. ed. 1878)). In fact, before ratification of the 26th Amendment in 1971, states rarely permitted individuals under 21 to vote. *See, e.g.*, *Oregon v. Mitchell*, 400 U.S. 112, 130–31 (1970) (lead opinion of Black, J.) (upholding provision of Voting Rights Act Amendments of 1970 lowering voting age to 18 in federal elections but invalidating provision doing same for state and local elections); *id.* at 213 n.90 (Harlan, J., concurring in part and dissenting in part) (noting that at the time only four states set the voting age below 21). It was not until the 1970s that states lowered the age of majority to 18. *NRA*, 700 F.3d at 201; Larry D. Barnett, *The Roots of Law,* 15 Am. U.J. Gender Soc. Pol'y & L. 613, 681–86 app. (2007).

### ii.      Laws have restricted under-21 firearm sales since the 1800s

Against this historical backdrop, it is unsurprising that laws prohibiting those under 21 from purchasing firearms are longstanding. In the 19th century, 19 states and the District of Columbia enacted laws expressly restricting the ability of individuals under 21 to purchase or use particular firearms in jurisdictions where the age of majority was set at 21. *See, e.g.*, *NRA*, 700 F.3d at 202.[49] By the early twentieth century, three more states had restricted the purchase or use of particular firearms by persons under 21. *Id.* Thus by 1923, over half the states then in the union had set 21 as the minimum age for purchase or use of particular firearms. *Id.*[50]

This long-held tradition of restricting certain firearm rights of 18- to 20-year-olds continues today. Since 1968, federal law has prohibited FFLs from selling handguns to persons under 21. 18 U.S.C. § 922(b)(1). Currently, 17 states and the District of Columbia have parallel

---

[49] *See also* Simpson Decl., Ex. BB (Table of 19th Cent. Firearms Statutes).

[50] Such age restrictions were regarded as constitutional by "19th-century cases" and "legal scholar[s]." *Heller*, 554 U.S. at 610, 616. *See, e.g.*, *State v. Callicutt*, 69 Tenn. 714, 716-17 (1878) ("[W]e regard the acts to prevent the sale, gift, or loan of a pistol or other like dangerous weapon to a minor, not only constitutional as tending to prevent crime but wise and salutary in all its provisions."); *Coleman v. State*, 32 Ala. 581, 582 (1858) (upholding conviction under statute making it a misdemeanor to "sell, or give, or lend, to any male minor" a handgun). Those decisions cohere with the views of Judge Thomas Cooley, whose authority *Heller* recognized, *see* 554 U.S. at 616–17, and who wrote that 'the State may prohibit the sale of arms to minors' pursuant to the State's police power." *NRA*, 700 F.3d at 203 (quoting Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883)).

---

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

13

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  or more exacting laws prohibiting those under 21 from purchasing or possessing handguns.[51]

2  And five states also prohibit the sale of *all* long guns—not just SARs—to individuals under 21.

3  *Id.*[52] Contrary to Plaintiffs' erroneous assertion that the Age Provision is the "most expansive

4  firearms ban anywhere in the nation," Dkt. 76 at 1, prohibiting SAR sales to 18- to 20-year-olds

5  comports with these longstanding laws.

   **iii.**  **An emerging consensus among the courts is that firearm minimum age restrictions fall outside the Second Amendment**

8    Based on this historical evidence, several courts have concluded that firearms age

9  restrictions, particularly those for people under 21, fall outside the Second Amendment's ambit.

10  In *NRA*, 700 F.3d at 211, the Fifth Circuit rejected a Second Amendment challenge to the federal

11  prohibition on the sale of handguns by FFLs to those under 21, 18 U.S.C. § 922(b)(1). The Fifth

12  Circuit concluded that the federal age restriction was "consistent with a longstanding, historical

13  tradition, which suggests that the conduct at issue falls outside the Second Amendment's

14  protection." *Id.* at 203. A year later the same court upheld a Texas law prohibiting persons under

15  21 from receiving a license to carry concealed pistols, concluding that the age restriction "likely

16  'falls outside the Second Amendment's protection.'" *NRA v. McCraw*, 719 F.3d 338, 347 (5th

17  Cir. 2013) (quoting *NRA*, 700 F.3d at 203). In both cases, although the Fifth Circuit was "inclined

18  to uphold the challenged federal laws at step one of our analytical framework, in an abundance

19  of caution" it "proceed[ed] to step two" and upheld the minimum age restriction under

20  intermediate scrutiny. *NRA*, 700 F.3d at 204; *McCraw*, 719 F.3d at 347.

---

[51] Cal. Penal Code § 27505(a); Conn. Gen. Stat. § 29-34(b); Del. Code Ann. tit. 24, § 903; D.C. Code Ann. § 22-4507; Fla. Stat. § 790.065(13); Haw. Rev. Stat. Ann. § 134-2(a), (d); 430 Ill. Comp. Stat. 65/3a, 65/4(a)(2)(i-5); Iowa Code § 724.22(2); Md. Code Ann., Pub. Safety § 5-134(d); Mass. Gen. Laws ch. 140, §§ 130, 131E(a); Neb. Rev. Stat. §§ 69-2403, 69-2404; N.J. Stat. Ann. §§ 2C:58-3.3c, 2C:58-6.1(a), 2C:58-3c(4); N.Y. Penal Law § 400.00(1)(a), N.Y. Penal Law § 400.00(12); Ohio Rev. Code Ann. § 2923.21(B); R.I. Gen. Laws §§ 11-47-35(a)(1), R.I. Gen. Laws § 11-47-37; Vt. Stat. Ann. tit. 13, § 4020; RCW 9.41.240; Wyo. Stat. Ann. § 6-8-404(d)(i)(A). All those states, with the exception of Maryland, extend the federal minimum age requirement for handguns sold by FFLs to private sales as well.

[52] *See* Cal. Penal Code § 27510(a) (21 to purchase a long gun with some exceptions); Fla. Stat. § 790.065(13) (21 to purchase any firearm); Haw. Rev. Stat. Ann. § 134-2(a), (d) (21 to purchase long guns); 430 Ill. Comp. Stat. 65/3a, 65/4 (21 to purchase long guns) and 43.430 Ill. Comp. Stat. 65/2(a)(1), 65/4 (21 to possess a long gun); Vt. Stat. Ann. tit. 13, § 4020 (21 to purchase a long gun unless in possession of a hunter safety certificate).

DEFS.' CROSS-MSJ AND OPP. TO PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

14

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    At least three other courts have held that firearms restrictions applicable to persons under

2    21 fall outside the scope of the Second Amendment. *See, e.g.*, *Hirschfeld*, 417 F. Supp. 3d at

3    755–56 (rejecting challenge to federal prohibition on sale by FFLs of handguns and ammunition

4    to those under 21 because law "reflect[s] 'longstanding' prohibitions on the use or possession of

5    handguns by those under a given age" that "have been in place and upheld by courts since the

6    nineteenth century" and thus "do not implicate Second Amendment rights"); *Powell v.*

7    *Tompkins*, 926 F. Supp. 2d 367, 387–88 (D. Mass. 2013), *aff'd*, 783 F.3d 332 (1st Cir. 2015)

8    (state law prohibiting those under 21 from receiving concealed carry licenses "comports with the

9    Second Amendment" because such "[a]ge-based restrictions . . . are among those lawful,"

10   "access-limiting conditions" and "impose[] no burden on the rights of eighteen- to twenty-year-

11   olds to keep and bear arms"); *People v. Mosley*, 33 N.E.3d 137, 155 (Ill. 2015) (state convictions

12   for aggravated unlawful use of a weapon by defendant under 21 did not regulate conduct within

13   scope of Second Amendment); *see also United States v. Rene E.*, 583 F.3d 8, 16 (1st Cir. 2009)

14   (upholding the federal age restriction on possession of handguns because "the right to keep arms

15   in the founding period did not extend to juveniles"). Defendants are aware of no case—and

16   Plaintiffs provide no authority—holding that an age-based restriction on firearm sales falls

17   within the Second Amendment's scope.[53]

18   The Age Provision does not burden Second Amendment rights. Plaintiffs' challenge to

19   it thus fails at the first step of the inquiry. This Court should grant Defendants summary judgment

20   on the Second Amendment claims on this basis alone.[54]

21

22   [53] As with restrictions on age, restrictions on assault weapons are also longstanding and historical. *See Fyock*,
     779 F.3d at 996 ("longstanding prohibitions" on the possession of certain types of weapons are "traditionally
23   understood to be outside the scope of the Second Amendment"); *Kolbe*, 849 F.3d at 137-38 (holding that law
     banning assault rifles and high capacity magazines was "outside the ambit of the Second Amendment" because it
24   concerned weapons "most useful in military service"); Robert J. Spitzer, *Gun Law History in the United States and
     Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 56, 70 tbl. 2 (2017) ("[A]t least seven, and as many as
25   ten, state laws specifically restricted semi-automatic weapons" from the early 1900s to the present).
     [54] The Age Provision falls outside the Second Amendment because it simply "impos[es] conditions and
26   qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626–27; *see also Hirschfeld*, 417 F. Supp. 3d at
     756 (federal age restriction for handguns is "among the . . . conditions and qualifications on the commercial sale of
     arms," which the Supreme Court in *Heller* did not 'cast doubt' on") (quoting *Heller*, 554 U.S. at 626–27).

