1

2

3

4

5

6

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

7

8

9

DANIEL MITCHELL, ROBIN BALL, LUKE RETTMER, NATHANIEL CASEY, MATTHEW WALD, SECOND AMENDMENT FOUNDATION, and NATIONAL RIFLE ASSOCIATION,

The Honorable Ronald B. Leighton

No. 3:19-cv-05106-RBL

10

11

*Plaintiffs*,

v.

PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT AND OPPOSITION TO CROSS MOTION

12

13

14

15

16

CHUCK ATKINS, in his official capacity as the Sheriff of Clark County, Washington, CRAIG MEIDL, in his official capacity as the Chief of Police of Spokane, Washington, and TERESA BERNTSEN, in her official capacity as the Director of the Washington State Department of Licensing,

NOTING DATE: MAY 24, 2020

ORAL ARGUMENT REQUESTED

17

*Defendants*,

18

and

19

SAFE SCHOOLS SAFE COMMUNITIES,

20

*Defendant-Intervenor.*

21

22

23

24

25

26

27

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1

**TABLE OF CONTENTS**

2    I. INTRODUCTION ................................................................................................1

3    II. FACTUAL BACKGROUND ................................................................................ 2

4        A. Defendants Offer Irrelevant Disputed Claims, Styled as "Facts," to Support
            Their Motion................................................................................................. 2

5        B. Plaintiffs Rely Only On Undisputed Facts................................................... 3

6            1. Defendants Do Not Dispute That Semiautomatic Rifles Are In
                Common Use By Law Abiding Persons For Lawful Purposes.......................... 4

7            2. There Are No Disputed Facts Concerning The Interstate Purchase
8                Ban. ........................................................................................................ 4

9    III.        ARGUMENT ................................................................................. 5

10       A. The Standard of Review on Summary Judgment.......................................... 5

11       B. The State's Legal Framework Is Wrong Under *Heller*. ............................... 5

12           1. The Second Amendment, History, And *Heller* All Support Plaintiffs'
                View Of The Second Amendment. ............................................................ 6

13               a) The Second Amendment Codified A Pre-Existing Individual
14                   Right To Own Firearms For Any Lawful Purpose. ........................... 7

15               b) The Second Amendment Is Not Limited to Those the State
                     Deems to be "Responsible."............................................................ 8

16               c) Adults Under 21 Years Of Age Have Never Been Excluded
17                   From Those Who Had A Right To Keep And Bear Arms. ................. 9

18               d) *Heller* Permits Restrictions Only If Characterized By Long
                     Historical Standing. ........................................................................ 12

19           2. The State Does Not Properly Apply *Heller* Or The "Two-Part" Test. ......... 13

20           3. The State Improperly Limits *Heller* to Protect Only the Right of Self-
                 Defense in the Home. ....................................................................... 14

21           4. The Defendants' Application Of Other Aspects Of *Heller* Is Wrong. ............ 15

22               a) Common Use Must Be Measured Nationwide. .................................. 15

23               b) Permitting Some Arms Does Not Justify Banning Others.................. 16

24               c) The Fact That Some Adults Enjoy Second Amendment Rights
                     Cannot Justify Depriving Others of the Right. .................................. 16

25           5. A Ban On Purchasing An Entire Class Of Firearms Fails Under *Heller*
26               Before Applying Any Two Step Test Or Face At Least Strict Scrutiny. ......... 17

27           6. Even Under the "Interest-Balancing" / Intermediate Scrutiny Test,
                 The Ban Is Unconstitutional.................................................................. 18

PLAINTIFFS' REPLY ISO SUMMARY JUDGMENT - ii
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

a) The Governmental Interest Asserted Is the Prevention of Mass School Shootings by Young Adults. .................................... 19

b) I-1639 Does Not Serve The Asserted Governmental Interest. ........... 19

C. The State Cannot Ban Interstate Commerce In Long Guns. ..................................... 21

1. I-1639 Bans Purchases Of Semiautomatic Rifles Delivered Out-Of-State. ............................................................. 22

2. Discrimination, Not Only Economic Protectionism, is *Per Se* Unconstitutional. ............................................... 23

3. The Ban Fails Scrutiny On The Terms Offered By The State. ..................... 24

4. Federal Firearms Law Does Not Grant Authority For The Ban. ................. 25

D. All Claims Are Justiciable. ......................................................... 26

1. Matthew Wald Has Standing. ................................................. 26

2. The Organizational Plaintiffs Have Standing. ............................... 26

3. Mitchell Has Standing to Challenge The Interstate Purchase Ban................. 27

4. Casey's and Rettmer's Claims Are Not Moot. .............................. 27

IV.    Conclusion ................................................................ 28

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1
2

# TABLE OF AUTHORITIES

## CASES

*Caetano v. Massachusetts*, 136 S.Ct. 1027 (2016) ............................................................ 2, 4, 15, 16

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564 (1997) ............................ 2

*Carey v. Piphus*, 435 U.S. 247 (1978) ........................................................................................... 27

*City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978) ............................................................ 24

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............................................................ passim

*General Motors v. Tracy*, 519 U.S. 278 (1997) ............................................................................ 24

*Jackson v. City & Cty. of San Francisco,* 746 F.3d 953, 967 (9th Cir. 2014) .................................. 17

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ............................................................ passim

*Memphis Community School Dist. v. Stachura*, 477 U. S. 299 (1986) ............................................. 27

*Natl. Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 714 F.3d 334 (5th Cir. 2013) ............................................................................................... 11

*New York State Rifle & Pistol Assn., Inc. v. City Of New York*, 2020 WL 1978708, No. 18-280 ......................................................................................................................... 27

*Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93 (1994) ............................................. 24

*Packingham v. North Carolina*, 137 S.Ct. 1730 (2017) .............................................................. 19

*Rhode v. Becerra*, 2020 WL 1955363 (U.S. Dist. Ct. S.D. Cal., No. 18-cv-802-BEN) .............. 17, 18

*Rocky Mtn. Farmers Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013) ........................................... 24

*Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016) ........................................................................ 18

*Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503 (1969) ..................... 16, 17

*United States v. Miller*, 307 U.S. 174 (1939) ............................................................................... 10

## STATUTES

1 PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY OF MARYLAND JANUARY 1637/8 — SEPTEMBER 1664, at 347 (William Hand Browne ed., 1883) ................................................................................................... 11

10 U.S.C. § 246 (2020) ............................................................................................................. 10

18 U.S.C. § 922(b)(3) ..................................................................................................... 22, 25, 26

50 U.S.C. § 3802 ........................................................................................................................ 12

RCW 9.41.010 ........................................................................................................................... 22

RCW 9.41.080 ........................................................................................................................... 23

RCW 9.41.090 ........................................................................................................................... 23

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1  RCW 9.41.092 ................................................................................................ 23

2  RCW 9.41.124 ........................................................................................... 22, 23

3  UNITED STATES STATUTES AT LARGE, 2 Cong. Ch. 33, May 8, 1792, 1 Stat.
      271 ................................................................................................................. 11

4

                                     OTHER AUTHORITIES

5

6  Cramer, Clayton COLONIAL FIREARM REGULATION, 16 J. J. On Firearms &
      Pub. Pol'y 1 (2004) .............................................................................. 11, 12

7  https://www.marines.com/becoming-a-marine/enlisted.html ................................... 12

8  Kopel, David B. and Greenlee, Joseph, THE SECOND AMENDMENT RIGHTS
      OF YOUNG ADULTS (January 16, 2019). 43 Southern Illinois Law Journal
9      (2019); U Denver Legal Studies Research Paper No. 18-28 ................................. 11

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

PLAINTIFFS' REPLY ISO SUMMARY JUDGMENT - v
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

# I.   Introduction

In reviewing the competing motions for summary judgment, only one proponent has established that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law: the Plaintiffs have shown that the banned firearms are in common use by law-abiding citizens for lawful purposes, and that the ban on purchases by citizens of other states offends the Interstate Commerce Clause. In their "Facts in Support of Motion" the Defendants do not offer any relevant facts to controvert the basis of the Plaintiffs' motion.

