The Honorable Ronald B. Leighton

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| DANIEL MITCHELL, ROBIN BALL, LUKE RETTMER, NATHANIEL CASEY, MATTHEW WALD, SECOND AMENDMENT FOUNDATION, and NATIONAL RIFLE ASSOCIATION,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>CHUCK ATKINS, in his official capacity as the Sheriff of Clark County, Washington, CRAIG MEIDL, in his official capacity as the Chief of Police of Spokane, Washington, and TERESA BERNTSEN, in her official capacity as the director of the Washington State Department of Licensing,<br><br>　　　　　Defendants. | No. 3:19-cv-05106-RBL<br><br><br>BRIEF OF AMICI CURIAE CITIZENS' COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS AND FIREARMS POLICY COALITION<br><br>NOTE ON MOTION CALENDAR: August 14, 2020 |

## CORPORATE DISCLOSURE STATEMENT

Citizens' Committee for the Right to Keep and Bear Arms ("CCRKBA") and Firearms Policy Coalition ("FPC") are nonprofit corporations with no stock and no parent companies. No publicly held companies own 10% or more of their stock.

BRIEF OF AMICI CURIAE CITIZENS' COMMITTEE
FOR THE RIGHT TO KEEP AND BEAR ARMS
AND FIREARMS POLICY COALITION            i

Law Office of Eric R. Stahlfeld
145 SW 155th St., Ste 101, Burien, WA 98166
(206) 248-8016

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT............................................................................i

TABLE OF CONTENTS............................................................................................................ii

TABLE OF AUTHORITIES ....................................................................................................iii

INTEREST OF AMICI CURIAE ............................................................................................1

INTRODUCTION.......................................................................................................................2

ARGUMENT ..............................................................................................................................3

I.     I-1639's Scope—Prohibiting the Purchase of All Semiautomatic Rifles,
       Rather than a Subset of them—is Unprecedented .............................................3

II.    Bans on the Acquisition of Firearms Strike at the Very Core of the Right
       Recognized in *Heller* and *McDonald*.................................................................9

III.   Conclusion ..................................................................................................16

1

## **TABLE OF AUTHORITIES**

2

**Cases**

3  *Board of Airport Commissioners v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987) ........................ 12

4  *Caetano v. Massachusetts*, 577 U.S. ___, 136 S. Ct. 1027 (2016) ................................................ 4

5  *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984) ............................................... 14

6  *District of Columbia v. Heller*, 554 U.S. 570 (2008) ......................................................... *passim*

7  *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ............................................................. 3

   *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449 (2007) ................................................................ 13

8  *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) ............................................ 7

9  *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*") ........................... 7

10 *Ileto v. Glock, Inc.*, 565 F.3d 1126 (9th Cir. 2009) .................................................................. 13

11 *Jackson v. City of San Francisco*, 746 F.3d 953 (9th Cir. 2014) ............................................. 13

12 *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ........................................................................ 7

   *McCullen v. Coakley*, 573 U.S. 464 (2014) ............................................................................ 15

13 *McDonald v. City of Chicago*, 561 U.S. 742 (2010) ........................................................ 2, 9-11

14 *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) .................................................................. 14

15 *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) .................................... 7

16 *National Socialist Party of America v. Skokie*, 432 U.S. 43 (1977) ......................................... 12

17 *Reno v. ACLU*, 521 U.S. 844 (1997) ..................................................................................... 13

18 *Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016) ................................................................. 13

19 *Skokie v. Nat'l Socialist Party*, 373 N.E.2d 21, 69 Ill. 2d 605 (1978) .................................... 12

20 *State v. Kessler*, 614 P.2d 94, 289 Or. 359 (1980) .................................................................. 4

   *Stenberg v. Carhart*, 530 U.S. 914 (2000) .............................................................................. 5

21 *Teixeira v. County of Alameda*, 822 F.3d 1047 (9th Cir. 2016) .............................................. 11

22 *Tinker v. Des Moines Ind. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) ............................................ 3

23 *United States v. Carolene Products Co.*, 304 U.S. 144 (1938) ................................................. 13

24 *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) ........................................................ 13

25 *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2009) ................................................ 11, 13

   *United States v. Miller*, 307 U.S. 174 (1939) ......................................................................... 4

26 *United States v. Playboy Entm't Group*, 529 U.S. 803 (2000) ........................................... 13-14

27 *Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ........................................................ 14-15

28

**Statutes**

10 U.S.C. § 246 ............................................................................................... 11

36 U.S.C. § 40722 ............................................................................................. 5

36 U.S.C. § 40732 ............................................................................................. 5

50 U.S.C. § 3802 ............................................................................................... 11

Chicago, Ill., Municipal Code § 8–20–040 ...................................................... 10

Chicago, Ill., Municipal Code § 8–20–050 ...................................................... 10

D.C. Code § 7-2501.01 ..................................................................................... 5

D.C. Code § 7-2502.01 (2001) ......................................................................... 9

D.C. Code § 7-2502.02 (2001) ......................................................................... 9

N.Y. City Admin. Code § 10-301 ..................................................................... 8

N.Y. City Admin. Code § 8-803 ....................................................................... 15