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106                                15                    ATTORNEY GENERAL OF WASHINGTON
                                                                                     800 5th Ave. Suite 2000
                                                                                     Seattle, WA 98104-3188
                                                                                         (206) 464-7744

### 3.      Regardless, the Age Provision withstands constitutional scrutiny

Even if Plaintiffs' challenge implicated the Second Amendment (which it does not), their claim would still fail because I-1639's Age Provision withstands intermediate scrutiny.

### a.      Intermediate scrutiny applies because the Age Provision does not severely burden a core Second Amendment right

If a law burdens protected conduct, the court next determines whether to apply intermediate or strict scrutiny. The level of scrutiny depends on two factors: "(1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on the right." *Chovan*, 735 F.3d at 1138 (internal quotation marks omitted). Strict scrutiny applies only to a law that (1) "implicates the core of the Second Amendment right" (namely, the right to defend one's home), and (2) "severely burdens that right." *Pena v. Lindley*, 898 F.3d 969, 977 (9th Cir. 2018) (quoting *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016)). Intermediate scrutiny applies if the law either does not implicate the core Second Amendment right *or* does not place a severe burden on that right. *Id.* (quoting *Fyock*, 779 F.3d at 998–99). Where a law carves out exceptions to its regulation of the core Second Amendment right, it may alleviate the impact so as to render any burden insubstantial. *Chovan*, 735 F.3d at 1138.

There "has been 'near unanimity in the post-*Heller* case law that, when considering regulations that fall within the scope of the Second Amendment, intermediate scrutiny is appropriate.'" *United States v. Torres*, 911 F.3d 1253, 1262 (9th Cir. 2019) (quoting *Silvester*, 843 F.3d at 823).

### i.      The Age Provision does not burden the "core right" of "responsible individuals" to defend themselves in the home

The "core right" of the Second Amendment is that of "responsible" individuals to possess firearms for self-defense in the home. *Heller*, 554 U.S. at 630; *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 961 (9th Cir. 2014). The Age Provision does not burden this right.

First, the Age Provision places no limits on the ability of 18- to 20-year-olds to purchase long guns that are not semiautomatic—including shotguns, any non-semiautomatic rifles (*e.g.*,

DEFS.' CROSS-MSJ AND OPP. TO PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

16

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  bolt-action rifles, lever-action rifles, pump-action rifles, break-action rifles), or any antique long

2  gun. RCW 9.41.010(26). Plaintiffs acknowledge that such firearms are good—even "ideal"—

3  self-defense options.[55] In fact, in Plaintiff Ball's gun store there are dozens of firearms available

4  for purchase by 18- to 20-year-olds that Ball concedes are appropriate for self-defense.[56]

5      Second, the Age Provision contains multiple exceptions, allowing 18- to 20-year-olds to

6  possess SARs in several places and situations, including in their homes for self-defense. *See*

7  RCW 9.41.240(3)(a), 9.41.042(8); Knezovich Rep. at 6 (noting that I-1639 contains "broad

8  exceptions under RCW 9.41.240, permitting the possession of the same firearms by 18- to 20-

9  year-olds in a wide variety of circumstances").

10     Third, strict scrutiny does not apply because 18- to 20-year-olds have historically not

11 been considered "responsible." This group has not had the same panoply of constitutional or

12 other legal rights as adults, such as to vote, serve on juries, consume alcohol, gamble, or own

13 firearms. *See supra* at 12–14; *see, e.g.*, *NRA*, 700 F.3d at 206 ("restricting the presumptive

14 Second Amendment rights of 18-to-20-year-olds does not violate the central concern of the

15 Second Amendment" which protects "responsible" citizens because "Congress found that

16 persons under 21 tend to be relatively irresponsible and can be prone to violent crime").

17     **ii.    Any burden imposed by the Age Provision is not**
18           **"severe"**

19     Even if the Age Provision did implicate Plaintiffs' core Second Amendment rights,

20 intermediate scrutiny would still apply because any such burden is not "severe." A severe burden

---

21     [55] Simpson Decl., Ex. S (Casey Dep. Ex. 95) (NRA article describing shotguns as "an ideal home-defense
22 tool"); Ex. CC (Foskey Dep. 56:9–25) ("Q. Are shotguns a good option for self-defense? A. Yes."); Ex. V
(Knezovich Dep. 78:13–16) (agreeing that "shotguns are an ideal home-defense tool for many reasons"); Ex. R
23 (Mitchell Dep. 110:2–11) ("A compact shotgun could be very effective in the same . . . scenario [for self-defense
in the home]"); Ex. T (Wald Dep. 71:21–72:2) ("[H]ome defense could be solved by a number of different
24 firearms . . . . I think that in some situations the shotgun might be adequate and some others a rifle might be
adequate, and others it may be a handgun."); *see also id.* Dkt. 78-1 at 4 of 300 (Knezovich Rep.) ("shotguns are
25 preferred for . . . self-protection from animals and criminal threats"). Defendants have moved to exclude the
testimony of Plaintiffs' expert, Sheriff Ozzie Knezovich. Dkt. 77. Although Defendants urge the Court to disregard
Sheriff Knezovich's Report and deposition testimony in their entirety, they include herein relevant citations to each
26 in the event the Court declines to exclude him as an expert.
     [56] Simpson Decl., Ex. K (Ball. Dep. 45:21–46:5, 119:18–120:13).

1    is one that "substantially prevent[s] law-abiding citizens from using firearms to defend

2    themselves in the home." *Jackson*, 746 F.3d at 964.

3         First, the courts of appeals consistently have applied and upheld under intermediate

4    scrutiny laws that restrict access to firearms by discrete groups of individuals, including 18- to

5    20-year-olds. *See, e.g.*, *NRA*, 700 F.3d at 211 (upholding federal prohibition on sale of handguns

6    by FFLs to those under 21); *McCraw*, 719 F.3d at 349 (upholding Texas law restricting ability

7    of 18- to 20-year-olds to carry handguns in public).[57]

8         Second, courts also have applied intermediate scrutiny to laws that leave alternatives for

9    using firearms in self-defense at home are left open. For example, in *Pena*, 898 F.3d at 977, the

10   Ninth Circuit recently applied intermediate scrutiny to a California law requiring new safety

11   technology on all new models of semiautomatic handguns. The *Pena* court rejected the plaintiffs'

12   arguments that they faced a substantial burden because they would be unable to purchase "the

13   majority of Smith & Wesson's handguns, two of Ruger's most popular models, and the fourth

14   generation of Glocks." *Id.* at 978. The *Pena* court explained that "being unable to purchase a

15   subset of semiautomatic weapons, without more, does not significantly burden the right to self-

16   defense in the home." *Id.* Plaintiffs could still purchase those firearms through exceptions in the

17   law and "[t]here [was] no evidence in the record that the hundreds of firearms available for

18   purchase are inadequate for self-defense." *Id.* at 979 (citing *United States v. Decastro*, 682 F.3d

19   160, 168 (2d Cir. 2012) (firearm regulation that preserved alternatives not a substantial burden)).

20        Plaintiffs' argument for strict scrutiny fails for similar reasons. While I-1639 prohibits

21   18- to 20-year-olds from purchasing one specific category of firearm, the law has no impact on

22   their ability to purchase other firearms for self-defense. As in *Pena*, 898 F.3d at 978, Plaintiffs

23   here may purchase firearms "suitable for self-defense—just not the exact gun they want."

24   _____

25   [57] *See also Schrader v. Holder*, 704 F.3d 980, 991 (D.C. Cir. 2013) (upholding federal prohibition on possession
     of firearms by individuals convicted of common law misdemeanor offenses); *United States v. Booker*, 644 F.3d 12,
     24–26 (1st Cir. 2011) (upholding federal prohibition on possession of firearms by domestic violence

26   misdemeanants); *United States v. Reese*, 627 F.3d 792, 804–05 (10th Cir. 2010) (upholding federal prohibition on
     possession of firearms by individuals subject to domestic protective orders).

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106                        18                ATTORNEY GENERAL OF WASHINGTON
                                                                     800 5th Ave. Suite 2000
                                                                     Seattle, WA 98104-3188
                                                                        (206) 464-7744

Moreover, "[a]ny burden on the right is lessened by [a law's] exceptions." *Id.* at 979. I-1639 contains several exceptions, including specifically for possession of SARs in the home. Indeed, each of the three older adolescent Plaintiffs already owns one or more SARs.[58] Under I-1639, they are free to keep these firearms in their homes and use them in self-defense—as well as in many other circumstances, which they all acknowledge.[59]

Finally, any perceived burden is alleviated by the Age Provision's inherently temporary nature. In *NRA*, the Fifth Circuit held that intermediate scrutiny was appropriate in a challenge to a federal law which prohibited FFLs from selling handguns to individuals under 21. *NRA*, 700 F.3d at 209 ("[T]hese laws demand only an 'intermediate' level of scrutiny because they regulate commercial sales through an age qualification with temporary effect. Any 18-to-20-year-old subject to the ban will soon grow up and out of its reach."); *see also Stiles v. Blunt*, 912 F.2d 260, 265 (8th Cir. 1990) ("[I]t is particularly appropriate to apply a deferential standard of review to age requirements affecting young people because such requirements do not result in an absolute prohibition but merely postpone the opportunity to engage in the conduct at issue.").

That is exactly the case here. The "temporary nature" of I-1639's Age Provision "reduces its severity" such that, at most, intermediate scrutiny applies. Since this lawsuit was filed, Plaintiffs Casey and Rettmer turned 21 and are now legally entitled to purchase SARs.[60] So too will Plaintiff Wald, who already owns three SARs (including an AR-15 rifle), when he turns 21 in October of this year.[61]

The Age Provision is not a categorical ban on SARs that triggers strict scrutiny. If any scrutiny applies, it is intermediate scrutiny.