By contrast, in support of their cross-motion, Defendants present speculative and highly disputed contentions, styled as "facts": that the ban will make a rare occurrence—mass shootings—even rarer. What they then describe as the law that applies to these disputed facts is unrecognizable from the Supreme Court's description of the Second Amendment in *District of Columbia v. Heller*, 554 U.S. 570 (2008). Defendants ask the Court to treat the Second Amendment as a privilege rather than a right, allowing the government to extend or retract it at will, and limit its exercise to those whom the government judges to be "responsible." Even then, the privilege can be revoked whenever the government places a higher priority on such values as public health and safety. The government does not recognize the Second Amendment as protecting an individual right, and in that, makes a fundamental error of law.

Defendants' Motion is wrong on the law in every particular, directly contrary to the way in which the Supreme Court describes the scope of the Second Amendment. The Defendants assume that if the Second Amendment protects any right, it is only the right of an individual to personal self-defense in the home, and that a government restriction is permissible so long as it leaves some means of self-defense available. They further assume that the government can ban ownership of specific firearms by specific groups if that specific firearm is not already in common use by that specific group. The State errs in pointing to certain restrictions on firearms ownership to justify other, new restrictions. The State errs in justifying its purchase ban by pointing to other categories of firearms that can still be purchased. And it errs in inventing a new category of enumerated Constitutional right—a Constitutional right that is really only a government-regulated privilege

Plaintiffs' Reply and Opposition iso Summary Judgment - 1
No. 3:19-cv-05106-RBL

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

that can only be exercised with a parent's assistance. It also errs in fundamentally misunderstanding the scope and effect of the interstate purchase ban, because it apparently does not understand state and federal laws governing the conduct of federally licensed firearms dealers such as Plaintiff Dan Mitchell.

Because the Plaintiffs' motion is based on undisputed facts, and a straightforward application of *Heller*, *McDonald v. City of Chicago*, 561 U.S. 742 (2010), *Caetano v. Massachusetts*, 136 S.Ct. 1027 (2016) , and *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564 (1997), their motion should be granted. Because the Defendants fail to present undisputed facts as the basis for their motion, and base it entirely on misstatements of the law, it should be denied.

## II.   Factual Background

### A.   Defendants Offer Irrelevant Disputed Claims, Styled as "Facts," to Support Their Motion

Defendants begin the Argument section of their brief with an accurate recitation of the test for summary judgment—whether the moving party has established that there is no genuine issue of material fact as to those facts upon which the moving party relies to support its request for judgment as a matter of law. But the Defendants fail to identify which of the facts in their "Facts in Support of Motion" are undisputed, and which are simply the assertions of the partisans on one side of a highly contentious social issue. Public opinion is divided: some believe that in the effort to reduce gun crime, guns are the problem; others believe that guns are actually part of the solution.[1] Defendants confidently assert that there is a "scientific consensus" that states are wise to ban the purchase of semiautomatic rifles by persons under 21. (Dkt. # 85, p. 22) Yet this is not a fact, much less an undisputed fact—it is precisely the point of contention over which social

---

[1] *See, e.g.*, Declaration of Spokane Cunty Sheriff Ozzie Knezovich, attached as Exhibit B to the Declaration of Joel Ard; John Lott, More Guns, Less Crime (1998) (based on data collected from states that permit or limit firearm access, violent crime is reduced in states that encourage, rather than impede, lawful access to firearms). *See also McDonald*, 561 U.S. at 782-73 (noting "there is intense disagreement on the question whether the private possession of guns in the home increases or decreases gun deaths and injuries").

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1   scientists and policymakers disagree.[2] That disagreement has no legal importance because the

2   Second Amendment "necessarily takes certain policy options off the table." *Heller*, 544 U.S. at

3   636.

4        Moreover, Defendants casually mix evidence about "gun violence"[3] with the asserted

5   purpose of I-1639—which is to prevent theoretical future mass shootings by 18- to 20-year-olds in

6   the State of Washington. Defendants' key factual claim—that I-1639, by preventing the *purchase*

7   of semiautomatic rifles by certain adults, will reduce mass shootings by those adults—is without

8   basis or merit, because the claim is not a fact. It is nothing more than rank speculation about a

9   future causal relationship.

10        The Defendants' claim is particularly weak in light of their acknowledgement that, while I-

11   1639 prevents *purchase* by adults, I-1639 **does not preclude 18- to 20-year-olds from accessing**

12   **SARs.**" (Dkt. # 84, 7:10) (emphasis added). It is hard to overstate the significance of this

13   concession. While touting it as a virtue (attacking "Plaintiffs' false characterization of I-1639 as a

14   'blanket ban,'" *id.*) Defendants concede that I-1639 does not even qualify as a means to its

15   supposed end—preventing these adults from having semiautomatic rifles to use in mass shootings.

16   What I-1639 indisputably *does* do is to ensure that whatever access young adults do have to

17   semiautomatic rifles, it will occur without a background check.[4] As will be discussed more fully in

18   the Argument section of this brief, the assertion that I-1639 will prevent mass shootings is far from

19   an "undisputed fact." Rather, it is at best a doubtful prediction.

20   **B. Plaintiffs Rely Only On Undisputed Facts.**

21        Plaintiffs ask this Court to declare that I-1639 is unconstitutional in two aspects: first, that

22   the ban on purchase by adults violates the Second Amendment; second, that the ban on interstate

23   ---

24   [2] Defendants refer to the "unrebutted" evidence submitted by their experts. (Dkt. # 84, at 4:15) No surprise that it
        was unrebutted when filed: it was presented in pleadings for the first time in their Motion. Plaintiffs' opening brief

25   would hardly "pre-rebut" evidence that had never been filed. Regardless, the expert testimony from Defendants is
        irrelevant and instantly contestable.

26   [3] *See, e.g.*, Defendants' brief at 2:20 ("Gun violence is a scourge in our society.")

27   [4] *See* Ard Decl. Exh. J, BATF Form 4473 (instructing that a purchaser planning to purchase a firearm to give as a gift
        must fill out Form 4473 and be subject to the background check, not the recipient).

purchases violates the interstate commerce clause. Plaintiffs have offered undisputed facts to support both claims, as the following sections demonstrate. Defendants' assertions that no record evidence exists is simply gaslighting.

### 1. Defendants Do Not Dispute That Semiautomatic Rifles Are In Common Use By Law Abiding Persons For Lawful Purposes.

In their "Facts in Support of Motion," Defendants make no attempt to prove that semiautomatic rifles are *not* in common use by law-abiding citizens for lawful purposes. Instead, Defendants drop a footnote to the Argument section of their brief (Dkt. 84, 12:22) suggesting that Plaintiffs failed to establish "the popularity of semiautomatic rifles among 18- to 20-year-olds." *Id*. However, as the Argument section of this brief demonstrates, the test under *Heller* is whether semiautomatic rifles are in common use in the United States population as a whole—a point that the Defendants concede.[5] Neither do Defendants attempt to argue that the banned firearms can be banned because they are suitable exclusively for military purposes, excluding them from Second Amendment protection.[6] Thus, there is no genuine issue as to the key fact upon which this portion of Plaintiffs' motion for summary judgment rests.

### 2. There Are No Disputed Facts Concerning The Interstate Purchase Ban.

Defendants raise extensive arguments concerning whether the ban on interstate purchases by citizens of other states violates the dormant Interstate Commerce Clause. However, they offer no controverting facts—aside from questioning whether there is sufficient evidence that the Dealer

---

[5] In a single line of the Argument section, Defendants state that Plaintiffs "fail to support with any actual evidence" the claim that semiautomatic rifles enjoy "overwhelmingly common and popular" use. (Dkt. 84, 12:11.) However, the record is replete with such evidence. For example, the Declaration of Dan Mitchell submitted with the original motion states that he has sold over 5,000 semiautomatic rifles in the last four years and that semiautomatic rifles are the majority of the rifles that he sells. (Dkt. # 76-4, ¶¶ 14-15.) Mitchell also testified in his deposition to the same effect. Ard Decl. Exh. D.

[6] It is quite clear that the banned firearms are not suitable for military use. *See* Ard Decl. Exh. A, Declaration of Hugh Foske. Some lower courts have purported to exclude firearms from Second Amendment protection because they are "suitable for military use;" others have done so for arms that the court held had no military use. *See, e.g.*, *Caetano*, 136 S.Ct. at 1032 (Alita, concurring, and rejecting the "war equipment" test. Neither of these approaches finds support in *Heller*, *McDonald*, or *Caetano*.