N.Y. Penal Law § 265.00 .................................................................................. 5

**Other Authorities**

Gov. Edmund G. Brown Jr., Veto Message, SB374 (Oct. 11, 2013), *available at* https://www.ca.gov/archive/gov39/wp-content/uploads/2017/09/SB_374_2013_ Veto_Message.pdf (last visited Jul. 21, 2020) ................................................... 8

Christopher Chant, *The New Encyclopedia of Handguns* (1986) ..................... 4

Civilian Marksmanship Program – M1 Garand, *available at* https://thecmp.org/ sales-and-service/m1-garand/ (last visited Jul. 21, 2020) ................................ 5

Edward Clinton Ezell, *Small Arms of the World* (12th ed. 1983) ..................... 5

Stephen P. Halbrook, *Reality Check: The Assault Weapon Fantasy and Second Amendment Jurisprudence*, 14 Geo. J.L. & Pub. Pol'y 47 (2016) .................... 6

Bruce Kobayashi & Joseph Olson, *In re 101 California Street: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of "Assault Weapons,"* 8 Stan. L. & Pol'y Rev. 41 (1997) .................................................. 5

David B. Kopel & Joseph Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. L.J. 495 (2019) ........................................................ 3

Julian S. Hatcher, *The Book of the Garand* (Gun Room Press 1977) (1948) ............................... 5

Christopher S. Koper, et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, Report to the National Institute of Justice, United States Department of Justice (Jun. 2004) ................... 7

Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* (1994) ........................................................................... 3

Martin Pegler, *Firearms in the American West 1700-1900* (2002) ................. 4

BRIEF OF AMICI CURIAE CITIZENS' COMMITTEE
FOR THE RIGHT TO KEEP AND BEAR
AND FIREARMS POLICY COALITION                iv

Law Office of Eric R. Stahlfeld
145 SW 155th St., Ste 101, Burien, WA 98166
(206) 248-8016

SB374, 2013-14 Leg., Regular Sess. (Cal. 2013)..........................................................8

Josh Sugarmann, Violence Policy Center, *Assault Weapons and Accessories in America* (1988), *available at* https://www.vpc.org/studies/awaconc.htm (last visited Jul. 21, 2020) ..........................................................................................6

Jacob Sullum, *'Assault Weapons,' Explained: How a scary name for an arbitrary group of firearms distorts the gun control debate*, Reason (Jun. 2018), *available at* https://reason.com/2018/05/14/assault-weapons-explained/ (last visited Jul. 21, 2020) ..........................................................................................6

E. Gregory Wallace, *"Assault Weapon" Myths*, 43 S. Ill. L.J. 193 (2019) ...............................5-6

Winston Williams, *New Law Swells Chicago Pistol Registrations*, N.Y. Times, Apr. 9, 1982, at A16, *available at* https://www.nytimes.com/1982/04/09/us/new-law-swells-chicago-pistol-registrations.html (last visited Jul. 21, 2020)............................10

## Foreign Authorities

1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1689)............................................3

*Burke v. Sec'y of State for Home Dep't* [1999] EWCA (Civ) 989 (Eng.) .....................................9

Firearms (Amendment) Act 1988 (Eng.), *available at* https://www.legislation.gov.uk/id?title=Firearms+%28Amendment%29+Act+1988 (last visited Jul. 21, 2020) ..........................................................................................8

BRIEF OF AMICI CURIAE CITIZENS' COMMITTEE
FOR THE RIGHT TO KEEP AND BEAR ARMS
AND FIREARMS POLICY COALITION          v

Law Office of Eric R. Stahlfeld
145 SW 155th St., Ste 101, Burien, WA 98166
(206) 248-8016

## INTEREST OF AMICI CURIAE

Amicus Citizens' Committee for the Right to Keep and Bear Arms ("CCRKBA") is a Washington nonprofit corporation that is dedicated to protecting the right of the people to keep and bear arms. CCRKBA's role includes educating grass root activists, the general public, judges, legislators and the media. Its programs are designed to help all Americans understand the importance of the Second Amendment and its role in keeping Americans safe and free. CCRKBA has been particularly involved in advocating for and against both legislation and initiatives relating to firearms in Washington.

Amicus Firearms Policy Coalition ("FPC") is a Delaware nonprofit corporation, based in California, with purposes that include defending and promoting the People's rights and freedom. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach and other programs. FPC represents its members and supporters, who include individuals aggrieved by I-1639.

BRIEF OF AMICI CURIAE CITIZENS' COMMITTEE
FOR THE RIGHT TO KEEP AND BEAR ARMS
AND FIREARMS POLICY COALITION                    1

Law Office of Eric R. Stahlfeld
145 SW 155th St., Ste 101, Burien, WA 98166
(206) 248-8016

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION[1]**

During the Twentieth Century, cars replaced buggies, vaccines replaced folk remedies—and autoloading (or semiautomatic) firearms replaced manually operated ones. "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008) (citations omitted).