---

[58] Simpson Decl., Ex. T (Wald Dep. 21:1–15, 23:7–15); Ex. J (Casey Dep. 28:11–29:7); Ex. Y (Rettmer Dep. 13:5–8).

[59] Simpson Decl., Ex. J (Casey Dep. 86:15–91:5), Ex. T (Wald Dep. 100:6–101:22), Ex. Y (Rettmer Dep. 26:3–29:17); *see also* RCW 9.41.240, 9.41.042(1)–(9).

[60] Simpson Decl., Ex. Y (Rettmer Dep. 9:18–19), Ex. J (Casey Dep. 64:12–18).

[61] Simpson Decl., Ex. T (Wald Dep. 7:18–25, 21:4–7).

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

19

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   **b.     The Age Provision satisfies intermediate scrutiny**

2      A law meets intermediate scrutiny if (1) the state's objective is significant, substantial,

3   or important; and (2) there is a reasonable fit between the challenged regulation and the objective.

4   *Jackson*, 746 F.3d at 965. The regulation must "promote[] a 'substantial government interest that

5   would be achieved less effectively absent the regulation,'" but need not be the "least restrictive

6   means" of achieving the government's interest. *Fyock*, 779 F.3d at 1000 (quoting *Colacurcio v.*

7   *City of Kent*, 163 F.3d 545, 553 (9th Cir. 1998) (internal quotation marks omitted)).

8      Courts considering a state's interest "do not impose an 'unnecessarily rigid burden of

9   proof,'" and the state is allowed to "rely on any material 'reasonably believed to be relevant' to

10  substantiate its interests in gun safety and crime prevention." *Pena*, 898 F.3d at 979 (quoting

11  *Mahoney v. Sessions*, 871 F.3d 873, 881 (9th Cir. 2017)). When analyzing whether there is a

12  "reasonable fit between the government's stated objective and the regulation," courts consider

13  "the legislative history of the enactment as well as studies in the record or cited in pertinent case

14  law." *Id.* (quoting *Fyock*, 779 F.3d at 1000) (internal citations omitted).

15     Plaintiffs make no meaningful attempt to apply the correct standard for intermediate

16  scrutiny. Their omission demonstrates the law's constitutionality.

17  **i.     I-1639 addresses significant government interests**

18     The people of Washington passed I-1639 to "increase public safety and reduce gun

19  violence."[62] Specifically, the intent of the Initiative was "to increase public safety for all

20  Washingtonians, in particular our children," by "requir[ing] that individuals . . . be at least

21  twenty-one years of age to purchase" SARs.[63] Promoting public safety and preventing violent

22  crime are indisputably substantial government interests. *See e.g.*, *Pena*, 898 F.3d at 981–82

23  (noting that "countless cases support" the principle that "public safety and crime prevention are

24  substantial government interests"); *NRA*, 700 F.3d at 209 ("[C]urbing violent crime perpetrated

25  by young persons under 21—by preventing such persons from acquiring handguns from FFLs—

26

---

[62] Simpson Decl., Ex. A at 2 (I-1639 § 1).
[63] *Id.*

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

20

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

constitutes an important government objective."); *Cuomo*, 804 F.3d at 261 ("[S]tates have substantial, indeed compelling, governmental interests in public safety and crime prevention.") (internal citation omitted).[64] Given the epidemic of gun violence, and in particular the use of SARs by mass shooters age 18 to 20, Washington unquestionably has a significant interest in enhancing public safety by reducing the risk and severity of gun violence—an interest that Plaintiffs entirely ignore.

  **ii.**   **Restricting SAR sales to 18- to 20-year olds has a "reasonable fit" with reducing gun violence and increasing public safety**

  The Age Provision reasonably fits with Washington's interest in promoting public safety and reducing gun violence. Scientific research, crime data, and legislative findings all support "the commonsense notion that 18–to–20–year–olds tend to be more impulsive" and likelier to resort to violent crime than older adults. *NRA*, 700 F.3d at 210 n.21. Indeed, the prevalence of 18- to 20-year-olds as mass shooters is sufficient justification itself. Age-based access to SARs is "reasonably suited to achieve" the state's interests. *Silvester*, 843 F.3d at 827.

  **(a)**  **The regions of the brain that govern impulsivity and judgment do not fully mature until the twenties**

  Research shows that 18- to 20-year-olds are developmentally immature compared with older adults, increasing their risk to the community. Canvassing the leading research in neuroscience and developmental psychology, Defendants' two unrebutted scientific experts have found clear "consensus" that various regions of the human brain that govern impulsivity and sensation-seeking do not fully mature until the twenties.[65] Courts have reached the same conclusion. *See e.g.*, *Horsley*, 808 F.3d at 1133 ("The evidence now is strong that the brain does not cease to mature until the early 20s in those relevant parts that govern impulsivity, judgment,

---

[64] *See also McCraw*, 719 F.3d at 348 (age limit to carry handguns in public served an important public safety interest); *Kolbe*, 849 F.3d at 139 (public safety interest is "not only substantial, but compelling").

[65] Aylward Decl., Ex. A at 17 (Aylward Rep.); *see also id.* at 1 ("[B]rains of individuals under 21 years of age are still under development, particularly in regions that are involved in sensation-seeking and poor impulse control, two factors responsible for risky (and sometimes violent) behavior."); S. Johnson Decl., Ex. A at 10 (Johnson Rep.) ("Complex supervisory and regulatory brain functions and social judgment continue to develop . . . into emerging adulthood.").

DEFS.' CROSS-MSJ AND OPP. TO PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

21

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  planning for the future, foresight of consequences, and other characteristics that make people

2  morally culpable.") (quoting scientific expert declaration); *Graham v. Florida*, 560 U.S. 48, 68

3  (2010) ("[D]evelopments in psychology and brain science continue to show fundamental

4  differences between juvenile and adult minds. For example, parts of the brain involved in

5  behavior control continue to mature through late adolescence.").[66] These well-established

6  neuroscientific findings logically support the decision of Washington voters to limit sales of

7  SARs, a firearm with the potential to inflict significant harm, to those 21 and older.[67]

8         **(b)**       **Individuals 18 to 20 disproportionately commit violent crimes**

9

10        Given their higher degree of impulsiveness and emotional immaturity, it is unsurprising

11  that 18- to 20-year-olds commit a disproportionately large share of crimes, including violent

12  crimes involving firearms. Though this group comprises only 4.4% of the population, it accounts

13  for approximately one-quarter of firearm homicides committed where an offender was

14  identified.[68] *See, e.g.*, 145 Cong. Rec. 18119 (1999) ("Studies show that one in four gun murders

15  are committed by people aged 18 to 20.") (statement of Rep. Grace Napolitano).

16  In addition, 18- to 20-year-olds account for 8.7% of all violent crime arrests, including: 15.5%

17  of murder and non-negligent manslaughter, 17.1% of robbery, 11.1% of rape, and 11.5% of

18  weapons offense arrests.[69] Overall, older adolescents aged 19, 18, and 20 accounted for the first,

19  second, and third highest percentages of arrests, respectively, for any age up to age 24.[70] Arrest

20      [66] *See also NRA*, 700 F.3d at 210 n.21 ("Modern scientific research supports the commonsense notion that 18-

21  to-20-year-olds tend to be more impulsive than young adults aged 21 and over."); *Horsley v. Trame*, 61 F. Supp. 3d 788, 793 (S.D. Ill. 2014), *aff'd*, 808 F.3d 1126 (7th Cir. 2015) ("Many courts have noted that the risk of irresponsibility is higher in minors, and consequently, the danger of damage is greater.").

22      [67] *See, e.g.*, Aylward Decl., Ex. A at 2 (Aylward Rep.) ("[L]ate adolescence/early adulthood (approximately

23  ages 18 to 21) is a developmental period during which the cognitive and emotional control needed for responsible possession of firearms is still under development."); S. Johnson Decl. Ex. A at 12 (Johnson Rep.) ("During older

24  adolescence, individuals are maturing in important ways, psychologically, cognitive, and neurologically . . . . During this period of [developmental vulnerability], in order to protect young people and their communities, it is reasonable to limit purchases of semiautomatic firearms, whose misuse is particularly dangerous.").

25      [68] Simpson Decl., Ex. DD at 2, 6 fig. 1 (U.S. Dep't of the Treasury & U.S. Dep't of Justice, *Gun Crime in the Age Group 18–20* (June 1999)).

26      [69] Simpson Decl., Ex. L (U.S. Dep't of Justice, 2018 Crime in the United States, tbl. 38).

    [70] *Id.*

DEFS.' CROSS-MSJ AND OPP. TO PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

22

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

rates for murder, robbery, and other violent crimes peak around ages 17 to 20, and arrest rates for weapons crimes are nearly 50% higher among 18- to 20-year-olds than among younger adolescents.[71]

The statistics are even starker when analyzing school shootings in particular. "[M]ore than two hundred eight thousand students attending at least two hundred twelve schools have experienced a shooting on campus since the Columbine mass shooting in 1999."[72] At the time I-1639 was enacted, five of the previous six school shooters used a SAR.[73] And of "active shooter" incidents[74] since 1970, more than 80% of the assailants were under age 21.[75] One need look no further than Columbine, Sandy Hook, and Parkland to understand the scope of the problem.