ARD LAW GROUP PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1  Plaintiffs have suffered a loss of such sales.[7] As Plaintiffs' opening brief showed, the ban is *per se*

2  invalid, and needed no concrete evidence of lost sales. In addition, such evidence is already in the

3  record. If the Court adopts the analytical structure of the Defendants' brief (which is contradicted

4  by the literal text of the law), Mitchell's Opposition Declaration and deposition extracts show

5  plentiful lost sales. Consequently, the sole question before this Court is whether or not the ban on

6  interstate purchases is permissible under the Interstate Commerce Clause.

## III.   ARGUMENT

### A.   The Standard of Review on Summary Judgment.

9  As noted previously, Plaintiffs agree with the Defendants' recitation of the standard of

10  review for summary judgment: if the moving party relies on disputed facts, summary judgment is

11  inappropriate. Because the Defendants rely on disputed facts, their motion should be denied.

12  Because the Plaintiffs rely only on facts that the Defendants have not put in controversy, their

13  Motion should be granted.

### B.   The State's Legal Framework Is Wrong Under *Heller*.

15  *Heller* rejected the contention that the Second Amendment was limited to protecting the

16  right of states to maintain a militia, and the further contention that it conferred no individual right.

17  *Heller* made clear that, like the other enumerated rights in the Bill of Rights,[8] the Second

18  Amendment guarantees individuals the right to keep and bear arms—not just for the specific

---

[7] As with the question of whether semiautomatic rifles are in "common use" for purposes of analysis under *Heller*, in the section of their brief entitled "Facts in Support of Motion" the Defendants do not raise a genuine issue with respect to whether or not the Dealer Plaintiffs have suffered injury. In the Argument section of their brief, particularly in the section challenging Plaintiffs' standing, the Defendants assert that Mitchell "has not identified a single lost sale due to I-1639." (Dkt. 84, 39:15.) However, as with the question of the popularity of semiautomatic rifles, Mitchell testified in the Declaration accompanying the Plaintiffs' original Motion concerning lost sales. Dkt. # 76-4, ¶¶ 16-21. Moreover, this Court has already determined that there is past evidence that "Dealers lost profits by choosing not to sell specific semiautomatic rifles that they had in stock." Dkt. #44, 7:13-14. As the Court noted, the Dealers are not required to break the law in order to establish the injury that they suffered as a result of compliance with it.

[8] "We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." *Heller*, 554 U.S. at 634.

purpose Dick Heller asserted (his right to self-defense of the home), but for all the purposes for which arms have been historically valued.

    1.   **The Second Amendment, History, And *Heller* All Support Plaintiffs' View Of The Second Amendment.**

Where *Heller* and *McDonald* focused on the text and meaning of the Second Amendment to show that it codifies protection of pre-existing individual rights, the Defendants take those cases as an invitation to go on a free-wheeling linguistic ramble. They select particular words and phrases from the opinions, invest them with new meaning in a manner that is plainly unrelated to any method of analysis used by the Supreme Court—or by any other court when evaluating government intrusion on any other Constitutional right—and leap to conclusions in support of government intrusions on an enumerated Constitutional right that have no support in *Heller*, *McDonald*, the Second Amendment, or the history of firearms regulation in the United States.

Far and away the most pernicious is the Defendants' request that this Court treat a group of law-abiding Americans as the legal equivalent of convicted felons or people who have been adjudicated as mentally ill, based on Defendants' fear that if these Americans exercise their enumerated constitutional right, public safety will suffer. The Defendants distort *Heller*'s affirmation of the individual right to keep and bear arms to cast doubt on the very nature of the Second Amendment (and other constitutional rights). Felons and the mentally ill are stripped of their Second Amendment rights only after individual legal adjudication (protected by due process), just as they can be deprived of their individual right to liberty. Defendants lift the word "responsible" out of context to claim that a state government can categorize a group of presumptively law-abiding adults as the legal equivalent of individually adjudicated felons who have lost the rights to life, liberty and property. Far too many famous cases in the nation's history have approved deprivations of fundamental right based on majority perceptions of the undesirable characteristics of targeted, disfavored groups. None of those cases should serve as a model for the state to follow.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

**a) The Second Amendment Codified A Pre-Existing Individual Right To Own Firearms For Any Lawful Purpose.**

As the *Heller* court held, "the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right," namely, the "individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. That right is incorporated by the Fourteenth Amendment against the states. *McDonald*, 561 U.S. 742. *Heller* repeated this holding emphatically throughout the majority opinion: "There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *Heller*, 554 U.S. at 595. Further, contrary to the petitioners' argument (and that of the *Heller* dissent), the militia identified in the prefatory clause was not "the state- and congressionally-regulated military forces described in the Militia Clauses . . ." but comprised "all able bodied men." *Id*. at 596. The "militia" comprised far more than those called by the government into actual service because "when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny." *Id*. at 598. The Court explained:

> It was understood across the political spectrum that the right helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down. It is therefore entirely sensible that the Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia. The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting. But the threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right—unlike some other English rights—was codified in a written Constitution. *Heller*, 554 U.S. at 599.

Thus, in addition to Mr. Heller's right to purchase and possess a firearm in common use by law-abiding citizens for the purpose of defending himself and his family in his own home, the Second Amendment codified the pre-existing right of all people—the unorganized militia—to keep and bear arms for self-defense, for hunting, and to preserve the existence of a "citizens' militia as a safeguard against tyranny." *Id*. at 600.

After this lengthy exposition, the Court "turn[ed] finally to the law at issue here. As we have said, the law totally bans handgun possession in the home. It also requires that any lawful

PLAINTIFFS' REPLY AND OPPOSITION ISO SUMMARY JUDGMENT - 7
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable." *Id.* at 628. The Court struck it down instantly:

> As the quotations earlier in this opinion demonstrate, the inherent right of self-defense has been central to the Second Amendment right. The handgun ban amounts to a prohibition of an entire class of "arms" that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute. Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family would fail constitutional muster.

*Id.* at 628–29 (internal quotations and citations omitted). Thus, a state ban on purchasing and using a class of firearms in common use in the United States is unconstitutional. Nothing in that holding eliminates the other reasons the Court identified for the exercise of the right codified in the Second Amendment. Indeed, as the *Heller* court held, the primary reason for its codification—not its *exercise* but its *codification*—is to preserve the existence of the armed citizenry as a bulwark against tyranny. Moreover, the majority explicitly left open—to the dismay of the dissent—the outcome of future cases asserting the protection of other activities by the Second Amendment: "Justice BREYER chides us for leaving so many applications of the right to keep and bear arms in doubt, and for not providing extensive historical justification for those regulations of the right that we describe as permissible. *See post*, at 2869 – 2870. But since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field . . .." *Id.* at 635. The State's conceit, presented here, that the right consists of exclusively an individual right to self-defense in the home, on terms and conditions as the State sees fit to allow, subject to whatever limitations and exceptions as it might implement, has no support in the Second Amendment or the holding of *Heller*.

### b) The Second Amendment Is Not Limited to Those the State Deems to be "Responsible."

As noted previously, the Defendants attempt to evade the application of *Heller*—and the Second Amendment—by arguing that *Heller* limited the Second Amendment's protection to those

Plaintiffs' Reply and Opposition iso Summary Judgment - 8
No. 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

the state deems "responsible."[9] Neither the text and history of the Second Amendment nor *Heller* granted state majorities s the right to create wholesale categorical exclusions of minority groups from the Second Amendment's protection. When *Heller* summarizes its analysis by stating that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *Heller*, 554 U.S. at 635, it uses the word "responsible" as a shorthand for the long-standing historical exclusion of identifiable persons who had forfeited their rights or had been legally subjected to state control because they posed a danger to themselves or others, as determined on an individual basis, resulting from individual, adjudicated conduct. Neither the Second Amendment, nor *Heller*, nor any other constitutional doctrine, gives any support to the Defendants' proposal that a majority of the state's voters can decide that a minority group can be excluded from constitutional protections because the majority deems that group not "responsible," as a group—regardless of the "evidence" a political majority offers concerning its perceptions of that minority group's characteristics.

### c) Adults Under 21 Years Of Age Have Never Been Excluded From Those Who Had A Right To Keep And Bear Arms.

The text and history of the Second Amendment, read in light of the much-longer history of the militia in the colonies and United States, demonstrate beyond any doubt that the Amendment protects the rights of adults aged 18 to 20 to keep and bear long guns.[10] "[T]he Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia. The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting. But the threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right—unlike some other English

---

[9] "[S]trict scrutiny does not apply because 18- to 20-year-olds have historically not been considered 'responsible.'" Defendants' Brief at 17:10-11.