I-1639 purports to apply only to "semiautomatic assault rifles," and to stand only as a bar to their purchase (not possession) by young adults, but its actual import is far more severe. I-1639 bars young adults from *all* semiautomatic rifles, not just a limited subset defined as "assault weapons," and it thus marks an unprecedented encroachment on the right to keep and bear modern small arms. Moreover, attempts to distinguish *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), on the ground that they concerned "bans," while I-1639 prohibits only "sales," do not actually stand up. The laws the Supreme Court overturned in *Heller* and *McDonald* were laws that barred the acquisition of guns, not their possession.

While I-1639 bedecks itself in "enough is enough" reasonableness—"why should 18 year-olds be able to purchase assault rifles?"—it in fact stands as an effectual ban on a young adult's ability to purchase any modern, semiautomatic rifle. That same young adult is (if male) a member of the militia, and subject to being drafted, both of which would entail the use of modern, semiautomatic rifles. This cannot be squared with the constitutional guarantee that "the

_____

[1] No counsel for a party authored this brief in whole or in part. No person other than amici or their counsel contributed money to fund this brief's preparation or submission.

BRIEF OF AMICI CURIAE CITIZENS' COMMITTEE
FOR THE RIGHT TO KEEP AND BEAR ARMS
AND FIREARMS POLICY COALITION                    2

Law Office of Eric R. Stahlfeld
145 SW 155th St., Ste 101, Burien, WA 98166
(206) 248-8016

right of the people to keep and bear Arms, shall not be infringed." It could only be justified by

the conclusion that adults under the age of 21 have no constitutional rights at all. *But see Tinker*

*v. Des Moines Ind. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) (rejecting claim that high school

students lack First Amendment rights). *See generally* David B. Kopel & Joseph Greenlee, *The*

*Second Amendment Rights of Young Adults*, 43 S. Ill. L.J. 495 (2019).

## ARGUMENT

I.    **I-1639's Scope—Prohibiting the Purchase of All Semiautomatic Rifles, Rather than a Subset of them—is Unprecedented**

The historical genesis of the *right* to keep and bear arms was the *obligation* that English

law imposed on its subjects to take up arms in defense of their country and communities. *See*

Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 1-2, 117-

18 (1994). Indeed, the Second Amendment's prefatory clause, declaring "A well regulated

Militia, being necessary to the security of a free State," reflects one key purpose underlying the

guarantee—that individuals would have arms available to them that would be suitable to defend

their country and communities in times of war or civil unrest. *See Heller*, 554 U.S. at 577

(citations omitted). Over the course of several centuries, the obligation to keep arms evolved to

also become a right to keep them—a right the 1689 English Declaration of Rights enshrined by

declaring (after Catholic King James II had sought to disarm them) that "Protestants may have

arms for their defence suitable to their conditions and as allowed by law." 1 W. & M., c. 2, § 7,

in 3 Eng. Stat. at Large 441 (1689); *see also Heller*, 554 U.S. at 593 (citing Malcolm, *supra*, at

103-06). When the framers ratified the Second Amendment, they accordingly understood that the

Amendment "codified a *pre-existing* right." *Heller*, 554 U.S. at 592 (emphasis in source).

The actual scope of the Second Amendment's protection turns on "a textual and historical

inquiry into original meaning." *Ezell v. City of Chicago*, 651 F.3d 684, 701 (7th Cir. 2011).

BRIEF OF AMICI CURIAE CITIZENS' COMMITTEE
FOR THE RIGHT TO KEEP AND BEAR ARMS
AND FIREARMS POLICY COALITION                    3

Law Office of Eric R. Stahlfeld
145 SW 155th St., Ste 101, Burien, WA 98166
(206) 248-8016

Historically, individuals reporting for militia service "were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *United States v. Miller*, 307 U.S. 174, 179 (1939); *accord Heller*, 554 U.S. at 624. Furthermore, "weapons used by militiamen and weapons used in defense of person and home were one and the same." *State v. Kessler*, 614 P.2d 94, 98, 289 Or. 359, 368 (1980) (citation omitted); *accord Heller*, 554 U.S. at 624-25. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them[.]" *Heller*, 554 U.S. at 634-35. Thus, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582; *accord Caetano v. Massachusetts*, 577 U.S. ___, 136 S. Ct. 1027, 1030 (2016) (stun guns). The only bearable arms that the Second Amendment does not protect are "those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller*, 554 U.S. at 625 (citing *Miller*, 307 U.S. 174).

After the Second Amendment's ratification in 1791, firearms continued to develop. In particular, firearms development moved in the direction of increasing the ease and speed with which guns could be reloaded and fired again. *See* Martin Pegler, *Firearms in the American West 1700-1900* 62 (2002). Muskets using revolving cylinders, which could fire several times without reloading, were already in existence at the time of the Second Amendment's ratification. *See id.* As the Nineteenth Century progressed, developers created other designs—slide-action, lever-action and bolt-action—that enabled users to reload and fire again by manually cycling a gun's slide, lever or bolt. *See id.* at 64-83. The first semiautomatic rifles and handguns—which used mechanism that automatically loaded another shot, without the necessity of operating a slide, lever or bolt—appeared in the latter part of the Nineteenth Century. *See* Christopher Chant, *The New Encyclopedia of Handguns* 57-58, 73-74 (1986). By the time of the early Twentieth