Such violence is a problem here, too. In Washington, there were 330 firearm homicides among 18- to 20-year-olds from 2000 to 2017.[76] The Mukilteo shooter and the Burlington Mall shooter are among those 18- to 20-year-olds who used SARs in their crimes.[77] Moreover, at Seattle's Harborview Medical Center, semiautomatic firearm injuries to young adult patients cost approximately $10,000 more than other firearm injury types.[78]

        **(c)**      **Minimum age laws have proven effective in addressing health and safety concerns**

Laws raising the minimum legal age to engage in certain behaviors to 21 have effectively addressed other public health and safety concerns. For example, raising the minimum age to drink alcohol to 21 reduced alcohol-related traffic crashes.[79] Raising the age to purchase tobacco

---

[71] S. Johnson Decl., Ex. A at 10 (Johnson Rep.).

[72] Simpson Decl., Ex. A at 2 (I-1639 § 1).

[73] Simpson Decl., Exs. Q at 26 (I-1639 Voter Pamphlet, Proponent's Statement), D (mass shootings chart).

[74] The FBI defines an "active shooter" incident as "[one or more] individual[s] actively engaged in killing or attempting to kill people in a . . . populated area." Simpson Decl., Ex. EE at 5 (A Study of Active Shooter Incidents in the United States Between 2000 and 2013).

[75] *Id.*, Ex. FF (K-12 School Shooting Database).

[76] Simpson Decl., Ex. GG at 3 (*Analysis of the Involvement of 18-20 Year Olds in Firearm Violence and the Special Problem of Semi-Automatic Weapons*, Firearm Injury and Policy Research Program (June 2019)).

[77] Simpson Decl., Ex. D at 2, 4 (Mass Killings table).

[78] Rivara Decl., Ex. A at 9–10 (Rivara Rep.).

[79] Simpson Decl., Ex. HH at 113 (William DeJong et al., *Case Closed: Research Evidence on the Positive Public Health Impact of the Age 21 Minimum Legal Drinking Age in the United States*, 75 J. Stud. on Alcohol & Drugs 108, 113 (2014)).

DEFS.' CROSS-MSJ AND OPP. TO PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

23

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

to 21 is expected by the Institute of Medicine to "eventually . . . result in 249,000 fewer premature deaths . . . for people born between 2000 and 2019. It also would result in about 286,000 fewer pre-term births and 438,000 fewer babies born with low birth weights" by reducing smoking among older adolescents.[80] Washington recently enacted exactly such a measure. *See* RCW 26.28.080. It is reasonable for Washingtonians to anticipate that corresponding minimum age requirements for firearms would also yield public health benefits.

### (d) SARs are more dangerous and used more frequently in mass shootings than other firearms

Data on mass shootings reinforces the reasonableness of prohibiting sales of SARs to those under 21. As Defendants' experts explain, SARs "pose special risks to the public because the number of bullets that can be shot in a very short period of time."[81] And many SARs shoot those bullets at higher speeds and have more lethal impacts.[82]

Further, SARs are easier to operate for inexperienced shooters.[83] This aspect of SARs is particularly relevant in Washington: in 2016, a 19-year-old in Mukilteo studied the owner's manual for his newly purchased AR-15-style SAR before walking into a party and opening fire, killing three people and injuring another.[84]

Not only are SARs the weapon of choice for mass shooters, but mass shootings are "demonstrably more lethal when the assailant uses a semiautomatic rifle than when other

---

[80] Simpson Decl., Ex. II at 2. (Tripp Mickle, *Study Supports Raising Tobacco-Purchase Age to 21*, Wall St. J., Mar. 12, 2015), Ex. JJ at 182, 201, 214–15 (*Public Health Implications of Raising the Minimum Age of Legal Access to Tobacco Products*, Inst. of Medicine of the Nat'l Academies (Richard J. Bonnie, et al., eds. 2015).

[81] Rivara Decl., Ex. A at 3 (footnote omitted); *see also* Jones Decl., Ex. A at 11 ("The practical difference between operating mechanisms is that a semiautomatic shooter may continue to rapidly fire his/her weapon uninterrupted until the ammunition is depleted and reloading with another magazine is required."); *see also* Simpson Decl., Ex. J (Casey Dep. 37:8–38:10; 77:15–18) (SARs permit shooter to fire more shots in same amount of time).

[82] Simpson Decl., Ex. B at 859 (Rhee et al., *Gunshot Wounds*, 80 J. Trauma & Acute Care Surgery 853 (2016)).

[83] Simpson Decl., Ex. K (Ball Dep. 59:17–25 (bigger firearms are "easier to shoot"), 132:14–25 (shooter-induced malfunctions more likely with handgun or shotgun than SAR), 133:23–134:15 (SARs "are easier to grab ahold of").

[84] Kramer Decl. ¶¶ 4, 17; Simpson Decl., Ex. E at 2 (Sara Jean Green, *Shooting suspect jealous over ex, bought rifle a week ago, police say*, Seattle Times, Aug. 2, 2016).

firearms are used."[85] Semiautomatic weapons result in higher mortality rates (16.3%) than other types of firearms (12%) and require on average 4.12 more days of hospitalization compared with other types of firearms.[86] Plaintiff Casey concedes that if he were a victim of a mass shooting, he would prefer the shooter to have a bolt action rifle over a SAR.[87] Nor would exempting .22 caliber rifles from the age restriction satisfy the public interest; such rifles are the most common known type of firearm used in school shootings.[88]

Given mass shooters' preference for SARs and their lethality, it is not surprising that other states have enacted total bans on assault weapons (even to individuals over 21)—and federal courts have upheld them. *Wilson v. Cook Cty.*, 937 F.3d 1028, 1036–37 (7th Cir. 2019) (per curiam) (upholding Illinois county's ban on assault rifles); *Kolbe v. Hogan*, 849 F.3d 114, 137–38 (4th Cir. 2017) (upholding Maryland's ban on assault rifles); *Cuomo*, 804 F.3d at 242 (upholding New York's and Connecticut's bans on assault weapons); *Heller II*, 670 F.3d at 1264 (upholding District of Columbia's ban on assault rifles).[89]

---

[85] Jones Decl., Ex. A at 10–11 (Jones Rep.); *see also Friedman v. City of Highland Park*, 784 F.3d 406, 411 (7th Cir. 2015) ("But assault weapons with large-capacity magazines can fire more shots, faster, and thus can be more dangerous in aggregate. Why else are they the weapons of choice in mass shootings?"); *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1262–63 (D.C. Cir. 2011) ("assault weapons are preferred by criminals") (citing, inter alia, Dep't of Treasury, *Study on the Sporting Suitability of Modified Semi-automatic Assault Rifles* 34–35, 38 (1998); Christopher S. Koper et al., U. Penn. Jerry Lee Ctr. of Criminology, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003*, at 51, 87 (2004)).

[86] Simpson Decl., Ex. GG at 5 (*Analysis of the Involvement of 18-20 Year Olds in Firearm Violence and the Special Problem of Semi-Automatic Weapons*, Firearm Injury and Policy Research Program (June 2019)).

[87] Simpson Decl., Ex. J (Casey Dep. 73:18-74:1, 77:15-78:2).

[88] Simpson Decl., Ex. FF at 3 (K-12 School Shooting Database).

[89] I-1639 differs in some respects from the assault weapon bans in Connecticut, D.C., Illinois, Maryland, and New York, as well as the federal assault weapons ban that expired in 2004. *See* Violent Crime Control and Law Enforcement Act of 1994, Pub'l. No. 103–322, § 110102(b), 108 Stat 1796, 1997–98. First, I-1639 does not "ban" any weapons, but merely imposes a minimum age qualification to purchase a SAR. Second, the federal ban and more recent state analogues all define "assault weapons" by reference to both a list of specific firearm models such as the AR-15 (including "copies" or "duplicates," *e.g.*, *id.* § 110102(b)(A)), and by certain technical "features" such as a "pistol grip" or a "flash suppressor" (the so-called "features test"). Those definitions encompass not only assault rifles but semiautomatic handguns as well. *See, e.g.*, *id.*; Md. Code Ann., Crim. Law § 4-301(c), (d)(2); N.Y. Penal Law § 265.00(22)(c). It is widely acknowledged—including by Plaintiffs' own expert—that the federal definition was easily circumvented by firearms manufacturers and criminals through minor modifications designed to avoid triggering the technical "features test" but with "overall functionality undiminished." Jones Decl., Ex. A at 15 (Jones Rep.); *see also* Simpson Decl., Ex. V (Knezovich Dep. 149:18–151:6). I-1639 avoids that shortcoming by defining a SAR to include all rifles with semiautomatic firing action.