[10] It is irrelevant to deciding this case whether restrictions on adult purchases of handguns pass constitutional muster except to the extent that these new unconstitutional restrictions, piled atop existing restrictions, further disarm law-abiding adults.

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

rights—was codified in a written Constitution." *Heller*, 554 U.S. at 599. Furthermore, as the *Heller* majority made clear, the "citizens' militia" whose right to keep and bear arms was codified in the Second Amendment "'comprised all males physically capable of acting in concert for the common defense.'" *Id.* at 595 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). Thus, "the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty." *Heller*, 554 U.S. at 627. In short, the *Heller* decision makes explicit that members of the "citizens' militia" have the right to keep and bear arms that is protected by the Second Amendment.

Further, all historical evidence from long prior to and long after the Founding Era demonstrates that 18 to 20 year old adults were and are considered part of the militia. Begin with the present day:

**Militia: composition and classes**

(a) The militia of the United States consists of all able-bodied males at least 17 years of age and, except as provided in section 313 of title 32, under 45 years of age who are, or who have made a declaration of intention to become, citizens of the United States and of female citizens of the United States who are members of the National Guard.

(b) The classes of the militia are--

(1) the organized militia, which consists of the National Guard and the Naval Militia; and

(2) the unorganized militia, which consists of the members of the militia who are not members of the National Guard or the Naval Militia.

10 U.S.C. § 246 (2020). United States Code today defines the "unorganized militia" as comprising "all able-bodied males at least 17 years of age . . . who are not members of the National Guard or the Naval Militia."

The federally defined militia has always included 18 to 20 year old adults, starting with the first militia act, passed in 1792. That Act provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be or the age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia . . ." UNITED STATES STATUTES AT LARGE, 2 Cong.

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Ch. 33, May 8, 1792, 1 Stat. 271.[11] Each such militia member, subject to enrollment, was required to "provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder & ball: or with a good rifle, knapsack, shot-pouch and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder . . ." *Id.* In other words, not only were 18 to 20 year old adults members of the militia, with rights protected by the Second Amendment, federal law ***required*** them to own long guns, together with ammunition suitable to the firearm they personally provided for themselves. It is simply impossible to conclude that these same adults—who could face a federal mandate to own long guns—were nonetheless not protected by the Second Amendment in their right to own those same firearms.

Any attempt to exclude 18 to 20 year old adults from the militia whose members' right to keep and bear arms is protected by the Second Amendment is belied by pre-Founding history. Definitions of the militia always include 18 to 20 year old adults, reaching back hundreds of years to the earliest codifications of militias in America. For example, as far back as 1654, Maryland required "that all persons from 16 yeares of age to Sixty shall be provided with Serviceable Armes & Sufficient Amunition of Powder and Shott ready upon all occasions." Kopel, David B. and Greenlee, Joseph, THE SECOND AMENDMENT RIGHTS OF YOUNG ADULTS (January 16, 2019). 43 Southern Illinois Law Journal (2019); U Denver Legal Studies Research Paper No. 18-28, available at https://ssrn.com/abstract=3205664.[12] Other colonies had similar definitions of the militia, and similar mandates on members.[13] In pre-revolutionary America, 18 to 20 year old adult males were members of the militia, and as often as not were required to own long guns (muskets

---

[11] Of course, the modern militia does not and cannot countenance race-based exclusions. But neither can the State of Washington pretend to invent a new, age-based exclusion that has no historical or legal foundation.

[12] Citing 1 PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY OF MARYLAND JANUARY 1637/8 — SEPTEMBER 1664, at 347 (William Hand Browne ed., 1883).

[13] Cramer, Clayton, COLONIAL FIREARM REGULATION, 16 J. On Firearms & Pub. Pol'y 1, 2-10 (2004); *see also Natl. Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 714 F.3d 334, 341 and n.8 (5th Cir. 2013) (Jones, J., dissenting and collecting founding-era minimum militia age laws, all 18).

ARD LAW GROUP PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

and rifles) and ammunition.[14] Today, in addition to fitting the federal definition of the militia, 18 to 20 year old adults are not only required to register for the draft if male, *see* 50 U.S.C. § 3802, but are admitted to the ranks of the United States armed forces every day, where the federal government treats them as the responsible individuals they are, training them in the use of firearms. *See, e.g.*, https://www.marines.com/becoming-a-marine/enlisted.html ("Becoming an Enlisted Marine requires the ability to meet the highest standards of moral, mental and physical strength. . . INITIAL REQUIREMENTS: Must be at least 17 years old at time of enlistment").

### d) *Heller* Permits Restrictions Only If Characterized By Long Historical Standing.

The State bases its ahistorical claim that these adults lack any rights protected by the Second Amendment on a careful misrepresentation of the historical treatment of the rights of young adults to keep and bear arms. To avoid the conclusion that I-1639's ban on an entire class of firearms is novel, the Defendants point to two historical examples. The first is a list of states that passed statutes duplicating the ban on the sale of handguns to young adults contained in the Gun Control Act of 1986. Dkt. # 84, at note 51. These statutes offer no authority for a ban on the purchase of long guns by adults, including young adults. The second is a list of five state statutes that (with some exceptions) ban the sale of long guns to young adults. Dkt. # 84, at note 52. Defendants claim that these cases establish that I-1639 "comports with these longstanding laws." Dkt. #84, 14:5. But the ban on selling handguns to young adults is not analogous to the ban being challenged here, and all of the more extensive bans on sales of long guns to young adults are of very recent origin, the exact opposite of "longstanding," and none have withstood review by the U.S. Supreme Court.

In contrast to the State's presentation, the actual historical record shows that 18 to 20 year old adults have always been considered a part of the people and militia whose rights the Second Amendment protects. Instead, Defendants ask this Court to join what it calls an "emerging

---

[14] Cramer, COLONIAL FIREARM REGULATION, 16 J. J. On Firearms & Pub. Pol'y 1, 2-10 (2004).

PLAINTIFFS' REPLY AND OPPOSITION ISO SUMMARY JUDGMENT - 12
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

consensus" that these adults lack Second Amendment rights. The first problem with this request is that the conclusion is wrong. 18 to 20 year old adults **do** have Second Amendment rights and **do** have the right to own any long guns which are in common use in the United States. Second, *Heller* precludes any decision by a court to follow newly developed "emerging consensus" jurisprudence by requiring courts to follow not only *Heller* itself, but to examine and follow long-standing historical traditions and precedent in determining the meaning of the Second Amendment where *Heller* alone is not dispositive.

The State recites a broad variety of unrelated restrictions in its attempt to justify this brand new restriction, one with no historical pedigree in the United States. The very fact that it cannot identify long-standing restrictions—restrictions as long-standing as the Second Amendment—on the rights of adults to purchase long guns is, again, enough to strike down this restriction. As the *Heller* court held:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller*, 554 U.S. at 626–27. The Court did not say, as the State would have this court hold, that one set of restrictions justifies any new restriction. Because the State cannot offer any evidence that the newly invented rifle purchase ban of I-1639 actually is, or even is like, "longstanding prohibitions on the possession of firearms by felons and the mentally ill," it cannot justify the ban.

## 2. The State Does Not Properly Apply *Heller* Or The "Two-Part" Test.

The State misdescribes and misapplies first *Heller*, and then the Ninth Circuit's "two-part test" to determine whether a challenged regulation violates the Second Amendment.[15] According to the State, the first step "asks whether the challenged law burdens conduct protected by the Second Amendment." (Dkt. # 84, 11:4-5 (internal quotation marks omitted).) To answer this

---

[15] "In the wake of *Heller*, nearly every circuit (including the Ninth) has adopted a two-part test for Second Amendment claims." (Defendants' brief, 11:1-2.)

question, Defendants claim, courts look to the historical treatment of the conduct in question, and if history provides no support for Second Amendment protection, the analysis ends.[16]

In other words, according to Defendants, the only reason for engaging in a historical review similar to that conducted by the Supreme Court in *Heller* would be to ***disqualify*** the conduct from Second Amendment protection. After acknowledging that the Court might reject their argument regarding the first prong of the two-part test, the Defendants proceed to ignore history altogether, and justify its purchase ban by applying intermediate scrutiny.