BRIEF OF AMICI CURIAE CITIZENS' COMMITTEE
FOR THE RIGHT TO KEEP AND BEAR ARMS
AND FIREARMS POLICY COALITION          4

Law Office of Eric R. Stahlfeld
145 SW 155th St., Ste 101, Burien, WA 98166
(206) 248-8016

Century, a number of semiautomatic rifles were available to Americans, including models by Browning, Remington and Winchester. *See* Julian S. Hatcher, *The Book of the Garand* 13-15 (Gun Room Press 1977) (1948). Autoloading firearms took over during the Twentieth Century. By the time of World War II, the standard issue rifle of the U.S. Army was the M1 Garand, a semiautomatic rifle that held 8 rounds of ammunition. *See* Edward Clinton Ezell, *Small Arms of the World* 16 (12th ed. 1983). Notably, the U.S. government continues to sell surplus M1 Garand rifles to civilians through the Civilian Marksmanship Program. *See* 36 U.S.C. §§ 40722(5), 40732(b)(1) ("caliber .30 surplus rifles"); *see also* Civilian Marksmanship Program – M1 Garand, *available at* https://thecmp.org/sales-and-service/m1-garand/ (last visited Jul. 21, 2020).

Gun prohibitionists developed a new approach in the 1980s—that of prohibiting subsets of semiautomatic firearms characterized as "assault weapons." *See generally* E. Gregory Wallace, *"Assault Weapon" Myths*, 43 S. Ill. L.J. 193, 193 (2019). While there is no accepted or universal definition for the term "assault weapon," laws that ban "assault weapons" generally operate to "criminalize possession or transfer of semiautomatic rifles with detachable magazines *and at least one specified feature* such as a pistol grip, telescoping stock, flash suppressor, barrel shroud, bayonet mount, or grenade launcher." *Id.* (citing D.C. Code § 7-2501.01(3A)(A); N.Y. Penal Law § 265.00(22)) (emphasis added). Like the term "partial birth abortion," the term "'assault weapon' . . . is a political term, developed by anti-gun publicists to expand the category of 'assault rifles' so as to allow an attack on as many additional firearms as possible on the basis of undefined 'evil' appearance." Bruce Kobayashi & Joseph Olson, *In re 101 California Street: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of "Assault Weapons,"* 8 Stan. L. & Pol'y Rev. 41, 43 (1997), *quoted in Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting).

BRIEF OF AMICI CURIAE CITIZENS' COMMITTEE
FOR THE RIGHT TO KEEP AND BEAR ARMS
AND FIREARMS POLICY COALITION                    5

Law Office of Eric R. Stahlfeld
145 SW 155th St., Ste 101, Burien, WA 98166
(206) 248-8016

The Violence Policy Center, an organization that advocates against civilian firearms ownership, penned a report in 1988 opining that "[a]ssault weapons' menacing looks, coupled with the public's confusion over fully-automatic machine guns versus semi-automatic assault weapons—anything that looks like a machine gun is assumed to be a machine gun—can only increase the chance of public support for restrictions on these weapons." Josh Sugarmann, Violence Policy Center, *Assault Weapons and Accessories in America*, Conclusion (1988), *available at* https://www.vpc.org/studies/awaconc.htm (last visited Jul. 21, 2020). Many members of the general public simply do not understand the actual attributes that distinguish "assault weapons" from other semiautomatic firearms, mistakenly believing that "assault weapons" shoot at a higher rate of speed, or hold more rounds of ammunition, or shoot larger caliber ammunition.[2] *See* Wallace, *"Assault Weapon" Myths*, *supra*, at 198; *see also* Stephen P. Halbrook, *Reality Check: The Assault Weapon Fantasy and Second Amendment Jurisprudence*, 14 Geo. J.L. & Pub. Pol'y 47, 49 (2016); Jacob Sullum, *'Assault Weapons,' Explained: How a scary name for an arbitrary group of firearms distorts the gun control debate*, Reason (Jun. 2018), *available at* https://reason.com/2018/05/14/assault-weapons-explained/ (last visited Jul. 21, 2020). Moreover, there is little evidence that attempts to define and then ban "assault weapons" achieves any public safety benefit. In 2004, when the federal ban on "assault weapons" was expiring, the National Institute of Justice conducted a study of its effectiveness. *See* Christopher S. Koper, et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, Report to the National Institute of

---

[2] We will never know what Washington voters would have said if I-1639 had said "all semiautomatic rifles" instead of "semiautomatic assault rifles."

BRIEF OF AMICI CURIAE CITIZENS' COMMITTEE
FOR THE RIGHT TO KEEP AND BEAR ARMS
AND FIREARMS POLICY COALITION          6

Law Office of Eric R. Stahlfeld
145 SW 155th St., Ste 101, Burien, WA 98166
(206) 248-8016

Justice, United States Department of Justice (Jun. 2004). Not surprisingly, the NIJ report found a reduction in the prevalence of guns defined as "assault weapons"—but much more significantly, "no discernible reduction in the lethality and injuriousness of gun violence, based on indicators like the percentage of gun crimes resulting in death or the share of gunfire incidents resulting in injury." *Id.* at 96.