1   In sum, the people's decision to limit the often deadly mix of older adolescents and SARs

2   reasonably fits with the substantial interests in increasing public safety and reducing gun

3   violence. *See Powell*, 926 F. Supp. 2d at 392–93 ("[Y]oung adults' access to firearms is an issue

4   of significant governmental concern and . . . there is a close fit between this concern and the

5   prohibition on the grant of licenses to carry to adults under the age of twenty-one."). Defendants

6   need not prove that the Age Provision is the only strategy that would achieve that public interest,

7   only that there is a reasonable fit. For that reason, too, Defendants are entitled to summary

8   judgment on Plaintiffs' Second Amendment claim.[90]

9   **C.    The Nonresident Sales Provision Does Not Violate the Dormant Commerce Clause**

10      The Commerce Clause provides that Congress shall have the power "[t]o regulate

11   Commerce with foreign Nations, and among several states, and with the Indian Tribes." U.S.

12   Const. Art. 1, § 8, cl. 3. In addition to this express grant of power to Congress, the Commerce

13   Clause has an implicit negative aspect—known as the dormant Commerce Clause—that

14   "prohibits state laws that unduly restrict interstate commerce." *Tenn. Wine & Spirit Retailers*

15   *Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019). The dormant Commerce Clause serves as a

16   bulwark against state programs of "economic protectionism—that is, regulatory measures

17   designed to benefit in-state economic interests by burdening out-of-state competitors." *Int'l*

18   *Franchise Ass'n, Inc. v. City of Seattle* (*Int'l Franchise Ass'n*), 803 F.3d 389, 399 (9th Cir. 2015)

19   (internal citations and quotations omitted).

20      If a law affects interstate commerce, then a court applies one of two levels of scrutiny

21   depending on whether the law is "discriminatory" as that term is used in dormant Commerce

22

23   _____

[90] Even if the Court were to apply heightened or strict scrutiny, the Age Provision still passes constitutional
24   muster: Washington's interests in reducing gun violence and promoting public safety are "compelling"; its
     prohibition on the sale to a discrete, high-risk group of older adolescents of one specific type of weapon used
25   disproportionately in mass shootings is "narrowly tailored" to advancing those interests; and the law—including the
     wide range of exceptions allowing possession of SARs by older adolescents—leaves ample alternative channels for
26   exercise of Second Amendment rights. *See, e.g., Chovan*, 735 F.3d at 1152 (Bea, J., concurring) (agreeing with
     majority that federal law prohibiting convicted domestic violence misdemeanants from possessing firearms does
     not violate Second Amendment, but reaching conclusion after applying strict scrutiny).

1   Clause jurisprudence. *Conservation Force, Inc. v. Manning*, 301 F.3d 985, 995 (9th Cir. 2002).

2   Here, the Nonresident Sales Provision is valid regardless what level of scrutiny applies.

3   **1.      Dormant Commerce Clause framework**

4          In fewer than two pages of argument, Plaintiffs' Motion cherry-picks quotes from

5   dormant Commerce Clause cases, rather than articulating or applying the governing legal

6   framework. To determine whether a law violates the dormant Commerce Clause, courts "first

7   ask whether it discriminates on its face against interstate commerce." *United Haulers Ass'n v.*

8   *Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338–39 (2007). If so, the law is

9   invalid unless the state "has no other means to advance a legitimate local purpose." *Id.*

10  (citing *Maine v. Taylor*, 477 U.S. 131, 138 (1986)). If the law is non-discriminatory, however, it

11  violates the dormant Commerce Clause only if the burden on interstate commerce is "clearly

12  excessive in relation to the putative local benefits." *Sullivan v. Oracle Corp.*, 662 F.3d 1265,

13  1271 (9th Cir. 2011) (quotation marks omitted) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S.

14  137, 142 (1970)). This *Pike* balancing test requires "sensitive consideration of the weight and

15  nature of the state regulatory concern in light of the extent of the burden imposed on the course

16  of interstate commerce." *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 441 (1978). That

17  there be a *substantial burden* on *interstate commerce*" is a "critical requirement" of a dormant

18  Commerce Clause violation. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144,

19  1148 (9th Cir. 2012) (citing *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984)).

20  **2.      The Nonresident Sales Provision is non-discriminatory because it does not**
21  **          involve economic protectionism**

22         The threshold question under the dormant Commerce Clause is whether the law is

23  discriminatory. The term "discrimination" has a specific meaning in the dormant Commerce

24  Clause context: "economic protectionism, or discrimination, 'simply means differential

25  treatment of in-state and out-of-state economic interests that benefits the former and burdens the

26

1  latter.'" *Rocky Mtn. Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013) (quoting *Or.*

2  *Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994)).

3     Mere differential treatment of in-state and out-of-state interests is not sufficient to

4  establish discrimination. Rather, there must be some economic benefit to in-state interests or

5  some economic burden on out-of-state interests. *See, e.g.*, *City of Phila. v. New Jersey*, 437 U.S.

6  617, 624 (1978) ("The crucial inquiry . . . [is] whether [the law] is basically a protectionist

7  measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with

8  effects upon interstate commerce that are only incidental."). This makes sense, as "[t]he central

9  rationale for the rule against discrimination is to prohibit state or municipal laws *whose object is*

10  *local economic protectionism*, laws that would excite those jealousies and retaliatory measures

11  the Constitution was designed to prevent." *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S.

12  383, 390 (1994) (emphasis added).

13     The Nonresident Sales Provision does not trigger this protectionism concern because it

14  neither benefits in-state economic interests nor burdens out-of-state economic interests. Plaintiff

15  Mitchell—the only Plaintiff who now asserts a Commerce Clause claim, Dkt. No. 76 at 16—

16  bears the burden of establishing that the provision discriminates. *Int'l Franchise Ass'n*, 803 F.3d

17  at 400. (Plaintiff Ball had originally alleged a dormant Commerce Clause claim too, but

18  Plaintiffs' abandoned her claim after Ball revealed in discovery that, after I-1639 went into

19  effect, her firearm sales revenue increased.[91]) But Mitchell fails to adduce facts creating a

20  genuine dispute on this threshold issue. Mitchell alleges that the provision has diminished his

21  sales of SARs to potential out-of-state purchasers.[92] But Mitchell concedes that no actual

22  evidence supports his bare allegation of diminished sales because he did not consult any financial

23  records or sales data in arriving at his "ballpark" estimate.[93]

24

25

26  [91] Dkt. 17 ¶ 120; Simpson Decl., Ex. K (Ball Dep. 125:25–126:5).
    [92] *See, e.g.*, Dkt. 76-4, ¶ 17.
    [93] Simpson Decl., Ex. R (Mitchell Dep. 169:7–172:9).

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

28

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    Even if Mitchell's allegations were true, they would not establish discrimination under

2    the dormant Commerce Clause because they connote a *burden* to Washington economic

3    interests—the very opposite of economic protectionism. Conversely, the likely economic

4    beneficiaries of the Nonresident Sales Provision are out-of-state gun dealers who would, if

5    anything, see a corresponding *increase* in sales at the expense of Washington gun dealers. *See*

6    *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298–99 (1997) ("[A]ny notion of discrimination

7    assumes comparison of substantially similar entities.") (footnote omitted). Thus, the central

8    concern of the dormant Commerce Clause is not triggered and the Nonresident Sales Provision

9    is nondiscriminatory. *See, e.g.*, *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 49 (2d

10   Cir. 2007) (law nondiscriminatory where "it does not confer a competitive advantage upon local

11   business vis-a-vis out-of-state competitors" and "even local businesses operating within the

12   Town itself challenge [its] validity"); *Cohen v. R.I. Tpk. & Bridge Auth.*, 775 F. Supp. 2d 439,

13   447 (D.R.I. 2011) ("[W]hen a law does not implicate the kind of 'local economic protectionism'

14   that the Commerce Clause aims to eradicate, the rationale for equating differentiation and

15   discrimination disappears . . . . Plaintiff has failed to identify a specific in-state commercial

16   interest that is favored by the [law] at the expense of particular out-of-state competitors, so it

17   cannot demonstrate that the discount discriminates against interstate commerce.").

18   Mitchell's attempt to rebut this "cardinal" principle of dormant Commerce Clause

19   jurisprudence—that "a State may not benefit in-state economic interests by burdening out-of-

20   state competitors"—falls flat. *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 199 (1994)

21   (internal quotation marks omitted). First, Mitchell relies on decisions that concern state attempts

22   to hoard natural resources or other unique state products for the purpose of benefitting in-state

23   interests. In *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 576–77, 580–

24   81 (1997), the Court struck down a state tax exemption for summer camps serving mostly

25   Mainers but not those serving primarily out-of-state campers because it effectively blocked "out-

26   of-state access to" a "natural resource"—namely, "the natural beauty of Maine itself." Similarly,

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106                29                ATTORNEY GENERAL OF WASHINGTON
                                                         800 5th Ave. Suite 2000
                                                         Seattle, WA 98104-3188
                                                         (206) 464-7744

in *New England Power Co. v. New Hampshire*, 455 U.S. 331, 339 (1982), the prohibition on selling hydroelectric energy outside the state was "simple economic protectionism" designed to gain an "economic advantage for New Hampshire citizens at the expense of New England Power's customers." In contrast, Mitchell does not allege that I-1639's purpose or effect is to reserve scarce Washington products for in-state consumers. Nor could he. I-1639 indisputably restricts in-person SAR sales to "increase public safety and reduce gun violence"—a goal wholly unrelated to seeking in-state economic advantage or creating a functional export tariff.[94]

Further, I-1639 does not result in hoarding or discriminatory protection of in-state resources and is not a law that would incite retaliatory measures from other states. Indeed, the flow of commerce is not shut off at all. Contrary to Mitchell's unsupported assertion otherwise, Dkt. 76 at 16, nonresidents may continue to purchase SARs from Mitchell and other Washington dealers using the FFL-to-FFL transfer process. *See supra* at 9. Moreover, Mitchell does not contend that nonresidents are constrained in their ability to purchase SARs in their home states. Nor is there a nonresident plaintiff who asserts any injury from I-1639. According to Mitchell, it is the other way around: Washington residents prefer to purchase firearms in Oregon to avoid paying sales tax or transfer fees.[95] And, of course, nonresidents may continue to purchase SARs in their home states or in other states. Thus, SARs remain widely available to nonresidents.