Such an interpretation of the Second Amendment stands *Heller* on its head. *Heller* explicitly rejected the type of "interest-balancing" proposed by the dissent in *Heller*, holding that the Second Amendment's place in the Bill of Rights deserved a similar protection of the individual right against the government's claim that public policy would be better served by ignoring it:

> The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong headed views. The Second Amendment is no different. Like the First, it is the very *product* of an interest balancing by the people— which Justice BREYER would now conduct for them anew.

*Heller*, 554 U.S. at 635. Instead of conducting a historical analysis limited solely to the question of ending the analysis, the two-step analysis faithful to *Heller* requires consideration of whether the conduct, like the possession of a handgun in *Heller*, falls within the description of a firearm "in common use at the time." *Heller*, 554 U.S. at 628

Consequently, in analyzing the first step of the two-step inquiry, Plaintiffs demonstrated that the right to purchase a long gun such as a semiautomatic rifle was historically within the rights that the Second Amendment categorically eliminated a government's ability to restrict.

### 3.  The State Improperly Limits *Heller* to Protect Only the Right of Self-Defense in the Home.

As noted previously, the State presents an inaccurate and crabbed view of *Heller* to suggest that the Second Amendment is limited to the right of personal self-defense in the home. From this

---

[16] "If the law does not burden protected conduct, 'the inquiry is complete' and the law 'passes constitutional muster' without further analysis." (Defendants' Brief, 11:5-6.)

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

premise the Defendants then argue that the purchase ban of I-1639 passes muster because, *i.a.*, firearms other than semiautomatic rifles can fulfill that limited purpose. This line of reasoning has no basis in the Second Amendment or *Heller*. The Second Amendment protects more, and even if it did not, the State has no role in determining the *type* of firearms a law-abiding citizen can select to use for that lawful purpose, any more than it can limit the *number* of firearms on the theory that, possessing one firearm is sufficient to exercise the rights guaranteed by the Second Amendment. Instead, the Second Amendment protects possession of all forms of firearms "in common use," just as the First Amendment forbids the State from restricting access to Twitter because Facebook and other social media exist; nor can the State limit a subscription to the *New York Times* because the *Wall Street Journal* is still available.

### 4.   The Defendants' Application Of Other Aspects Of *Heller* Is Wrong.

#### a)   Common Use Must Be Measured Nationwide.

The Defendants do not seriously contest the evidence presented by Plaintiffs that semiautomatic rifles are in common use. As noted above, Defendants mistakenly suggest that the Plaintiffs' burden is to show that semiautomatic rifles are in common use *by young adults*.[17] Defendants misunderstand the test for what constitutes "common use." *Heller*, *McDonald*, and *Caetano* all demonstrate that the test for whether a category of firearms is in "common use" must be measured by considering the United States as a whole. It cannot be measured by selecting a subset, whether geographically, by age, by race, by socioeconomic status, or on the basis of any other class or division. This is obvious from *Heller*: it is a truism that no law-abiding citizen in the District of Columbia owned handguns when doing so was against the law. Yet the Court concluded that handguns were in common use in the United States, and therefore could not be banned in the District. To follow the State's suggestion would gut any protections of the Second Amendment by measuring a ban against itself: ban a certain firearm; *ipso facto* all those who possess it cease to be law abiding; therefore the firearm is not in common use by law abiding citizens when the ban is

---

[17] "Plaintiffs cite no evidence whatsoever as to the popularity of SARs among 18- to 20-year olds." (Defendants' Brief at 12, n. 47.)

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

tested in court. This approach was rejected just as promptly in *Caetano*, which measured the common use of stun guns in the United States, not just people in Massachusetts or women. *Caetano*, 136 S. Ct. at 1032 (Alito, concurring).

### b) Permitting Some Arms Does Not Justify Banning Others

The Defendants argue that I-1639 does not violate the Second Amendment rights of the young adult plaintiffs because "the law has no impact on their ability to purchase other firearms for self-defense." (Dkt. # 84, 18:21-22.) This line of reasoning was explicitly rejected by *Heller*, which struck down a ban on handgun ownership even though other firearms were available to Mr. Heller. "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed." *Heller*, 554 U.S. at 629. It is no more of an answer to say, as Defendants do, that it is permissible to ban the purchase of semiautomatic rifles so long as the purchase of other firearms (*i.e.*, bolt action rifles) is allowed. Following this reasoning, in *Caetano*, 136 S.Ct. 1027, the Court struck down a ban on stun guns without ever suggesting that the prevalent common use of handguns or long guns ought bear on the decision. This Court must reject the Defendants suggestion that the ban can be justified by other permissions or exceptions.

### c) The Fact That Some Adults Enjoy Second Amendment Rights Cannot Justify Depriving Others of the Right.

The State places great emphasis on the fact that I-1639 "does not preclude 18- to 20-year-olds from accessing SARs." (Dkt. # 84, 7:10-11.) However, without the ability to purchase semiautomatic rifles, the exercise of the rights guaranteed by the Second Amendment will available only to those young adults who are lucky enough to have an older adult (typically a parent) who will gratuitously furnish the semiautomatic rifle—either as a gift or loan. It is precisely the nature of a right that it does not depend upon someone else's permission (or generosity) to exercise it. Just as the students in *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503 (1969) were not required to obtain the permission of the school (or their parents) in order to express

PLAINTIFFS' REPLY AND OPPOSITION ISO SUMMARY JUDGMENT - 16
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

themselves,[18] I-1639 impermissibly makes the young adults' exercise of their Second Amendment rights dependent upon the generosity of their parents or some other closely related adult.

A similar, albeit less restrictive, condition imposed on the exercise of a Second Amendment right—the ability to purchase ammunition—was recently preliminarily enjoined in *Rhode v. Becerra*, 2020 WL 1955363 (U.S. Dist. Ct. S.D. Cal., No. 18-cv-802-BEN): "The Second Amendment protects firearms and ammunition. Of course, the Second Amendment does not explicitly mention ammunition. 'Nevertheless, without bullets, the right to bear arms would be meaningless . . . .'" *Id.*, Slip Op. at 49, quoting *Jackson v. City & Cty. of San Francisco,* 746 F.3d 953, 967 (9th Cir. 2014). Similarly, allowing possession of semiautomatic rifle while preventing its *purchase* violates the Second Amendment.

### 5.   A Ban On Purchasing An Entire Class Of Firearms Fails Under *Heller* Before Applying Any Two Step Test Or Face At Least Strict Scrutiny.

As Plaintiffs' opening brief showed, the state's ban on purchase of an entire category of firearms in common use in the United States cannot be reconciled with *Heller*, *McDonald*, and *Caetano*.[19] Defendants want to have their cake and eat it too: they minimize the impact of the law by characterizing the ban on *purchase* (but not possession) as so minor an inconvenience that it should face only intermediate scrutiny, but at the same time it claims that the effect of that supposed tiny encroachment will be a dramatic reduction in the very rare case of young adult violent crime committed with semiautomatic rifles. *Heller* and *McDonald* both reject a role for "judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise." *McDonald*, 561 U.S. at 790–91. As the opening

---

[18] "Under our Constitution, free speech is not a right that is given only to be so circumscribed that it exists in principle but not in fact. Freedom of expression would not truly exist if the right could be exercised only in an area that a benevolent government has provided as a safe haven for crackpots. The Constitution says that Congress (and the States) may not abridge the right to free speech. This provision means what it says. We properly read it to permit reasonable regulation of speech-connected activities in carefully restricted circumstances. But we do not confine the permissible exercise of First Amendment rights to a telephone booth or the four corners of a pamphlet, or to supervised and ordained discussion in a school classroom." *Id.* at 513.

[19] As Judge Benitez noted in *Rhode v. Becerra*, *supra*, "*Heller* asks whether the law bans the types of firearms commonly used for a lawful purpose. It is a hardware test." *Rhode*, 2020 WL 1955363 at 51.

Plaintiffs' Reply and Opposition iso Summary Judgment - 17
No. 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

brief showed, because this law "imposes such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right [and] is unconstitutional under any level of scrutiny." *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016). The law bars 18, 19, and 20 year old adults from purchasing any model of semi-automatic rifle, akin to the blanket handgun ban at issue in *Heller*, a ban which the Supreme Court agreed failed any degree of scrutiny.