Notwithstanding this, the federal appellate courts have generally upheld "assault weapon" prohibitions—most commonly on the rationale that they "ban only a limited subset of semiautomatic firearms" and allow individuals to continue using "any semiautomatic gun that does not contain any of the enumerated military-style features." *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 260 (2d Cir. 2015); *see also Friedman v. City of Highland Park*, 784 F.3d 406, 411 (7th Cir. 2015); *Heller v. District of Columbia*, 670 F.3d 1244, 1262 (D.C. Cir. 2011) ("*Heller II*"). *But see Kolbe v. Hogan*, 849 F.3d 114, 136 (4th Cir. 2017) ("assault weapons" are "outside the ambit of Second Amendment protection"). Perhaps the Seventh Circuit was most candid when it acknowledged that a ban on "assault weapons" may serve only to "increase the public's *sense* of safety." *Friedman*, 784 F.3d at 412 (emphasis added). The court reasoned that if the ban "reduces the perceived risk from a mass shooting, and makes the public feel safer as a result, that's a substantial benefit." *Friedman*, 784 F.3d at 412 (citation omitted).

Whether such rationales stand the test of time or not, they are completely out the window with I-1639. For while I-1639 invokes the term "assault rifle," its actual sweep—covering *all* semiautomatic rifles, regardless of whether they have additional "military-style features," or even accept detachable magazines—is without precedent in the United States. Indeed, I-1639 prohibits the purchase of .22 rimfire repeaters intended for hunting rabbits and World War II relics like the M1 Garand—not just semiautomatics like the AR15, which appear similar to

BRIEF OF AMICI CURIAE CITIZENS' COMMITTEE
FOR THE RIGHT TO KEEP AND BEAR ARMS
AND FIREARMS POLICY COALITION            7

Law Office of Eric R. Stahlfeld
145 SW 155th St., Ste 101, Burien, WA 98166
(206) 248-8016

current military service rifles. To counsel's knowledge, there is no other place in America that prohibits M1 Garand rifles.[3]

The only State that has even come close to I-1639's scope is California, where in 2013 the legislature attempted to ban all semiautomatic rifles except those with fixed magazines holding no more than 10 rounds. *See* SB374, 2013-14 Leg., Regular Sess. (Cal. 2013) § 1. Governor Ed Brown vetoed this bill, explaining that, in contrast to an "assault weapon" ban, the proposed bill "goes much further by banning any semi-automatic rifle with a detachable magazine." Gov. Edmund G. Brown Jr., Veto Message, SB374 (Oct. 11, 2013), *available at* https://www.ca.gov/archive/gov39/wp-content/uploads/2017/09/SB_374_2013_ Veto_Message.pdf (last visited Jul. 21, 2020). Notably, he signed bills banning "high-capacity" ammunition magazines on the same day. *See id.*

To find analogues to I-1639 one must look to countries that do not (or no longer) protect the right of their people to have arms. For example, the United Kingdom banned all semiautomatic rifles (except .22 rimfires) in 1988. *See* Firearms (Amendment) Act 1988 (Eng.), *available at* https://www.legislation.gov.uk/id?title=Firearms+%28Amendment%29+Act+1988 (last visited Jul. 21, 2020). While the Supreme Court of the United Kingdom has not addressed the issue, lower UK courts have ruled that parliamentary gun bans stand as effectual repeals of the right to arms enshrined in the 1689 Declaration of Rights. *See Burke v. Sec'y of State for*

---

[3] To be fair, a person purchasing an M1 Garand in New York City would need to remove any bayonet lug that was present. *See* N.Y. City Admin. Code § 10-301(16) ("assault weapon" definition covers any semiautomatic rifle with, among other things, a "bayonet mount"). New York City's "assault weapon" ban is arguably the country's broadest, as it applies to any semiautomatic rifle with a designated "military-style" feature, regardless of whether it accepts a detachable magazine. *See id.*

BRIEF OF AMICI CURIAE CITIZENS' COMMITTEE
FOR THE RIGHT TO KEEP AND BEAR ARMS
AND FIREARMS POLICY COALITION          8

Law Office of Eric R. Stahlfeld
145 SW 155th St., Ste 101, Burien, WA 98166
(206) 248-8016

*Home Dep't* [1999] EWCA (Civ) 989 (Eng.) ("What the law makes the law can unmake."). This result would be untenable in the United States, where our Constitution removes the fundamental right to keep and bear arms from the vagaries of legislatures responding to tragic, high profile events.

## II.      Bans on the Acquisition of Firearms Strike at the Very Core of the Right Recognized in *Heller* and *McDonald*

By prohibiting the "purchase" and "transfer" of semiautomatic rifles by young adults, I-1639 strikes right at the core of the Second Amendment right that the Supreme Court recognized in *Heller* and *McDonald*—even though I-1639 does not proscribe "possession" by young adults per se. This is because the laws at issue in both *Heller* and *McDonald* likewise did not prohibit the "possession" of handguns per se, or "ban" them outright. Rather, those laws—which the Court described as "bans"—precluded the *acquisition* of handguns on a prospective basis.