Second, Mitchell's reliance on *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573 (1986), for the proposition that a regulation that disadvantages in-state interests may constitute economic protectionism, is misplaced. Dkt. 77 at 16. In *Brown-Forman Distillers*, the Supreme Court struck down a state law that, to give low prices to New Yorkers, required liquor distillers to sell their products to in-state wholesalers for no more than the lowest price offered in any other state. *Id.* at 576. The Court held that the law violated the dormant Commerce Clause because it, in effect, "regulate[d] out-of-state transactions": "Once a distiller ha[d] posted prices in New York, it [wa]s not free to change its prices elsewhere in the United

---

[94] Simpson Decl., Ex. A at 2 (I-1639 § 1).
[95] Simpson Decl., Ex. R (Mitchell Dep. 42:21–43:13).

States during the relevant month." *Brown-Forman Distillers*, 476 U.S at 582. The Court noted that "[w]hile New York may regulate the sale of liquor within its borders, and may seek low prices for its residents, it may not project its legislation into [other States] by regulating the price to be paid for liquor in those States." *Id.* at 582–83 (quotation marks and citation omitted). I-1639 does not regulate or limit sales of SARs in other states.[96] Instead, it permissibly "regulate[s] the sale of [firearms] within its borders." *Id.* at 582. Doing so does not discriminate under the dormant Commerce Clause.

### 3.    The Nonresident Sales Provision meets the *Pike* balancing test

Without discrimination, a law need only meet the lenient *Pike* balancing test, under which courts "will uphold the law 'unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.'" *Corey*, 730 F.3d at 1087–88 (quoting *Pike*, 397 U.S. at 142). Mitchell "bears the burden of proof in establishing the excessive burden in relation to the local benefits." *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 528 (9th Cir. 2009). Courts will not look beyond a law's putative benefits absent proof of an excessive burden. *Harris*, 682 F.3d at 1155.

Mitchell put forth no evidence to establish an excessive burden on interstate commerce. When asked to identify details of his out-of-state SAR sales, including the number and value of such sales, Mitchell did not answer. He objected that, among other bases, the inquiry was "not relevant to any party's claims or defense" and that the "information . . . has no relevance to any issue in this case."[97] This response indicates that Mitchell cannot meet his burden of showing there is an excessive burden on interstate commerce. And notably, no out-of-state competitors to Mitchell or nonresident consumers have asserted that their interests are in any way harmed.

---

[96] A "per se" dormant Commerce Clause violation may also occur when a law "directly regulates interstate commerce," that is, when it "directly affects transactions that take place across state lines or entirely outside of the state's borders." *Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 445 (9th Cir. 2019) (quotation marks and citations omitted). As explained above, the Nonresident Sales Provision does not regulate sales outside Washington's borders or across state lines because it bars only SAR sales in person. An interstate transaction through FFL-to-FFL transfer remains lawful. *Supra* at 9.

[97] Simpson Decl., Ex. KK (Interrogatory Answers 1, 2, 5; Request for Production Responses 1, 3); *see also id.*, Ex. R (Mitchell Dep. 169:22–170:4) (examination of sales records would be "exceptionally difficult to do").

Because Mitchell fails to show an excessive burden, the Nonresident Sales Provision is presumptively valid even without evidence of any local benefits.

I-1639's benefits, however, are substantial. Thus, even if Mitchell had shown that the law substantially burdens interstate commerce, it would still pass constitutional muster because it advances a bona fide state interest in public safety that far outweighs any perceived burden on interstate commerce. I-1639 was adopted to "increase public safety and reduce gun violence," an unquestionably legitimate government interest.[98] To advance this interest, the people of Washington extended an existing safeguard on handgun sales to SAR sales: the requirement to undergo an enhanced background check, in which law enforcement searches additional state and local databases to ensure that the buyer is not prohibited by law from buying the firearm. *Supra* at 8–9. It is undisputed that enhanced background checks are more comprehensive than a NICS check alone.[99] As the Fifth Circuit has noted, "The states voluntarily provide records for use in the databases accessed by NICS," and, "for various reasons, some records are not timely provided, or are not provided at all." *Mance*, 896 F.3d at 707. This enhanced background check cannot be conducted on nonresidents because Washington State cannot request—much less require—out-of-state law enforcement agencies to assist with running Washington's background checks.[100] Thus, the Nonresident Sales Provision is necessary to ensure an enhanced background check is conducted before a SAR is sold in Washington. This local benefit far outweighs any alleged burden. The Nonresident Sales Provision is constitutional under *Pike* balancing.

### 4. The Nonresident Sales Provision would meet strict scrutiny if it applied

While the Nonresident Sales Provision is not discriminatory, if this Court were to conclude otherwise, the provision would survive strict scrutiny. To pass strict scrutiny, a law must be "demonstrably justified by a valid factor unrelated to economic protectionism." *Carbone*, 511 U.S. at 402; *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of N.Y.* (*N.Y. State Rifle*),

---

[98] Simpson Decl., Ex. A at 2 (I-1639 § 1).
[99] *See, e.g.*, Belcher Decl. ¶¶ 6–7; Candee Decl. ¶¶ 15–18; T. Johnson Decl. ¶¶ 6–7; Simpson Decl., Ex. R (Mitchell Dep. 119:18–120:16), Ex. V (Knezovich Dep. 107:25–108:3), Ex. K (Ball Dep. 71:22–72:3; 132:1–11).
[100] Candee Decl. ¶¶ 17–18; Belcher Decl. ¶¶ 6–9.

DEFS.' CROSS-MSJ AND OPP. TO PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

32

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

883 F.3d 45, 64 (2d Cir. 2018), *cert. granted*, 139 S. Ct. 939 (2019). Articulated in a different way, the law must "serve[] a legitimate local purpose, and this purpose could not be served as well by available nondiscriminatory means." *Corey*, 730 F.3d at 1087 (quoting *Maine*, 477 U.S. at 138 (internal quotation marks omitted)).

*New York State Rifle* is instructive. In that case, the Second Circuit recently rejected a dormant Commerce Clause challenge to a city's significant restrictions on the transportation of certain firearms outside of the home. The ordinance, like I-1639, was enacted "to protect the health and safety" of residents. *N.Y. State Rifle*, 883 F.3d at 65. Even if strict scrutiny applied, the court would have upheld the ordinance because it was "demonstrably justified by a valid factor unrelated to economic protectionism." *Id.* (internal quotations and citation omitted). Specifically, restricting access to firearms to curb gun violence is a valid part of a "'longstanding tradition of . . . regulating firearm possession and use in public because of the dangers posed to public safety.'" *Id.* (quoting *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 94–95 (2d Cir. 2012)). And the Supreme Court has recognized a "'deeply rooted' distinction 'between the power of the State to shelter its people from menaces to their health or safety . . . when those dangers emanate from interstate commerce, and its lack of power to . . . constrict the flow of such commerce for their economic advantage.'" *Id.* at 66 (quoting *W. Lynn Creamery, Inc.*, 512 U.S. at 206 n.21).

The same logic applies here. The Nonresident Sales Provision serves the legitimate local purpose of ensuring that Washington's enhanced background check procedures apply to all sales of SARs in this state. This concern is more than valid—it is compelling. *See, e.g.*, *Mance*, 896 F.3d at 706 (federal prohibition on in-person sales of handguns to nonresidents, 18 U.S.C. § 922(a)(3), was "justified by a compelling interest and is narrowly tailored to serve that interest"). Indeed, in the 2019 Gilroy Garlic Festival mass shooting, which killed or injured 20 people, the shooter purchased his SAR in Nevada before carrying out his attack in California.[101]

---

[101] Simpson Decl., Ex. D (Mass Killings Table), Ex. LL at 2 (Lauren Hepler, Amy Harmon, and Richard A. Oppel Jr., *Gilroy Shooting: Two Children Among the Dead at California Festival*, N.Y. Times, July 29, 2019).

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

33

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   And the 2013 D.C. Navy Yard shooter had attempted to purchase an AR-15 in a Virginia gun
2   store "but was stopped from buying one because state law there limits the sale of such weapons
3   to out-of-state buyers" by requiring additional forms of identification.[102] Forced to use a shotgun
4   and a handgun instead, the killer could well have harmed many more victims had his arsenal
5   included a SAR. The Nonresident Sales Provision is directed at only promoting public health
6   and safety and has no connection to economic protectionism.

7       Further, I-1639 is narrowly tailored. An interest is narrowly tailored if the state can
8   "demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local
9   interest." *Carbone*, 511 U.S. at 392. The Nonresident Sales Provision is necessary in light of the
10  mechanics of the enhanced background check process. *See supra* at 7–9. Washington cannot
11  compel thousands of local law enforcement agencies across the country to conduct detailed
12  background checks on prospective nonresident SAR purchasers.[103] And it would also be
13  "unrealistic" to require Washington FFLs to "become, and remain, knowledgeable about the
14  handgun laws of the 50 states and the District of Columbia, and the local laws within the 50
15  states and the District." *Mance*, 896 F.3d at 708 (federal in-state sales requirement for handguns
16  "is narrowly tailored to assure that an FFL . . . can . . . know and comply with the laws of the
17  state in which the delivery occurs").