This is not, as Defendants would have it, among the category of "laws which regulate only the manner in which persons may exercise their Second Amendment rights [and which] are less burdensome than those which bar firearm possession completely." *Silvester*, 843 F.3d at 827. A person exercises her fundamental right to keep and bear arms by purchasing arms. The State bans that protected conduct. Conditioning a fundamental, enumerated right on an adult receiving parent permission and a gift goes far beyond regulation of the manner of exercise, and no one would contend otherwise in the context of any other enumerated Constitutional right.

Plaintiffs' Opening Brief also showed that the ban is far more of an imposition on the exercise of the Second Amendment rights than any ban to which the Ninth Circuit has given strict scrutiny. As Judge Benitez characterized the proper application of *Heller,* if the "regulation" is in fact an effective ban on an entire class of hardware, it fails "The Simple *Heller* Test." *Rhode*, 2020 WL 1955363 at 51. Even if the "simple *Heller* test" does not apply, the Defendants effectively concede that I-1639 cannot meet strict scrutiny and can be defended only if intermediate scrutiny is applied.

### 6.   Even Under the "Interest-Balancing"/Intermediate Scrutiny Test, The Ban Is Unconstitutional.

Previous sections of this Brief have urged this Court to conclude that, in view of the history of how adults aged 18 to 20 have been expected to "keep and bear arms" similar to the rifles that are the subject of this litigation, I-1639 impermissibly prevents the exercise of the Plaintiffs' Second Amendment rights. No level of scrutiny is applied where a ban of such breadth is imposed. However, because the Defendants have urged that they are entitled to assert interests that can

PLAINTIFFS' REPLY AND OPPOSITION ISO SUMMARY JUDGMENT - 18
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

override the rights protected by the Second Amendment, Plaintiffs will now analyze the challenged statute under the "intermediate scrutiny" test that many Courts have applied.

I-1639 fails intermediate scrutiny unless the Defendants can affirmatively demonstrate that the law is "narrowly tailored to serve a significant governmental interest." *Packingham v. North Carolina*, 137 S.Ct. 1730, 1736 (2017) (internal quotation marks omitted). As an alternative holding to the finding urged above, this Court should find that I-1639 fails intermediate scrutiny because of the lack of any conceivable "fit" between the governmental interest and the statutory scheme.

### a)  The Governmental Interest Asserted Is the Prevention of Mass School Shootings by Young Adults.

Defendants fail to distinguish generic concerns about "gun violence" from the specific harm sought to be avoided by I-1639: the prevention of mass shootings by young adults. However horrific such cases are, they are also extremely rare.[20] Because Defendants assert the interest in preventing mass shootings by young adults, the Court must evaluate whether they have carried their burden to show that I-1639 is narrowly tailored to serve that specific interest, not whether there are additional harms that could be avoided such as suicide or accidental firearms injuries.[21]

### b)  I-1639 Does Not Serve The Asserted Governmental Interest.

The government bears the burden of proving that the chosen imposition on a constitutional right serves the identified governmental interest. Even crediting the interest, and claims of the applicability of intermediate scrutiny, I-1639 does not prevent adults from accessing semiautomatic rifles. Defendants freely admit that I-1639 "does not preclude 18- to 20-year-olds from accessing

---

[20] Plaintiffs have challenged two aspects of I-1639: the prohibition of sales of semiautomatic rifles to certain adults, and the prohibition against purchase of semiautomatic rifles by residents of other states. Defendants have proposed intermediate scrutiny for the prohibition on sales of semiautomatic rifles to resident adults, basing their defense of the statute on the supposedly "irresponsible" character of adults between 18 and 20. Consequently, to pass constitutional muster this aspect of the statute must be narrowly tailored to serve the specific governmental interest of preventing mass shootings by those adults.

[21] It would benefit society to reduce deaths and injuries by suicide or accidental shooting, but I-1639 is directed at a specific type of firearm—the semiautomatic rifle—and Defendants base their defense of I-1639 on "mass shooters' preference for semiautomatic rifles and their lethality." (Dkt. # 84, 25:7) There can be no claim that I-1639 is narrowly tailored to reduce the incidence of other types of gun violence, because I-1639 has no effect on the availability of other firearms that are equally well suited to inflict other types of gun violence.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

SARs." (Dkt. # 84, 7:10-11.) Not only does I-1639 permit supposedly "irresponsible" adults to acquire semiautomatic rifles legally, but the Defendants additionally ignore the substantial possibility that a person intent on committing a crime with a firearm would pursue illegal means of acquiring one. But far worse than simply being ineffectual, I-1639 actually subverts the identified governmental interest, which is to prevent the use of semiautomatic rifles in mass shootings. Absent the purchase ban of I-1639, an adult who wished to purchase a semiautomatic rifle would undergo the same background check that is applied to any other purchaser; with the ban, he cannot. For all of the reasons identified in Defendants' brief, a background check serves a legitimate governmental interest in preventing felons, the mentally ill, and other legally adjudicated "irresponsible" persons from obtaining firearms. But as a result of I-1639, the only way that a young adult can access to a semiautomatic rifle—access which I-1639 not only contemplates but specifically permits—is to obtain a semiautomatic rifle *without* a background check. Not only are background checks not required in order to give or loan an semiautomatic rifle to a young adult; **they are legally forbidden**.[22] Sympathetic adults who might otherwise insist that a young adult obtain a semiautomatic rifle by purchasing one may very well be persuaded that the lawful possession and use of a semiautomatic rifle—which I-1639 explicitly recognizes—should be made possible by gifting or loaning a semiautomatic rifle to an adult who cannot purchase it.

If "intermediate scrutiny" is to mean anything, it requires not only that the Court must consider the strength of the governmental interest asserted, but also whether it is "narrowly tailored"—so that it does not inflict substantial damage to other legitimate interests, especially enumerated constitutional rights. While I-1639 undeniably prevents adults from exercising their constitutional right to keep and bear arms—for self-defense, for marksmanship, for hunting, and for other lawful purposes—it does little to achieve the goal of preventing mass shootings, and may

---

[22] *See* Ard Decl. Exh. J, BATF 4473 Q 11.a and comments (a purchaser who intends to give a firearm as a lawful gift must complete the background check, not the intended recipient).

1    very well have a negative impact by evading the background check requirement that would

2    otherwise apply.[23]

3         **C.    The State Cannot Ban Interstate Commerce In Long Guns.**

4         Mitchell's challenge to the ban on interstate purchases withstands the Defendants' defense

5    of the law because the Defendants misrepresent what the law actually does. The proffered defense

6    of a wished-for statute provides as strong a condemnation of the actual text as well as any other

7    argument. Indeed, Defendants effectively concede that the statute is unconstitutional because it

8    explicitly forbids the purchase of a semiautomatic rifle with delivery to an out-of-state FFL.

9    Defendants claim that the purchase ban only addresses non-residents coming to the state and

10   taking in-state delivery of semiautomatic rifles, in order to effectuate the State's interest in

11   background checks. But the ban is broader. It forbids in-state purchases by non-residents, even

12   where delivery is performed in another state by another dealer. Defendants do not, and cannot,

13   defend that aspect of the ban; they wrongly claim it doesn't exist. Defendants defend a statute they

14   perhaps wish they had written: one that does not directly forbid purchases that are delivered out-

15   of-state, but instead imposes burdens on in-state sales and deliveries regardless of the purchaser's

16   residence. That is not the statute enacted by I-1639.