In *Heller*, the Supreme Court invalidated a District of Columbia law that substantively provided that "the registration of handguns is prohibited." *Heller*, 554 U.S. at 575. Specifically, the District of Columbia Code made it illegal to, *inter alia*, "possess" a gun in the absence of a "registration certificate," D.C. Code § 7-2502.01(a) (2001), and it then provided that "[a] registration certificate shall not be issued for a . . . [p]istol not validly registered to the current registrant in the District prior to September 24, 1976," *id.* § 7-2502.02(a)(4). The Court's conclusion was that "[a]ssuming that [the petitioner] is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun[.]" *Heller*, 554 U.S. at 635. Furthermore, the District's law was unconstitutional without regard to the standard of scrutiny. "Under any of the standards of scrutiny that we have applied to enumerated constitutional rights," a ban on handguns "would fail constitutional muster." *Id.* at 628-29.

BRIEF OF AMICI CURIAE CITIZENS' COMMITTEE
FOR THE RIGHT TO KEEP AND BEAR ARMS
AND FIREARMS POLICY COALITION          9

Law Office of Eric R. Stahlfeld
145 SW 155th St., Ste 101, Burien, WA 98166
(206) 248-8016

In *McDonald*, the Supreme Court likewise overturned a Chicago law that "prohibits registration of most handguns, thus effectively banning handgun possession by almost all private citizens who reside in the City." *Id.* at 750. Specifically, Chicago made it illegal to "possess . . . any firearm unless [a] person is the holder of a valid registration certificate," Chicago, Ill., Municipal Code § 8–20–040(a) (2009), and it then simultaneously provided that "[n]o registration certificate shall be issued for any . . . handguns," *id.* § 8–20–050(c). Finding the Second Amendment applicable against State and local governments, the Court reversed the lower court decisions that had granted the city's motion to dismiss. *See McDonald*, 561 U.S. at 791.

While there is some debate about the full import of the decisions in *Heller* and *McDonald*, this much is irreducible: The local laws that the Court invalidated were not, strictly speaking, laws that "banned" handguns. Rather, they were laws that prohibited people from acquiring additional handguns. People remained free to keep handguns they had registered in the District of Columbia before 1976, and in the City of Chicago before 1982.[4] The restrictions that the Court found invalid "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights," *Heller*, 554 U.S. at 628, were laws that prohibited otherwise eligible individuals from *acquiring* handguns. It is those laws that, under *Heller* and *McDonald*, are *per se* unconstitutional. And this is exactly what I-1639 does—it forecloses the ability to acquire modern, semiautomatic rifles.

--------

[4] Notably, many Chicago residents made it a point to acquire handguns before the city's ban went into force in 1982. *See* Winston Williams, *New Law Swells Chicago Pistol Registrations*, N.Y. Times, Apr. 9, 1982, at A16, *available at* https://www.nytimes.com/1982/04/09/us/new-law-swells-chicago-pistol-registrations.html (last visited Jul. 21, 2020).

BRIEF OF AMICI CURIAE CITIZENS' COMMITTEE
FOR THE RIGHT TO KEEP AND BEAR ARMS
AND FIREARMS POLICY COALITION                10

Law Office of Eric R. Stahlfeld
145 SW 155th St., Ste 101, Burien, WA 98166
(206) 248-8016

Significantly, both the Third Circuit and the Ninth Circuit have recognized that the Second Amendment cannot tolerate a prohibition on the commercial sale of guns. In *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2009), the Third Circuit evaluated the import of *Heller* and, particularly, of three examples of regulations that the Court had explained that it did not intend "to cast doubt on." *See id.* at 91-92 (*quoting Heller*, 554 U.S. at 626). Those were "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 91 (*quoting Heller*, 554 U.S. at 626-27). The Third Circuit concluded, pertinently, that "[c]ommercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment" because if so "it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. *Such a result would be untenable under Heller*." *Id.* at 92 n.8 (emphasis added). And, citing *Marzzarella*, the Ninth Circuit has likewise ruled that "a total prohibition on the commercial sale of firearms" is "'untenable under *Heller*.'" *Teixeira v. County of Alameda*, 822 F.3d 1047, 1057 (9th Cir. 2016) (*quoting Marzzarella*, 614 F.3d at 92 n.8). But this is exactly what I-1639 does: It creates a total prohibition on the commercial sale of all rifles that have modern, semiautomatic operating mechanisms. It does not apply to a mere subset of modern rifles. And while it does apply to a subset of the adult population, it is a subset that (if male) is both part of the militia and subject to the draft, *see* 10 U.S.C. § 246(a); 50 U.S.C. § 3802(a)—the very people in whom the right to arms first arose.