18      No alternative means are available to advance this interest. *See generally Mance*,
19  896 F.3d at 709 (holding that federal law prohibiting sales of handguns to nonresidents is the
20  "least restrictive means of insuring that the handgun laws of states are not circumvented"). And
21  nonresidents have adequate alternative channels to purchase SARs through the FFL-to-FFL
22  transfer process, in their own states, and in other states. *Supra* at 9; *see also Mance*, 896 F.3d at
23  709 ("a qualified person in any state may purchase a firearm] from an FFL in his or her state of

---

[102] Simpson Decl., Ex. MM (Michael S. Schmidt, *State Law Prevented Sale of Assault Rifle to Suspect Last Week, Officials Say*, N.Y. Times, Sept. 13, 2013).
[103] Candee Decl. ¶ 18; Belcher Decl. ¶¶ 8–9.

1   residence, or may purchase the firearm from an out-of-state FFL as long as the weapon is

2   lawfully transferred to an in-state FFL").[104]

3        Even if strict scrutiny applied, I-1639 does not violate the dormant Commerce Clause.

4        **5.    Congress has authorized states to restrict sales of rifles to nonresidents**

5        Mitchell's dormant Commerce Clause claim also fails because Congress has authorized

6   states to prohibit the sale of rifles to nonresidents. "It is well established that Congress may

7   authorize the States to engage in regulation that the Commerce Clause would otherwise forbid."

8   *Maine*, 477 U.S. at 138. Federal law permits sales of rifles to nonresidents only if they "fully

9   comply with the legal conditions of sale in both such States." 18 U.S.C. § 922(b)(3); 27 C.F.R.

10  § 478.99. Because § 922(b)(3) "plainly authorizes" states to restrict rifle sales to nonresidents,

11  the Nonresident Sales Provision is "invulnerable to constitutional attack under the Commerce

12  Clause." *Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 472 U.S. 159, 174 (1985).

13       Congress first enacted § 922(b)(3) as part of the GCA "to strengthen Federal controls

14  over interstate and foreign commerce in firearms and to assist the States effectively to regulate

15  firearms traffic within their borders." H.R. Rep. No. 90-1577, at 6 (1968), *reprinted*

16  *in* 1968 U.S.C.C.A.N. 4410, 4411. Having found that "the sale . . . of firearms" (including

17  "[r]ifles") "to nonresidents . . . has tended to make ineffective the laws, regulations, and

18  ordinances in the several States," S. Rep. No. 90-1501, at 28 (1968), Congress made it unlawful

19  for FFLs to sell or deliver "any firearm" (including a rifle) to a nonresident, 18 U.S.C.

20  § 922(b)(3) (1970). That general prohibition contained an exception for sales of rifles or

21  shotguns to residents of "contiguous" states. *Id.* But the exception applied only if allowed by law

22

23

24       [104] Simpson Decl., Ex. W at 203 (*Federal Firearms Regulations Reference Guide* 3, U.S. Dep't of Justice
     (2014)) ("[T]he sale may be made if the firearm is shipped to a licensee whose business is in the purchaser's State
25   of residence and the purchaser takes delivery of the firearm from the licensee in his or her State of residence."); *id.*
     Ex. X at 8 ("Initiative 1639: Frequently Asked Questions," Wash. Office of the Att'y Gen.) ("[N]othing in the
26   Initiative prohibits an FFL from transferring a semiautomatic assault rifle to an FFL in a different state, consistent
     with federal law—a practice long utilized for interstate sales of pistols and other types of firearms.").

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

35

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

in both states. *Id.* At the time of the GCA's enactment, at least 16 states had laws restricting acquisition or possession of one or more types of firearms by nonresidents.[105]

In enacting § 922(b)(3), Congress did not intend to displace state residency restrictions. Quite the opposite: its goal was to "[a]ssist and encourage States and local communities to adopt and enforce *stricter* gun control laws." H.R. Rep. No. 90-1577, at 8, 1968 U.S.C.C.A.N. at 4413 (emphasis added). By making the default rule that nonresidents may not purchase firearms—subject to an exception if and only if the laws of both states permit it—Congress sought to strengthen state restrictions on out-of-state purchasers. *See* S. Rep. No. 90-1097, at 50 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2166 (residency provisions "will enable the States to more effectively control this traffic within their own jurisdictions under the police power"). When Congress amended the GCA, it reaffirmed its original purpose to "prevent the use of interstate sales to defeat state and local gun restrictions," S. Rep. No. 98-583, at 10 (1984), and to "[l]et the States make those decisions," Hearings of Subcomm. on Crime, Comm. of Judiciary, 99th Cong. (1st and 2d Sess.) Pt. 1, Serial No. 131, at 785.[106] In sum, § 922(b)(3) vests in each state the authority to determine whether to permit FFLs to sell rifles to nonresidents.

In 1970, Washington allowed qualified nonresidents to purchase rifles and shotguns in person. 1970 Wash. Sess. Laws at 668, ch. 74, § 2 (originally codified at RCW 19.70.020,

---

[105] *See, e.g.*, Act of Mar. 2, 1937, No. 190, § 1, 1937 Ala. Laws 223, 223; Act of March 19, 1923 §§ 1, 3, 1923 Ark. Acts 379, 379-80; Act of Aug. 12, 1910, No. 432, 1910 Ga. Laws 134; Act of July 11, 1919, § 4, 1919 Ill. Laws 431, 432; Act of Feb. 21, 1935, ch. 63, §§ 1, 3, 5, 1935 Ind. Laws 159, 159-61; Act of Feb. 25, 1939, ch. 14, 1939 Me. Acts 53; Act of May 29, 1922, ch. 485, § 9, 1922 Mass. Acts 560, 563; Act of June 2, 1927, ch. 372, §§ 2, 6, 1927 Mich. Acts 887, 887-89; Act of April 7, 1921, § 2, 1921 Mo. Laws 692; Act of Feb. 20, 1918, ch. 2, §§ 1-3, 8, 1918 Mont. Laws 6, 6-9; Act of March 3, 1919, ch. 74, § 5, 1919 Mont. Acts 147, 148; Act of March 11, 1924, ch. 137, §§ 1-2, 1924 N.J. Acts 305, 305-06; Act of May 21, 1913, ch. 608, § 1, 1913 N.Y. Laws 1627, 1628-29; Act of March 10, 1919, ch. 197, §§ 1-2, 1919 N.C. Laws 397, 397-98; Act of Feb. 26, 1913, ch. 256, § 1, 1913 Or. Laws 497; Act of May 2, 1910, ch. 591, § 1, 1910 R.I. Acts 156, 156-57; Act of Feb. 16, 1909, ch. 51, 1909 W. Va. Acts 394, 395-96.

[106] In the Firearm Owners Protection Act ("FOPA"), Pub. L. No. 99-308, § 102(4)(B), 100 Stat. 449, 451 (1986), Congress expanded the exception for rifles and shotguns to permit their sale to residents of noncontiguous states—provided, again, that the "sale, delivery, and receipt fully comply with the legal conditions of sale in both such States." *Id.* (codified at 18 U.S.C. § 922(b)(3)). As FOPA's chief sponsor explained, Congress "never intended in the interstate sales [exception] to make any change in any local or State law." Hearings of Subcomm. on Crime on Comm. of Judiciary, 99th Cong. (1st and 2d Sess.) Pt. 1, Serial No. 131, at 785; *see also* 131 Cong. Rec. S9149–50 (daily ed. July 9, 1985) (Statement of Sen. Hatch) (FOPA "permits out[]of State purchases but it also ensures that the laws of the buyer's as well as the seller's State shall be scrupulously obeyed.").

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

36

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   codified as amended at RCW 9.41.124). But in I-1639, Washington's voters amended the law to

2   remove SARs from the class of rifles that may be sold in person to nonresidents. Washington's

3   decision to limit its own law squarely is within the state's congressionally delegated authority.

4           That statutory authorization defeats Mitchell's dormant Commerce Clause claim at its

5   threshold. "Where state or local government action is specifically authorized by Congress, it is

6   not subject to the Commerce Clause even if it interferes with interstate commerce." *White v.*

7   *Mass. Council of Const. Employers, Inc.*, 460 U.S. 204, 213 (1983). Here, Congress

8   unambiguously authorized states to regulate firearms sales to nonresidents. Section 922(b)(3)

9   permits sales of rifles to nonresidents, but only if they "fully comply with the legal conditions of

10  sale in both such States." *Id.*; *see also* 27 C.F.R. § 478.99 (same). By allowing nonresident rifle

11  purchases only if they "fully comply" with state laws, Congress allowed states to impose

12  additional limits on such sales. *See, e.g.*, *Hirst v. Skywest*, 910 F.3d 961, 967 (7th Cir. 2018)

13  (holding state minimum wage laws were authorized by federal law providing that "[n]o provision

14  of this chapter or of any order thereunder *shall excuse noncompliance with any Federal or State*

15  *law* . . . establishing a minimum wage higher than the minimum wage established under this

16  chapter.") (emphasis added). Indeed, the "entire thrust" of § 922(b)(3) "is for each state to resolve

17  for its own" how to regulate sales of rifles and shotguns to nonresidents. *Norfolk S. Corp. v.*

18  *Oberly*, 632 F. Supp. 1225, 1247 (D. Del. 1986), *aff'd*, 822 F.2d 388 (3d Cir. 1987).[107]

19          Defendants are entitled to summary judgment on Mitchell's Commerce Clause claim.

20  **D.    Plaintiffs' Claims Are Not Justiciable**

21          Finally, this Court lacks jurisdiction over some of Plaintiffs' claims due to lack of

22  standing or mootness. *Am. Civil Liberties Union of Nev. v. Lomax*, 471 F.3d 1010, 1015 (9th Cir.