17

18

19   [23] The Defendants' so-called "experts" do not present any relevant evidence, nor even well-educated and informed
20   predictions, but ideologically driven claptrap. *See, e.g.*, Ard Decl. Exh. F, Rivara Dep. pp. 41-42 (asserting that
     deaths due to medical errors, while higher than firearms deaths, are mere "problem" not "crisis" because
21   physicians are supposed to pay attention to delivery of care and prescription writing thereby "addressing"
     problem); *id.* at pp. 50-52 (50% of total suicides by firearm is a public health "crisis" while other 50% of suicides
22   performed by other means is mere "problem"); Ard Decl. Exh. G, Aylward Dep. pp. 7-12 (opining on "risky"
     firearms use by adults aged 18 to 20, after defining "risky behaviors" as only those potentially harmful activities
23   "that society has deemed to be inappropriate" according to "commonly accepted norms"); *id.* at pp. 30-32
     (acknowledging that following firearm laws is responsible behavior and admitting no knowledge as to actual
24   lawfulness of firearms use by adults age 18-20 in Washington); Ard Decl. Exh. G, Johnson Dep. pp. 11-12 (admitting
     she has no idea how to purchase a firearm or how long it takes despite opining that the act of purchase can be an
25   emotionally "hot" situation); pp. 17-19 (no idea whether any agency tracks firearms suicide or homicide specifically
     using semiautomatic rifles despite opining on predicted measurable societal benefits with respect to those types of
26   firearms); Ard Decl. Exh. H, Jones Dep. pp. 11-12 (unable to identify any firearms regulation he would not support
     or opines would not increase safety); pp. 52 (parroting firearms regulations he "remembered" he would oppose
27   after break to be coached by counsel); pp. 19-20 (admitting no idea whether prior actual Washington firearms
     regulations improved public safety).

Plaintiffs' Reply and Opposition iso Summary Judgment - 21
No. 3:19-cv-05106-RBL

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1.   **I-1639 Bans Purchases Of Semiautomatic Rifles Delivered Out-Of-State.**

RCW 9.41.124 states that "[r]esidents of a state other than Washington may ***purchase*** rifles and shotguns, ***except those firearms defined as semiautomatic assault rifles***, in Washington . . ." (emphasis added). Defendants insist it only bars in-state ***sales*** and in-state ***deliveries***, but they are wrong. This is key: in firearms law, a transaction in which a licensed dealer exchanges a firearm for money can constitute a "purchase" without an accompanying "sale," or a "sale" without a "purchase." Because these terms have firearms-specific federal definitions designed to ensure compliance with relevant federal law, and are not governed by general contract law, the ban on "purchase" of semiautomatic rifles by non-Washington residents does not have merely in-state effect and does not merely serve the state's asserted background check interest. It instead directly bans interstate commerce which the state has no interest in or right to regulate.

State law defines "sale" and "sell" with respect to firearms in a manner different than their common legal meaning:

> 'Sale' and 'sell' mean the actual approval of the delivery of a firearm in consideration of payment or promise of payment.

RCW 9.41.010. Federal law bans any licensed dealer from selling handguns to non-residents by forbidding the sale or delivery to a person who is not a resident of the state in which the dealer operates. *See* 18 U.S.C. § 922(b)(3).[24] Following that pattern and respectful of the distinction between purchase and sale/ delivery, Washington law has no ban on "purchase" of handguns akin to the new interstate ban challenged here. Instead, tracking federal law, an out-of-state resident may purchase a handgun from Mitchell. Mitchell cannot ***deliver*** it to the non-Washington resident, nor approve that delivery. Instead, he can send it to a licensed dealer in the purchaser's state of residence, for that FFL to run background checks and deliver the firearm to the purchaser. Thus, while he takes money in exchange for the firearm, he does not "sell" the firearm as that term is defined in this unique area of law. Furthermore, if the non-Washington FFL performs the

---

[24] Read in conjunction with Washington's definition, this means federal law bans both sale, meaning "actual approval of the delivery of a [handgun] in consideration of payment or promise of payment," and delivery performed *without* payment or promise of payment.

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

background check and delivers the firearm (after approval) as a professional courtesy to Mitchell, without charging the recipient, this means that neither Mitchell nor the out-of-state FFL "sold" the firearm for purposes of Chapter 9.41 RCW. Mitchell did not make "actual approval of the delivery;" the local FFL did. But the local FFL made delivery without payment or promise of payment. Thus, it is possible to have a firearms *purchase* without a firearms *sale*.

Similarly, much of federal and state firearms law regulate *delivery*.[25] Following the structure and format of federal law, other Washington statutes (those drafted and passed by the legislature, instead of through citizen initiative) also regulate "delivery" of firearms. *See, e.g.*, RCW 9.41.080 ("No person may *deliver* a firearm to any person" the deliverer believes ineligible to receive it); RCW 9.41.090 ("no dealer may *deliver* a pistol to the purchaser thereof until" various conditions are met); RCW 9.41.092 ("a licensed dealer may not *deliver* any firearm to a purchaser or transferee until" background check requirements are met) (all emphases added).

Attempting to evade the actual text of the law being challenged, Defendants claim that I-1639 "bars only SAR sales in person." Dkt. # 84, at 31 n. 96.[26] RCW 9.41.124 bans certain *purchases*, not *sales*. Because a purchase can take place without a sale, by barring *purchase* instead of *sale* or *delivery*, the newly enacted initiative bans conduct which even the Defendants agree cannot be forbidden, consistent with the interstate commerce clause. It forbids an out-of-state purchaser from paying Mitchell for a firearm that is transferred by Mitchell to an FFL in another state, who delivers the firearm in that state.

## 2. Discrimination, Not Only Economic Protectionism, is *Per Se* Unconstitutional.

Defendants claim that the dormant Interstate Commerce Clause bans only discrimination in the form of economic protectionism. They further argue that because I-1639 negatively affects

---

[25] Perhaps Congress thought that if it regulated only "sales" or "purchases," dealers could evade the law by giving away firearms. For whatever reason it made this distinction, it matters very much to understanding this ban.

[26] The online "Frequently Asked Questions" cited by Defendants is legally wrong, has no force of law, and is entitled to no deference. Nor does it bar the state or federal government from prosecuting Mitchell for allowing a non-resident purchase for delivery in another state, a transaction actually does violate state and thus federal law.

Plaintiffs' Reply and Opposition iso Summary Judgment - 23
No. 3:19-cv-05106-RBL

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1   only Mitchell and other in-state licensed firearms dealers, it is not "economic protectionism"

2   favoring in-state economic interests.[27] But Defendants' efforts to limit the scope of the dormant

3   Interstate Commerce Clause are unpersuasive. For example, in *General Motors v. Tracy*, 519 U.S.

4   278 (1997), cited as authority for the "economic protectionism" gloss proposed by the Defendants,

5   the Court allowed the challenged regulation because the statute was facially non-discriminatory:

6   "The State of Ohio imposes its general sales and use taxes on natural gas purchases from all sellers,

7   whether in-state or out-of-state, except regulated public utilities that meet Ohio's statutory

8   definition of a 'natural gas company.'" *GM v. Tracy*, 519 U.S. at 281-282. Similarly, in *City of*

9   *Philadelphia v. New Jersey*, 437 U.S. 617 (1978), the Defendants quote language suggesting that

10  there is no discrimination in the absence of economic favoritism benefitting a state's own residents.

11  However, it is noteworthy in that case that the Supreme Court struck down a New Jersey law

12  forbidding the importation of solid or liquid waste originating outside New Jersey. The asserted

13  justification was protection of the environment. Thus, it is *protectionism of any kind* that is *per se*

14  unconstitutional, not just economic protectionism. Just as the desire to protect New Jersey

15  residents from environmental degradation could not save a statute that discriminated against out-

16  of-state sales, I-1639 cannot be saved by claiming that it is protecting the health and safety of

17  Washington residents (without favoring them economically).

18          **3.   The Ban Fails Scrutiny On The Terms Offered By The State.**

19          Defendants claim the complete ban on purchases of semi-automatic rifles by out-of-state

20  residents promotes its interest in comprehensive background checks for in-state deliveries of those

21  rifles. As such, the Defendants affirmatively demonstrate that the ban fails any level of scrutiny,

22  because the ban is not tailored to that interest. The Defendants make no claim that the State has a

23  legitimate interest in regulating the scope of background checks that Arizona or Georgia require

24

25  ---

[27] "The term 'discrimination' has a specific meaning in the dormant Commerce Clause context: 'economic

26  protectionism, or discrimination, "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" Dkt. # 84, 27:23-28:1, quoting *Rocky Mtn. Farmers Union*

27  *v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013) and *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994)).

PLAINTIFFS' REPLY AND OPPOSITION iso SUMMARY JUDGMENT - 24
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1  for their residents to take delivery of a semi-automatic firearm from a licensed dealer in that state,

2  to possess it in that state. Yet, the statute forbids an out-of-state resident from purchasing from

3  Mitchell under exactly those circumstances. Plainly, if the proffered interest was an adequate

4  justification, the state could instead ban only *sale* and *delivery* of semi-automatic rifles by in-state

5  FFLs to non-residents physically present in the state, as it does for handguns. Instead, its ban goes

6  beyond that, to ban interstate commerce that affects absolutely no interest of the state of

7  Washington. Thus, even if the State's asserted interest is valid, the statute fails any balancing test,

8  because of the obvious narrower available regulation: regulating *sale* and *delivery* instead of

9  *purchase*.