The restrictions that the Defendants have imposed here are invalid for the same reasons that the laws in *Heller* and *McDonald* were invalid—and indeed, just as the Third Circuit and the Ninth Circuit have already articulated. These restrictions are invalid *per se* because they prohibit

BRIEF OF AMICI CURIAE CITIZENS' COMMITTEE
FOR THE RIGHT TO KEEP AND BEAR ARMS
AND FIREARMS POLICY COALITION                    11

Law Office of Eric R. Stahlfeld
145 SW 155th St., Ste 101, Burien, WA 98166
(206) 248-8016

something that may not be prohibited—the exercise of constitutional rights deemed fundamental—and it is not necessary to resort to tiers of scrutiny to evaluate them. One notable example is *Board of Airport Commissioners v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987), where the Court struck down an LAX airport policy that prohibited (literally) all "First Amendment activities" on LAX property. *See id.* at 575. The unanimous Court declined to address the standard of review, explaining simply that "no conceivable governmental interest would justify such an absolute prohibition of speech." *Id.*

Another pertinent example is *National Socialist Party of America v. Skokie*, 432 U.S. 43 (1977), where the Supreme Court summarily overturned a lower court decision that had enjoined a neo-Nazi group from parading through a town. *See id.* at 44; *see also Heller*, 554 U.S. at 635. Few would dispute that a (substantially Jewish) community has compelling public safety reasons for trying to stop a neo-Nazi group from parading, displaying swastikas and distributing literature—but these safety reasons were insufficient to override the enumerated right of free speech. *See Skokie v. Nat'l Socialist Party*, 373 N.E.2d 21, 22, 69 Ill. 2d 605, 609-10 (1978) (background facts). The Court's decision in *Heller* cited *Skokie* and explained that there, the Court had refused to "apply an 'interest-balancing' approach to the prohibition of a peaceful neo-Nazi march through Skokie." *Heller*, 554 U.S. at 635. There is no exception in "the freedom-of-speech guarantee that the people ratified . . . for the expression of extremely unpopular and wrong-headed views. *The Second Amendment is no different.*" *Id.* (emphasis added). There, as here, a flat prohibition on the exercise of an enumerated constitutional right is unconstitutional on its face. No amount of interest-balancing will remove a right from the Constitution. Laws that simply preclude protected activities do not require standards of scrutiny.

BRIEF OF AMICI CURIAE CITIZENS' COMMITTEE
FOR THE RIGHT TO KEEP AND BEAR ARMS
AND FIREARMS POLICY COALITION          12

Law Office of Eric R. Stahlfeld
145 SW 155th St., Ste 101, Burien, WA 98166
(206) 248-8016

To be sure, most decisions addressing burdens on the right to keep and bear arms use the tiered scrutiny approach that has its genesis in the Supreme Court's well known *Carolene Products* footnote. *See United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938) (suggesting a "more exacting judicial scrutiny" "when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten Amendments"). The Ninth Circuit has ruled that the level of scrutiny depends upon "(1) how close the challenged law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right." *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016) (citing *Jackson v. City of San Francisco*, 746 F.3d 953, 960-61 (9th Cir. 2014)). If there is "such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right," then the law is categorically unconstitutional (i.e. "under any level of scrutiny"). *See id.* (citing *Jackson*, 746 F.3d at 961). Moving beyond this, strict scrutiny applies to a law that "severely burdens" the right. *See id.* (citing *United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013)). And finally, intermediate scrutiny applies when a law implicates the right of armed self defense, but "does not place a substantial burden on the Second Amendment right." *Id.* (quoting *Jackson*, 746 F.3d at 961).

Under a strict scrutiny approach, a law must be "'narrowly tailored to serve a compelling state interest.'" *Marzzarella*, 614 F.3d at 99 (*quoting FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 465 (2007)); *see also Ileto v. Glock, Inc.*, 565 F.3d 1126, 1147 (9th Cir. 2009). "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Entm't Group*, 529 U.S. 803, 813 (2000) (*citing Reno v. ACLU*, 521 U.S. 844, 873 (1997)). The law is presumed to invalid, with "the government bear[ing] the burden of rebutting that presumption." *Marzzarella*, 614 F.3d at 99 (*citing Playboy*,

BRIEF OF AMICI CURIAE CITIZENS' COMMITTEE
FOR THE RIGHT TO KEEP AND BEAR ARMS
AND FIREARMS POLICY COALITION                    13

Law Office of Eric R. Stahlfeld
145 SW 155th St., Ste 101, Burien, WA 98166
(206) 248-8016

529 U.S. at 817). The burden at issue here—a ban on the acquisition of modern, semiautomatic rifles—cannot be sustained under this standard.

As a general proposition, the justification for restrictions on guns is public safety. And, concededly, public safety is a compelling government interest. But the mere fact that a gun restriction has some connection to public safety is not enough. If it were, every single gun law would be constitutional. Thus, when considering the constitutionality of gun laws, the heart of analysis must be proportionality (i.e. "fit") and alternatives (i.e. consideration of what has been closed off and what still remains open). The intermediate scrutiny standard accordingly requires laws to "'leave open ample alternative channels'" for protected conduct and "not [be] substantially broader than necessary to achieve th[e] interest" at hand. *Ward v. Rock Against Racism*, 491 U.S. 781, 783, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984) (other citations omitted)). The strict scrutiny standard requires more—that the government use the least restrictive means. *See id.* at 799 n.6. But the distinctions between these two approaches do not appear to make a difference here, as I-1639 leaves no alternatives for a young adult who wishes to exercise his or her right by acquiring a rifle with a modern, semiautomatic operating mechanism. A blanket ban on semiautomatic rifles is not narrowly tailored, and the only alternatives that it leaves open are rifles that rely on technology that is more than a century old. Indeed, the fact that no other States have attempted to prohibit all semiautomatic rifles—whether to a particular subset of the adults, or to all—only underscores the fact that I-1639's approach is not narrowly tailored. *Cf. Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012) ("There is no suggestion that some unique characteristic of criminal activity in Illinois justifies the state's taking a different approach from the other 49 states.").