23  2006). To demonstrate standing, a plaintiff must show "(1) injury in fact; (2) causation; and (3)

24  likelihood that the injury will be redressed by a favorable decision." *Id.* To avoid mootness, a

25

26  _____

[107] That Congress sought to authorize state restrictions on the sale of firearms to out-of-state residents is reinforced by its specification that "[n]o provision of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates *to the exclusion of the law of any State on the same subject matter*, unless there is a direct and positive conflict . . . ." 18 U.S.C. § 927 (emphasis added).

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

37

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

plaintiff must show that "an actual, ongoing controversy exist at all stages of federal court proceedings." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 862 (9th Cir. 2017).

### 1.     Plaintiffs Casey's and Rettmer's Second Amendment claims are moot

The claims of Casey and Rettmer are moot because they are now 21, so they have "aged out of the demographic group affected by" the Age Provision. *McCraw*, 719 F.3d at 344 (quoting *NRA*, 700 F.3d at 188); *see, e.g.*, *Craig v. Boren*, 429 U.S. 190, 192 (1976) (turning 21 mooted a challenge to laws barring minors from buying beer). Their claims should be dismissed.

### 2.     Plaintiff Wald lacks standing

Although Plaintiff Wald is 20 years old, he can show neither that any injury suffered is "fairly traceable" to I-1639 nor that a "favorable decision" would "redress[]" it. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Wald is a sophomore at Seattle University and "live[s] in a dorm," but stores his three SARs at his parents' home outside Tacoma.[108] Seattle University prohibits firearms on campus.[109] Thus, even if Plaintiffs were to prevail, Wald would be in the same position he is in today—the owner of multiple SARs but unable, by dint of a private college's policy, to keep them at home. Any injury of his is neither traceable to I-1639 nor redressable by a favorable decision. Wald lacks standing. *See, e.g.*, *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 756 (4th Cir. 2013) ("A plaintiff faces a related obstacle to establishing traceability and redressability when there exists an unchallenged, independent rule, policy, or decision that would prevent relief even if the court were to render a favorable decision.").

### 3.     The Organizational Plaintiffs lack standing to challenge the Age Provision

The Organizational Plaintiffs lack Article III standing. An association may sue on behalf of its members when "[1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

---

[108] Simpson Decl., Ex. T (Wald Dep. 8:25; 21:1–25:22).
[109] *Id.* at Ex. T (Wald Dep. 53:12–20, 82:25, 85:11), Ex. NN (Wald Dep. Ex. 85); *see also id.*, Ex. J (Casey Dep. 29:8–30:11), *id.* Ex. OO (Casey Dep. Ex. 89).

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

38

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 181 (2000). Associations must

2   make "specific allegations establishing that at least one identified member had suffered or would

3   suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).

4       The Organizational Plaintiffs merely restate in a conclusory fashion the requirements of

5   associational standing. *Compare* Dkt. 76 at 7, *with Laidlaw*, 528 U.S. at 181. But they offer no

6   evidence that any of the individual plaintiffs are members of their organizations, nor that any of

7   their members have suffered specific harm. While the First Amended Complaint broadly asserts

8   that both organizations have members who are Washington residents, Dkt. 17, ¶¶ 23, 31, that is

9   not sufficient. *See Summers*, 555 U.S. at 497–98 (requiring "plaintiff-organizations to make

10  specific allegations establishing that at least one identified member had suffered or would suffer

11  harm"). The Organizational Plaintiffs offered no evidence that they meet standing requirements

12  in their pleadings and Motion.

13      **4.      Plaintiff Mitchell lacks standing to challenge the Nonresident Sales Provision**

14      Mitchell lacks Article III standing to challenge the Nonresident Sales Provision because

15  he has not identified a single lost sale due to I-1639. When asked during his deposition about the

16  basis of his claimed diminished sales, Mitchell conceded that he had not consulted any financial

17  records or sales data.[110] When asked to provide evidence of lost sales in written discovery,

18  Mitchell objected on multiple grounds, including that the request did not seek relevant

19  information, and did not answer.[111] Mitchell's contrary statements in his declaration, untethered

20  from documentation, are insufficient as mere "general averments." *Swanson Grp. Mfg. LLC v.*

21  *Jewell*, 790 F.3d 235, 242 (D.C. Cir. 2015) (quoting *Laidlaw*, 528 U.S. at 184).

22      Mitchell also lacks standing because he can sell SARs to nonresidents through the FFL-

23  to-FFL transfer process, *supra* at 9, which is evidently the sales method his prospective out-of-

24  state customers request. Dkt. 76-5, ¶ 19. His claim should be dismissed for lack of standing.[112]

25

26

---

[110] Simpson Decl., Ex. R (Mitchell Dep. 169:7–172:9) (claimed diminished sales was "a ballpark estimate").
[111] Simpson Decl., Ex. KK (Mitchell discovery responses).
[112] Mitchell argues that this Court already held he has standing, Dkt. 76 at 7, but to the extent the Court did so, it was before Mitchell revealed that no evidence supports his claimed injury specific to the Commerce Clause claim.

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

39

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**E.      Plaintiffs' Request for Attorney Fees Should Be Denied**

Plaintiffs' request for attorney fees should be denied because they are unlikely to be able to establish their status as a prevailing party, a requirement of a fee award under 42 U.S.C. § 1988. *Friend v. Kolodzieczak*, 72 F.3d 1386, 1388 (9th Cir. 1995). As explained above, Plaintiffs should not succeed "on any significant issue in litigation." *Farrar v. Hobby*, 506 U.S. 103, 109 (1992) (quotation marks and citation omitted).[113]

## IV.      CONCLUSION

Gun violence results in tragic deaths, grievous injuries, and lifelong trauma in our communities. To combat this threat to public health and safety, the people of Washington took the reasonable step of applying to SARs the same restrictions that have long applied to handguns under state and federal law. The temporary age restriction on 18- to 20-year-olds' ability to purchase SARs does not trigger, nor offend, the Second Amendment. Likewise, the Nonresident Sales Provision does not violate the Commerce Clause, as it enables effective implementation of Washington's enhanced background check requirements to ensure only eligible persons purchase SARs in the state. Plaintiffs raise no genuine issue of material fact in this case. Defendants respectfully request that the Court enter summary judgment in their favor.

RESPECTFULLY SUBMITTED this 31st day of March 2020.

ROBERT W. FERGUSON
*Attorney General*
NOAH G. PURCELL, WSBA No. 43492
*Solicitor General*

*s/ Zachary Pekelis Jones*
JEFFERY T. EVEN, WSBA No. 20367
 Deputy Solicitor General
ZACHARY PEKELIS JONES, WSBA No. 44557
R. JULY SIMPSON, WSBA No. 45869
BRENDAN SELBY, WSBA No. 55325
 Assistant Attorneys General,
 Complex Litigation Division
DIONNE PADILLA-HUDDLESTON, WSBA No. 38356

---

[113] If this Court were to invalidate any provision of I-1639, it should sever it from the remainder, consistent with the text and expressed will of the voters. Simpson Decl., Ex. A at 30 (I-1639 § 19) (severability clause).

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

40

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

| | |
|---|---|
| 1 | Assistant Attorney General, |
| | Licensing and Administrative Law Division |
| 2 | Attorney General's Office |
| | 800 Fifth Ave., Ste. 2000, Seattle, WA  98104 |
| 3 | (206) 464-7676 Fax: (206) 464-2800 |
| 4 | dionnep@atg.wa.gov; lalseaef@atg.wa.gov |
| 5 | *Attorneys for Defendant Teresa Berntsen* |
| 6 | |
| 7 | PACIFICA LAW GROUP LLP |
| 8 | By *s/ Gregory J. Wong* |
| | Paul J. Lawrence, WSBA No. 3557 |
| 9 | Gregory J. Wong, WSBA No. 39329 |
| | Nicholas W. Brown, WSBA No. 33586 |
| 10 | Kai A. Smith, WSBA No. 54749 |
| 11 | |
| | *Attorneys for Intervenor-Defendant* |
| 12 | *Safe Schools Safe Communities* |
| 13 | *s/ Leslie A. Lopez* |
| 14 | Leslie A. Lopez, WSBA No. 46118 |
| | Deputy Prosecuting Attorney |
| 15 | Clark County Prosecutor's Office – Civil Division |
| | PO Box 5000 |
| 16 | Vancouver WA  98666-5000 |
| | Tele: (564) 397-2478 |
| 17 | Email:  leslie.lopez@clark.wa.gov |
| 18 | *Attorney for Defendant Chuck Atkins* |
| 19 | *s/ Salvatore J. Faggiano* |
| 20 | Salvatore J. Faggiano, WSBA No. 15696 |
| | Assistant City Attorney |
| 21 | Office of the City Attorney |
| 22 | 808 W. Spokane Falls Blvd. |
| | Spokane, WA 99201-3326 |
| 23 | Telephone: (509) 625-6818 |
| | Fax: (509) 625-6277 |
| 24 | Email: sfaggiano@spokanecity.org |
| 25 | *Attorney for Defendant Craig Meidl* |
| 26 | |

DEFS.' CROSS-MSJ AND OPP. TO
PLFS.' MSJ
CAUSE NO. 3:19-CV-5106

41

ATTORNEY GENERAL OF WASHINGTON
800 5th Ave. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744