### 4.   Federal Firearms Law Does Not Grant Authority For The Ban.

11  Finally, Defendants assert that Congress allows the interstate commerce restriction by

12  imposing criminal penalties on dealers who do not comply with relevant state laws when making

13  sales or deliveries. This also fails. Phrased in double and triple negatives, 18 U.S.C. § 922(b)(3)

14  requires federally licensed dealers who *sell* or *deliver* long guns to residents of other states know,

15  understand, and comply with the laws of both the state in which they operate and the state of the

16  purchaser's residence. It imposes criminal penalties on any dealer who fails to do so. It further

17  imposes a presumption of knowledge: "any licensed manufacturer, importer or dealer shall be

18  presumed, for purposes of this subparagraph, in the absence of evidence to the contrary, to have

19  had actual knowledge of the State laws and published ordinances of both States . . ." 18 U.S.C.

20  § 922(b)(3). The state argues that because Mitchell must comply with Washington law as well as

21  another state's law in making *sales* or *deliveries* to non-residents, it can therefore ban *purchases* by

22  those non-residents for sale or delivery by a different dealer in a different state.

23  The argument fails specifically because Congress did not authorize a state ban on interstate

24  commerce. It regulated, and subjected to state regulation, sale and delivery by dealers, but does

25  not thereby authorize discriminatory regulation of *purchase*—again, because, as discussed above,

26  sale, delivery, and purchase are different and uniquely understood in firearms law. Here, none of

27  the State's cases or discussions of legislative history offer any support for its decision to ban out-

Plaintiffs' Reply and Opposition iso Summary Judgment - 25
No. 3:19-cv-05106-RBL

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

of-state residents from purchasing semiautomatic rifles from Washington dealers for eventual *delivery* to those purchasers in their home states. As discussed above, such action by Mitchell is, as a matter of Washington law, not a sale or delivery. The Defendants' extensive discussion of legislative history shows, in fact, that the ban is too broad—again, because it regulates *purchase*, not *sale* or *delivery*. 18 U.S.C. § 922(b)(3) requires Mitchell to comply with both states' laws when he sells or delivers. According to the Defendants' mistaken reading of state law, that justifies a state law ban on Mitchell selling or delivering to a non-resident purchaser, because that reaches only conduct within the state's borders. It reaches further: because I-1639's citizen drafters instead banned *purchase* by non-residents, they reached conduct which the state plainly cannot regulate even as described by the Defendants' reliance on 18 U.S.C. § 922(b)(3). Thus, none of the cases cited by Defendants are apposite. Whether or not Congress *can* authorize the state to regulate *purchase* by unlicensed individuals in a way that affects interstate commerce, Congress has chosen not to do so. It allows state regulation of sale and delivery by licensed dealers, actions which by definition occur within the state. This law goes far beyond that.

### D.   All Claims Are Justiciable.

Defendants challenge the justiciability of this case, both on grounds of standing and mootness. Neither challenge is well taken.

#### 1.   Matthew Wald Has Standing.

Defendants claim that Matthew Wald has not suffered an injury because Wald is unable to keep any firearms at his college dorm. This continues the Defendant's blatant misreading of *Heller* and the Second Amendment as protecting only the right to self-defense in a person's abode. Even crediting that cramped and legally incorrect view of the scope of Wald's rights protected by the Second Amendment, and particularly in light of COVID-19, Wald has an interest in being able to acquire and then possess a semiautomatic rifle at his parents' home. He has standing.

#### 2.   The Organizational Plaintiffs Have Standing.

Defendants challenge the Organizational Plaintiffs standing by claiming that Plaintiffs "offer no evidence that any of the individual plaintiffs are members of their organizations." The

PLAINTIFFS' REPLY AND OPPOSITION ISO SUMMARY JUDGMENT - 26
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1   attached Declaration of Dan Mitchell in Opposition to the Motion for Summary Judgment rebuts

2   their Motion.

3               **3.   Mitchell Has Standing to Challenge The Interstate Purchase Ban.**

4               Defendants also challenge the dealers' standing to assert injury as a result of I-1639's

5   prohibition on interstate purchases. Plaintiffs' Motion showed that the ban is *per se* invalid;

6   Defendants assert that a balancing test is appropriate and therefore that Mitchell must make some

7   showing of lost sales. In the event the Court considers a balancing test, this Opposition includes

8   excerpts from Mitchell's declaration describing the loss of sales because of I-1639. As the Court

9   noted in denying Defendants' Motion to Dismiss on the identical claim of lack of standing,

10  Mitchell is not required to document an attempt to violate the law. His testimony adequately

11  supports the claim that he has been injured by I-1639.

12              With respect to the argument that Mitchell can sell to nonresidents through the FFL-to-

13  FFL transfer process, Defendants are simply wrong about I-1639, which as detailed above

14  absolutely forbids a purchase from Mitchell by non-resident customers, thereby precluding him

15  from transferring the firearm to a colleague for background check and delivery.

16              **4.   Casey's and Rettmer's Claims Are Not Moot.**

17              Because of the passage of time inherent to litigating this case, Casey and Rettmer are now

18  able to purchase semiautomatic rifles on the same terms as other Washington citizens. However,

19  as the Supreme Court has recognized, once a plaintiff establishes a constitutional violation,

20  nominal damages are recoverable by the plaintiffs. *Carey v. Piphus*, 435 U.S. 247 (1978); *Memphis*

21  *Community School Dist. v. Stachura*, 477 U. S. 299 (1986). Just yesterday, in *New York State Rifle &*

22  *Pistol Assn., Inc. v. City Of New York*, 2020 WL 1978708, No. 18-280, the Supreme Court

23  recognized that even though the City had withdrawn the ordinance that was being challenged, the

24  case would not be moot if the plaintiffs added a claim for damages: "On remand, the Court of

25  Appeals and the District Court may consider whether petitioners may still add a claim for damages

26  in this lawsuit with respect to New York City's old rule." Slip Op. at 2. Here the young adult

27  plaintiffs could still add a claim for damages if I-1639 is found to be unconstitutional.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1

## IV. CONCLUSION

2      I-1639 attempts to solve a serious problem—mass shootings—by impermissibly limiting

3 the Second Amendment rights of Washington citizens, for no better reason than their perceived

4 inferiority. It further discriminates against out-of-state purchasers, not just indirectly, but on its

5 face. On both grounds, this Court should enjoin those portions of I-1639.

6 ///

7 ///

8 April 28, 2020.

9                                              ARD LAW GROUP PLLC

10                                         By: _____

11                                              Joel B. Ard, WSBA # 40104

12                                              P.O. Box 11633
                                               Bainbridge Island, WA 98110
13                                              (206) 701-9243

14                                              Attorneys for Plaintiffs

15                                              ALBRECHT LAW PLLC

16
                                           By: _____
17
                                               Matthew C. Albrecht, WSBA #36801
18                                              David K. DeWolf, WSBA #10875

19                                              421 W. Riverside Ave., Ste. 614
                                               Spokane, WA 99201
20                                              (509) 495-1246

21                                              Attorneys for Plaintiffs

22

23

24

25

26

27

PLAINTIFFS' REPLY AND OPPOSITION ISO SUMMARY JUDGMENT - 28
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1

## CERTIFICATE OF SERVICE

2  I certify under penalty of perjury under the laws of the United States of America that on

3  April 28, 2020, I filed the foregoing **REPLY AND OPPOSITION** together with the Declaration

4  of Joel Ard and its Exhibits A-J in *Mitchell et al. v. Atkins et al.*, No. 3:19-cv-05106, with the Court's

5  CM/ECF system, which will give notice to all parties and counsel of record.

6  ARD LAW GROUP PLLC

7

8  By

9

10  Joel B. Ard, WSBA # 40104
P.O. Box 11633
11  Bainbridge Island, WA 98110
(206) 701-9243
12  Joel@Ard.law

13  Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

CERTIFICATE OF SERVICE
No. 3:19-cv-05106-RBL

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243