BRIEF OF AMICI CURIAE CITIZENS' COMMITTEE
FOR THE RIGHT TO KEEP AND BEAR ARMS
AND FIREARMS POLICY COALITION          14

Law Office of Eric R. Stahlfeld
145 SW 155th St., Ste 101, Burien, WA 98166
(206) 248-8016

And while it should be clear that intermediate scrutiny does not apply to broad preclusions on core conduct, I-1639's prohibition on all semiautomatic rifles would not pass review even under that level of scrutiny. The decision in *McCullen v. Coakley*, 573 U.S. 464 (2014), is instructive, as it shows the importance of "fit" considerations in the intermediate scrutiny context. There, the Court declined to apply strict scrutiny to a Massachusetts law that created a 35 foot perimeter around the entrances of abortion clinics because the restriction was content-neutral. *See id.* at 478-85. But even though strict scrutiny did not apply, and the government thus did not need to use the "'least restrictive or least intrusive means of' serving the government's interests," the restriction still needed to be "narrowly tailored." *Id.* at 486 (*quoting Ward*, 491 U.S. at 798 (1989)). And specifically, the requirement of narrow tailoring meant that the law could not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* (*quoting Ward*, 491 U.S. at 799). To determine whether the law went too far, the Court looked first to the scheme that had previously been in place. *See id.* at 487-90. The Court then considered other States' laws, finding it significant that "no other State [had] a law that creates fixed buffer zones around abortion clinics," although there were some localities that did. *See id.* at 490 & n.6. The Court next looked at other Massachusetts laws, as well as federal laws and some local laws, to find additional regulatory alternatives. *See id.* at 490-93. Notably, New York City's restriction was both smaller (15 feet) and more circumscribed in that it prohibited "follow[ing] and harass[ing]" within the perimeter, not just "standing." *See id.* at 491 (quoting N.Y. City Admin. Code § 8-803 (a)(3)). All of this led to the conclusion that the 35 foot buffer was unconstitutional because it "burden[ed] substantially more speech than necessary to achieve the Commonwealth's asserted interests." *Id.* at 490. This same analysis is fatal to I-1639's attempt to close off the means for young adults to acquire modern,

BRIEF OF AMICI CURIAE CITIZENS' COMMITTEE
FOR THE RIGHT TO KEEP AND BEAR ARMS
AND FIREARMS POLICY COALITION

15

Law Office of Eric R. Stahlfeld
145 SW 155th St., Ste 101, Burien, WA 98166
(206) 248-8016

semiautomatic rifles for their defense. It is obvious that effective options are available that would avoid unnecessarily burdening the right to keep and bear arms.

As the Supreme Court itself recognized in *Heller*, "[w]e know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach. The very enumeration of the right takes out of the hands of government— even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Heller*, 554 U.S. at 634. So, while I-1639's preclusion on all semiautomatic rifles would fail to pass constitutional muster under a standard-of-scrutiny based review, the reality is that any standard of review is inappropriate because a blanket ban on obtaining protected arms is unconstitutional without regard to the interests cited.

### III.    Conclusion

Notwithstanding its packaging, I-1639 does not apply only to "assault rifles," nor is it merely a non-preclusive regulation on commercial sales to young adults along the lines of, "just get your parents' permission." Rather, I-1639 takes the unprecedented step of closing off access to *all* semiautomatic rifles, and further, it stands as a complete ban for any young adult who lacks an obliging parent. Such a prohibition—directed at individuals who are part of the militia and subject to the draft—cannot be squared with the right to keep and bear arms. That guarantee protects the right to modern and useful arms, even when not in militia service.

BRIEF OF AMICI CURIAE CITIZENS' COMMITTEE
FOR THE RIGHT TO KEEP AND BEAR ARMS
AND FIREARMS POLICY COALITION                    16

Law Office of Eric R. Stahlfeld
145 SW 155th St., Ste 101, Burien, WA 98166
(206) 248-8016

1  RESPECTFULLY SUBMITTED on July 24, 2020.

2

3                                             By: /s/ Eric R. Stahlfeld

4                                             Eric R. Stahlfeld, WSBA #22002
                                              Law Office of Eric R. Stahlfeld
5                                             145 SW 155th St., Ste. 101
                                              Burien, WA 98166
6                                             (206) 248-8016
7                                             EStahlfeld@freedomfoundation.com

8                                             David D. Jensen, NY # 4234449
9                                             Petition for Admission *Pro Hac Vice* Pending
                                              David Jensen & Associates
10                                            33 Henry Street
                                              Beacon, New York 12508
11                                            (212) 380-6615
12                                            david@djensenpllc.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRIEF OF AMICI CURIAE CITIZENS' COMMITTEE
FOR THE RIGHT TO KEEP AND BEAR ARMS
AND FIREARMS POLICY COALITION          17

Law Office of Eric R. Stahlfeld
145 SW 155th St., Ste 101, Burien, WA 98166
(206) 248-8016