HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DANIEL MITCHELL, et al,

                    Plaintiffs,

          v.

CHARLES ATKINS, et al,

                    Defendants.

SAFE SCHOOLS SAFE
COMMUNITIES,

          Intervenor-Defendant.

CASE NO. C19-5106-RBL

ORDER

## I. INTRODUCTION

THIS MATTER is before the Court on Plaintiffs' Motion for Summary Judgment [Dkt. #76] and Defendants' and Intervenor-Defendant's Cross-Motion for Summary Judgment [Dkt. #84]. The parties dispute the constitutionality of I-1639, a Washington initiative regulating the sale and possession of semiautomatic assault rifles ("SARs"). The Court has reviewed the materials filed for and against said Motions, including materials filed by Certain Amici. The Court has conducted oral argument. For the reasons given below, the Court **GRANTS** the

Defendants and Intervenor's Motion for Summary Judgment and **DENIES** the Plaintiffs' Motion for Summary Judgment.

## II. FACTS

In 2018, the people of Washington passed Initiative Measure No. 1639 to expand background checks for purchase of guns in this state, to prohibit those under age 21 from purchasing an SAR, and to prohibit in-person sales of such rifles to out-of-state purchasers. Plaintiffs ask this Court to override this initiative and declare the age and out-of-state purchaser limitations unconstitutional.

I-1639 extends three longstanding statutory restrictions on handguns to the weapon often favored by mass shooters: SARs. I-1639 mirrors existing federal and state restrictions on handguns by (1) prohibiting individuals under 21 from purchasing SARs (the "Age Provision"); (2) requiring an enhanced background check—a comprehensive records search conducted by local law enforcement—for SAR purchases (the "Background Check Provision"); and (3) prohibiting in-person sales of SARs to non-Washington residents (the "Nonresident Sales Provision").

### A.    The Age Provision

First, I-1639's Age Provision extends longstanding federal and state restrictions on the sale and possession of handguns to persons under 21 to SARs. The Gun Control Act of 1968, Pub. L. 90-618, 82 Stat. 1213 (codified as amended at 18 U.S.C. §§ 921 et seq.) (the "GCA"), comprehensively regulates interstate and foreign commerce in firearms, imposing strict licensing requirements.  The GCA prohibits a federal firearms licensee ("FFL") from selling a handgun to anyone under the age of 21. *Id.* § 102, 82 Stat. at 1218 (codified as amended at 18 U.S.C. § 922(b)(1)). Since 1994, Washington State law has prohibited 18- to 20-year-olds from

possessing pistols, except in their home or in a variety of other enumerated situations. 1994 Wash. 1st Spec. Sess. Laws, ch. 7, § 423 (codified as amended at RCW 9.41.240).

Under I-1639's Age Provision, the minimum age requirements for purchase of SARs and pistols are identical: a person under 21 "may not purchase a pistol or semiautomatic assault rifle." RCW 9.41.240(1). Likewise, I-1639 limits possession of SARs by 18- to 20-year-olds in parallel circumstances to those long in place for pistols. RCW 9.41.240(3). The Age Provision does not preclude 18- to 20-year-olds from accessing SARs. Its exceptions permit 18- to 20-year-olds to possess SARs in a variety of situations, including: (1) in their home or business; (2) on real property they control; (3) at competitions or shooting ranges; (4) hunting; (5) anywhere shooting is legal; (6) while on duty in the armed forces; or (7) traveling to or from a place they may legally possess such weapons. RCW 9.41.240(2), 9.41.042, 9.41.060. Further, 18- to 20-year-olds may still legally buy shotguns and non-semiautomatic rifles for any and all legal purposes. *See* RCW 9.41.010(27); 18 U.S.C. § 922(b)(1).

**B.     The Background Check Provision**

Second, I-1639's Background Check Provision requires local law enforcement agencies to conduct the same enhanced background checks on prospective purchasers of SARs that they long have performed for pistols. RCW 9.41.090(2)(b).

Basic background check requirements apply to most firearm sales. Federal law requires FFLs to conduct background checks on potential firearm purchasers. 18 U.S.C. § 922(s). It also requires the FBI to maintain the National Instant Criminal Background Check System ("NICS"), a centralized catalog of records comprising three separate national databases. 18 U.S.C. § 922. States' participation in NICS is voluntary, and Defendants argue that the quantity and quality of records shared with NICS varies widely across states.  By one count, "at least 25% of felony convictions" in the United States "are not available" in NICS.

By default, an FFL will contact the FBI's NICS Section when performing a potential firearm transaction. 18 U.S.C. § 922(t). States may also designate a law enforcement agency "point of contact" to initiate the NICS check and to search any other state and local databases required under state law. *See* 28 C.F.R. §§ 25.1–.2, 25.6(d).

Washington is a "partial" point-of-contact state. Before I-1639, FFLs contacted the FBI for NICS checks on sales of all firearms except pistols. For pistols, Washington law enforcement agencies conduct "enhanced background checks." In such a check, law enforcement queries not only the NICS databases to determine a purchaser's eligibility, but also various state and local databases, including: (1) the Washington Crime Information Center (which may disclose state arrest warrants not in the NICS databases); (2) the DOL Firearms System (which reflects whether the purchaser has a concealed pistol license and whether it has been revoked); (3) Washington court databases; (4) the Department of Corrections database; (5) local records management systems; and (6) the Washington Health Care Authority's mental health records. It is undisputed that the enhanced background check is more comprehensive than a NICS check alone. This helps prevent ineligible purchasers from falling through the cracks. I-1639 now requires local law enforcement to conduct enhanced background checks for SARs as well.

**C.     The Nonresident Sales Provision**

Third, federal law has long prohibited in-person handgun sales to nonresidents of a state. I-1639 mirrors that requirement for SARs. Under the GCA, it is unlawful for anyone to sell a handgun in person to a nonresident. 18 U.S.C. § 922(a)(5)(A), (b)(3). All interstate transfers of firearms must take place through an FFL, *id.* § 922(a)(1)–(5), and only FFLs may "engage in the business of . . . dealing in firearms" (interstate or otherwise), *id.* § 922(a)(1)(A); *see United States v. Redus*, 469 F.2d 185, 187 (9th Cir. 1972). To buy a handgun from an out-of-state FFL, a nonresident may arrange for its delivery to an in-state FFL, from whom the buyer may retrieve

1    the gun. 18 U.S.C. § 922(b). This process is known as "FFL-to-FFL transfer." To purchase a rifle

2    or shotgun from an out-of-state FFL, the buyer may do so in person—provided that the sale

3    "compl[ies] with the legal conditions of sale in both such States." *Id.* § 922(b)(3).

4           Shortly after the GCA's enactment, Washington legalized the in-person sale of rifles and

5    shotguns to nonresidents. 1970 Wash. Sess. Laws, ch. 74, § 2 (originally codified at RCW

6    19.70.020, codified as amended at RCW 9.41.124). In I-1639, Washington narrowed the scope of

7    that permission by removing SARs from the category of "rifles and shotguns" that legally may

8    be purchased in person by nonresidents. RCW 9.41.124. The effect of this provision is that SARs

9    are treated the same as handguns: they may not be purchased by nonresidents in person. But just

10   as for handguns, a nonresident may still purchase an SAR through an FFL-to-FFL transfer.

11          The Nonresident Sales Provision is a corollary to the Background Check Provision.

12   Because enhanced background checks query an array of state and local databases, it is difficult if

13   not impossible for law enforcement agencies to effectively conduct such checks on nonresidents.

14   **D.     Plaintiffs' Legal Challenge**

15          Plaintiffs challenge only two provisions of I-1639. First, all Plaintiffs allege that the Age

16   Provision violates the Second Amendment. Dkt. 17 ¶¶ 117–19. Second, Mitchell alleges that the

17   Nonresident Sales Provision violates the Dormant Commerce Clause. Id. ¶ 120.

18                                    **III. DISCUSSION**

19   **A.     Standard of Review**

20          Summary judgment is appropriate when no genuine issues of material fact exist and the

21   moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Once the moving

22   party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the

23   opposing party must then set forth specific facts showing a genuine issue for trial in order to

24   defeat the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). If the nonmoving

1    party fails to make this showing, "Rule 56(c) mandates the entry of summary judgment." *Id.* at

2    322.

3    **B.      Constitutionality of the Age Provision under the Second Amendment**

4           In *District of Columbia v. Heller*, 554 U.S. 570, 573–74 (2008), the Supreme Court

5    struck down a city's "total ban" on the "possession of usable handguns in the home" under the

6    Second Amendment. In the wake of *Heller*, nearly every circuit (including the Ninth) has

7    adopted a two-part test for Second Amendment claims. *See N.Y. State Rifle & Pistol Ass'n, Inc.*

8    *v. Cuomo*, 804 F.3d 242, 254 (2d Cir. 2015); *see, e.g., Fyock v. Sunnyvale*, 779 F.3d 991, 996

9    (9th. Cir. 2015). The court first "asks whether the challenged law burdens conduct protected by

10   the Second Amendment." *Fyock*, 779 F.3d at 996 (quoting *United States v. Chovan*, 735 F.3d

11   1127, 1136 (9th Cir. 2013)). If the law does not burden protected conduct, "the inquiry is

12   complete" and the law "passes constitutional muster" without further analysis. *Teixeira v. Cty. of*

13   *Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (en banc) (internal quotation marks and citations

14   omitted). If there is a burden, the court proceeds to step two, asking "what level of scrutiny

15   should be applied" and evaluating the law in question. *Fyock*, 779 F.3d at 996.

16   *1.      Burden on Constitutionally Protected Conduct*

17          Not every firearm regulation burdens protected conduct. The Supreme Court has set forth

18   a non-"exhaustive" list of "presumptively lawful [firearm] regulatory measures," *Heller*, 554

19   U.S. at 627 & n.26, that "are outside the ambit of the [Second] [A]mendment," *United States v.*

20   *Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010). Those exceptions include "laws imposing

21   conditions and qualifications on the commercial sale of arms" and certain "longstanding

22   prohibitions on the possession of firearms." *Heller*, 554 U.S. at 626–27 & n.26. The Supreme

23   Court later "repeat[ed] those assurances" and reiterated that *Heller* had invalidated a broad ban

24

on handgun possession in the home while simultaneously "recogniz[ing] that the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (quoting *Heller*, 554 U.S. at 626). To determine whether a law is so historically rooted as to fall outside the scope of the Second Amendment, courts assess "a variety of legal and other sources to determine the public understanding of [the] legal text in the period after its enactment or ratification." *Heller*, 554 U.S. at 600.

U.S. law has long recognized that age can be decisive in determining rights and obligations. For most of our country's history, 18- to 20-year-olds were considered minors or "infants" without the full legal rights of adulthood. At common law and at the time of the adoption of the Constitution, the age of majority was 21 years. *See, e.g.*, 1 William Blackstone, Commentaries *463 ("So that full age in male or female, is twenty one years . . . , who till that time is an infant, and so styled in law."); Infant, Black's Law Dictionary 847 (9th ed. 2009) ("An infant in the eyes of the law is a person under the age of twenty-one years, and at that period . . . he or she is said to attain majority . . . .") (quoting John Indermaur, *Principles of the Common Law* 195 (Edmund H. Bennett ed., 1st Am. ed. 1878)). In fact, before ratification of the 26th Amendment in 1971, states rarely permitted individuals under 21 to vote. *See, e.g., Oregon v. Mitchell*, 400 U.S. 112, 130–31 (1970) (lead opinion of Black, J.) (upholding provision of Voting Rights Act Amendments of 1970 lowering voting age to 18 in federal elections but invalidating provision doing same for state and local elections); *id.* at 213 n.90 (Harlan, J., concurring in part and dissenting in part) (noting that at the time only four states set the voting age below 21). It was not until the 1970s that states lowered the age of majority to 18. *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 201 (5th Cir. 2012)

1  ("*NRA*"); Larry D. Barnett, *The Roots of Law,* 15 AM. U.J. GENDER SOC. POL'Y & L. 613, 681–

2  86 app. (2007).

3     Against this historical backdrop, it is unsurprising that laws prohibiting those under 21

4  from purchasing firearms are longstanding. In the 19th century, 19 states and the District of

5  Columbia enacted laws expressly restricting the ability of individuals under 21 to purchase or use

6  particular firearms in jurisdictions where the age of majority was set at 21. *See, e.g.*, *NRA*, 700

7  F.3d at 202. By the early twentieth century, three more states had restricted the purchase or use

8  of particular firearms by persons under 21. *Id.* Thus by 1923, over half the states then in the

9  union had set 21 as the minimum age for purchase or use of particular firearms. *Id.*

10     This long-held tradition of restricting certain firearm rights of 18- to 20-year-olds

11  continues today. Since 1968, federal law has prohibited FFLs from selling handguns to persons

12  under 21. 18 U.S.C. § 922(b)(1). Currently, 17 states and the District of Columbia have parallel

13  or more exacting laws prohibiting those under 21 from purchasing or possessing handguns. And

14  five states also prohibit the sale of *all* long guns—not just SARs—to individuals under 21. *Id.*

15  Prohibiting SAR sales to 18- to 20-year-olds comports with these longstanding laws.

16     Based on this historical evidence, several courts have concluded that firearms age

17  restrictions, particularly those for people under 21, fall outside the Second Amendment's ambit.

18  In *NRA*, 700 F.3d at 211, the Fifth Circuit rejected a Second Amendment challenge to the federal

19  prohibition on the sale of handguns by FFLs to those under 21, 18 U.S.C. § 922(b)(1). The Fifth

20  Circuit concluded that the federal age restriction was "consistent with a longstanding, historical

21  tradition, which suggests that the conduct at issue falls outside the Second Amendment's

22  protection." *Id.* at 203. A year later the same court upheld a Texas law prohibiting persons under

23  21 from receiving a license to carry concealed pistols, concluding that the age restriction "likely

24

'falls outside the Second Amendment's protection.'" *NRA v. McCraw*, 719 F.3d 338, 347 (5th Cir. 2013) (quoting *NRA*, 700 F.3d at 203). In both cases, although the Fifth Circuit was "inclined to uphold the challenged federal laws at step one of our analytical framework, in an abundance of caution" it "proceed[ed] to step two" and upheld the minimum age restriction under intermediate scrutiny. *NRA*, 700 F.3d at 204; *McCraw*, 719 F.3d at 347.

At least three other courts have held that firearms restrictions applicable to persons under 21 fall outside the scope of the Second Amendment. *See, e.g.*, *Hirschfeld*, 417 F. Supp. 3d at 755–56 (rejecting challenge to federal prohibition on sale by FFLs of handguns and ammunition to those under 21 because law "reflect[s] 'longstanding' prohibitions on the use or possession of handguns by those under a given age" that "have been in place and upheld by courts since the nineteenth century" and thus "do not implicate Second Amendment rights"); *Powell v. Tompkins*, 926 F. Supp. 2d 367, 387–88 (D. Mass. 2013), *aff'd*, 783 F.3d 332 (1st Cir. 2015) (state law prohibiting those under 21 from receiving concealed carry licenses "comports with the Second Amendment" because such "[a]ge-based restrictions . . . are among those lawful," "access-limiting conditions" and "impose[] no burden on the rights of eighteen- to twenty-year-olds to keep and bear arms"); *People v. Mosley*, 33 N.E.3d 137, 155 (Ill. 2015) (state convictions for aggravated unlawful use of a weapon by defendant under 21 did not regulate conduct within scope of Second Amendment); *see also United States v. Rene E.*, 583 F.3d 8, 16 (1st Cir. 2009) (upholding the federal age restriction on possession of handguns because "the right to keep arms in the founding period did not extend to juveniles").

These authorities demonstrate that reasonable age restrictions on the sale, possession, or use of firearms have an established history in this country. The extension of Washington's age restrictions to SARs is ultimately a distinction without a difference. Like handgun age

restrictions, the Age Provision here is "consistent with a longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety." *NRA*, 700 F.3d at 203. While states may vary in terms of the specific guns or activities they regulate, restrictions on potentially dangerous firearm conduct by those under the age of 21 is the common refrain. There is no reason why a restriction on sale and possession of SARs—powerful weapons that can be wielded against the public—constitutes a break from this pattern. The Age Provision does not burden Second Amendment rights. Plaintiffs' challenge to it thus fails at the first step of the inquiry.

## 2.    *Level of Scrutiny*

Although the Age Provision does not burden constitutional rights, the Court will nonetheless perform the full constitutional analysis out of an "abundance of caution." *Id*. at 204. If a law burdens protected conduct, the court next determines whether to apply intermediate or strict scrutiny. The level of scrutiny depends on two factors: "(1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on the right." *Chovan*, 735 F.3d at 1138 (internal quotation marks omitted). Strict scrutiny applies only to a law that (1) "implicates the core of the Second Amendment right" (namely, the right to defend one's home), and (2) "severely burdens that right." *Pena v. Lindley*, 898 F.3d 969, 977 (9th Cir. 2018) (quoting *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016)).

Intermediate scrutiny applies if the law either does not implicate the core Second Amendment right *or* does not place a severe burden on that right. *Id*. (quoting *Fyock*, 779 F.3d at 998–99). Where a law carves out exceptions to its regulation of the core Second Amendment right, it may alleviate the impact so as to render any burden insubstantial. *Chovan*, 735 F.3d at 1138. There "has been 'near unanimity in the post-*Heller* case law that, when considering

1    regulations that fall within the scope of the Second Amendment, intermediate scrutiny is

2    appropriate.'" *United States v. Torres*, 911 F.3d 1253, 1262 (9th Cir. 2019) (quoting *Silvester*,

3    843 F.3d at 823).

4           Unsurprisingly, intermediate scrutiny is appropriate here. The Age Provision does not

5    implicate the core Second Amendment right to defend one's home because it does not restrict the

6    ability of 18- to 20-year-olds to purchase long guns that are not semiautomatic. The Age

7    Provision also contains multiple exceptions, allowing 18- to 20-year-olds to possess SARs in

8    several places and situations, including in their homes for self-defense. *See* RCW 9.41.240(3)(a),

9    9.41.042(8); Knezovich Rep. at 6 (noting that I-1639 contains "broad exceptions under RCW

10   9.41.240, permitting the possession of the same firearms by 18- to 20-year-olds in a wide variety

11   of circumstances"). Finally, 18- to 20-year-olds have historically not been considered

12   "responsible" and thus have not had the same panoply of constitutional or other legal rights as

13   adults, such as to vote, serve on juries, consume alcohol, gamble, or own firearms. *See, e.g.,*

14   *NRA*, 700 F.3d at 206 ("restricting the presumptive Second Amendment rights of 18-to-20-year-

15   olds does not violate the central concern of the Second Amendment" which protects

16   "responsible" citizens because "Congress found that persons under 21 tend to be relatively

17   irresponsible and can be prone to violent crime").

18          To the extent the Age Provision does have an impact on the core home defense right, it is

19   not severe. A severe burden is one that "substantially prevent[s] law-abiding citizens from using

20   firearms to defend themselves in the home." *Jackson*, 746 F.3d at 964. As already discussed, the

21   Age Provision leaves 18- to 20-year-olds with ample alternative to defend their home. *See Pena*,

22   898 F.3d at 978 ("[B]eing unable to purchase a subset of semiautomatic weapons, without more,

23   does not significantly burden the right to self-defense in the home."). I-1639's limited scope and

24

1    exceptions ensure that its impact on home defense is minimal. Intermediate scrutiny is therefore

2    appropriate.

3    ***3.       Intermediate Scrutiny***

4         A law meets intermediate scrutiny if (1) the state's objective is significant, substantial, or

5    important; and (2) there is a reasonable fit between the challenged regulation and the objective.

6    *Jackson*, 746 F.3d at 965. The regulation must "promote[] a 'substantial government interest that

7    would be achieved less effectively absent the regulation,'" but need not be the "least restrictive

8    means" of achieving the government's interest. *Fyock*, 779 F.3d at 1000 (quoting *Colacurcio v.*

9    *City of Kent*, 163 F.3d 545, 553 (9th Cir. 1998) (internal quotation marks omitted)).

10        Courts considering a state's interest "do not impose an 'unnecessarily rigid burden of

11   proof,'" and the state is allowed to "rely on any material 'reasonably believed to be relevant' to

12   substantiate its interests in gun safety and crime prevention." *Pena*, 898 F.3d at 979 (quoting

13   *Mahoney v. Sessions*, 871 F.3d 873, 881 (9th Cir. 2017)). When analyzing whether there is a

14   "reasonable fit between the government's stated objective and the regulation," courts consider

15   "the legislative history of the enactment as well as studies in the record or cited in pertinent case

16   law." *Id.* (quoting *Fyock*, 779 F.3d at 1000) (internal citations omitted).

17        The objectives of I-1639—promoting public safety and preventing violent crime—are

18   indisputably substantial government interests. *See e.g., Pena*, 898 F.3d at 981–82 (noting that

19   "countless cases support" the principle that "public safety and crime prevention are substantial

20   government interests"); *NRA*, 700 F.3d at 209 ("[C]urbing violent crime perpetrated by young

21   persons under 21—by preventing such persons from acquiring handguns from FFLs—constitutes

22   an important government objective."); *Cuomo*, 804 F.3d at 261 ("[S]tates have substantial,

23

24

1  indeed compelling, governmental interests in public safety and crime prevention.") (internal

2  citation omitted).

3      The Age Provision reasonably fits with Washington's interest in promoting public safety

4  and reducing gun violence. Scientific research, crime data, and legislative findings all support

5  "the commonsense notion that 18- to 20-year-olds tend to be more impulsive" and likelier to

6  resort to violent crime than older adults. *NRA*, 700 F.3d at 210 n.21. Indeed, the prevalence of

7  18- to 20-year-olds as mass shooters is sufficient justification itself. Age-based access to SARs is

8  "reasonably suited to achieve" the state's interests. *Silvester*, 843 F.3d at 827.

9      Research shows that 18- to 20-year-olds are developmentally immature compared with

10  older adults, increasing their risk to the community. Canvassing the leading research in

11  neuroscience and developmental psychology, Defendants' two unrebutted scientific experts have

12  found clear "consensus" that various regions of the human brain that govern impulsivity and

13  sensation-seeking do not fully mature until the twenties. Courts have reached the same

14  conclusion. *See e.g., Horsley*, 808 F.3d at 1133 ("The evidence now is strong that the brain does

15  not cease to mature until the early 20s in those relevant parts that govern impulsivity, judgment,

16  planning for the future, foresight of consequences, and other characteristics that make people

17  morally culpable.") (quoting scientific expert declaration); *Graham v. Florida*, 560 U.S. 48, 68

18  (2010) ("[D]evelopments in psychology and brain science continue to show fundamental

19  differences between juvenile and adult minds. For example, parts of the brain involved in

20  behavior control continue to mature through late adolescence."). These well-established

21  neuroscientific findings logically support the decision of Washington voters to limit sales of

22  SARs, a firearm with the potential to inflict significant harm, to those 21 and older.

23

24

Given this higher degree of impulsiveness and emotional immaturity, it is unsurprising that 18- to 20-year-olds also commit a disproportionate share of crimes, including violent crimes. Though this group comprises only 4.4% of the population, it accounts for approximately one-quarter of firearm homicides committed where an offender was identified. *See, e.g.*, 145 Cong. Rec. 18119 (1999) ("Studies show that one in four gun murders are committed by people aged 18 to 20.") (statement of Rep. Grace Napolitano). In addition, 18- to 20-year-olds account for 8/7% of all violent crime arrests, including: 15.5% of murder and non-negligent manslaughter, 17.1% of robbery, 11.1% of rape, and 11.5% of weapons offense arrests. Simpson Decl., Dkt. # 94, Ex. L, at tbl. 38. Overall, older adolescents aged 18, 19, and 20 accounted for the first, second, and third highest percentages of arrests, respectively, for any age up to age 24. *Id*. Arrest rates for murder, robbery, and other violent crimes peak around ages 17 to 20, and arrest rates for weapons crimes are nearly 50% higher among 18- to 20-year-olds than among younger adolescents. S. Johnson Decl., Dkt. # 88, Ex. A, at 10.

Laws raising the minimum legal age to engage in certain behaviors to 21 have effectively addressed other public health and safety concerns. For example, raising the minimum age to drink alcohol to 21 reduced alcohol-related traffic crashes. William DeJong et al., *Case Closed: Research Evidence on the Positive Public Health Impact of the Age 21 Minimum Legal Drinking Age in the United States*, 75 J. STUD. ON ALCOHOL & DRUGS 108, 113 (2014). Raising the age to purchase tobacco to 21 is expected by the Institute of Medicine to "eventually . . . result in 249,000 fewer premature deaths . . . for people born between 2000 and 2019. It also would result in about 286,000 fewer pre-term births and 438,000 fewer babies born with low birth weights" by reducing smoking among older adolescents. Tripp Mickle, *Study Supports Raising Tobacco-Purchase Age to 21*, Wall St. J., Mar. 12, 2015; *Public Health Implications of Raising the*

1    *Minimum Age of Legal Access to Tobacco Products*, Inst. of Medicine of the Nat'l Academies

2    (Richard J. Bonnie, et al., eds. 2015). Washington recently enacted exactly such a measure. *See*

3    RCW 26.28.080.

4          In sum, 18- to 20-year-olds are developmentally immature, commit a disproportionate

5    share of violent crimes, and have been successful subjects of public health and safety regulation

6    in the past. This, combined with the dangers posed by SARs, makes it reasonable for

7    Washingtonians to anticipate that minimum age requirements for purchase and possession of

8    SARs would also yield public health benefits. The Age Provision passes intermediate scrutiny.

9    **C.    Constitutionality of the Nonresident Sales Provision under the Dormant Commerce**

10   **Clause**

11         The Commerce Clause provides that Congress shall have the power "[t]o regulate

12   Commerce with foreign Nations, and among several states, and with the Indian Tribes." U.S.

13   Const. Art. 1, § 8, cl. 3. In addition to this express grant of power to Congress, the Commerce

14   Clause has an implicit negative aspect—known as the Dormant Commerce Clause—that

15   "prohibits state laws that unduly restrict interstate commerce." *Tenn. Wine & Spirit Retailers*

16   *Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019). The Dormant Commerce Clause serves as a

17   bulwark against state programs of "economic protectionism—that is, regulatory measures

18   designed to benefit in-state economic interests by burdening out-of-state competitors." *Int'l*

19   *Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 399 (9th Cir. 2015) (internal citations and

20   quotations omitted).

21         To determine whether a law violates the Dormant Commerce Clause, courts "first ask

22   whether it discriminates on its face against interstate commerce." *United Haulers Ass'n v.*

23   *Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338–39 (2007). If so, the law is

24

1    invalid unless the state "has no other means to advance a legitimate local purpose." *Id.* (citing

2    *Maine v. Taylor*, 477 U.S. 131, 138 (1986)). If the law is non-discriminatory, however, it violates

3    the Dormant Commerce Clause only if the burden on interstate commerce is "clearly excessive

4    in relation to the putative local benefits." *Sullivan v. Oracle Corp.*, 662 F.3d 1265, 1271 (9th Cir.

5    2011) (quotation marks omitted) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

6    This *Pike* balancing test requires "sensitive consideration of the weight and nature of the state

7    regulatory concern in light of the extent of the burden imposed on the course of interstate

8    commerce." *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 441 (1978). That there "be a

9    substantial burden on interstate commerce" is a "critical requirement" of a Dormant Commerce

10   Clause violation. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th

11   Cir. 2012) (citing *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984)).

12   *1.    Discrimination against Interstate Commerce*

13          The threshold question under the Dormant Commerce Clause is whether the law is

14   discriminatory. The term "discrimination" has a specific meaning in the Dormant Commerce

15   Clause context: "economic protectionism, or discrimination, 'simply means differential treatment

16   of in-state and out-of-state economic interests that benefits the former and burdens the latter.'"

17   *Rocky Mtn. Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013) (quoting *Or. Waste*

18   *Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994)).

19          Mere differential treatment of in-state and out-of-state interests is insufficient to establish

20   discrimination. Rather, there must be some economic benefit to in-state interests or some

21   economic burden on out-of-state interests. *See, e.g., City of Phila. v. New Jersey*, 437 U.S. 617,

22   624 (1978) ("The crucial inquiry . . . [is] whether [the law] is basically a protectionist measure,

23   or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects

24

1    upon interstate commerce that are only incidental."). This makes sense, as "[t]he central rationale

2    for the rule against discrimination is to prohibit state or municipal laws whose object is local

3    economic protectionism, laws that would excite those jealousies and retaliatory measures the

4    Constitution was designed to prevent." *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S.

5    383, 390 (1994) (emphasis added).

6         The Nonresident Sales Provision does not trigger this protectionism concern because it

7    neither benefits in-state economic interests nor burdens out-of-state economic interests. Plaintiff

8    Mitchell—the only Plaintiff who now asserts a Commerce Clause claim, Dkt. # 76 at 16—bears

9    the burden of establishing that the provision discriminates. *Int'l Franchise Ass'n*, 803 F.3d at

10   400. (Plaintiff Ball had originally alleged a Dormant Commerce Clause claim too, but Plaintiffs'

11   abandoned her claim after Ball revealed in discovery that, after I-1639 went into effect, her

12   firearm sales revenue increased.) But Mitchell fails to adduce facts creating a genuine dispute on

13   this threshold issue. Mitchell alleges that the provision has diminished his sales of SARs to

14   potential out-of-state purchasers. But Mitchell concedes that no actual evidence supports his bare

15   allegation of diminished sales because he did not consult any financial records or sales data in

16   arriving at his "ballpark" estimate.

17        Even if Mitchell's allegations were true, they would not establish discrimination under

18   the Dormant Commerce Clause because they connote a burden to Washington economic

19   interests—the very opposite of economic protectionism. Conversely, the likely economic

20   beneficiaries of the Nonresident Sales Provision are out-of-state gun dealers who would, if

21   anything, see a corresponding increase in sales at the expense of Washington gun dealers. *See*

22   *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298–99 (1997) ("[A]ny notion of discrimination

23   assumes comparison of substantially similar entities.") (footnote omitted). Thus, the central

24

1    concern of the Dormant Commerce Clause is not triggered and the Nonresident Sales Provision

2    is nondiscriminatory. *See, e.g., Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 49 (2d

3    Cir. 2007) (law nondiscriminatory where "it does not confer a competitive advantage upon local

4    business vis-a-vis out-of-state competitors" and "even local businesses operating within the

5    Town itself challenge [its] validity"); *Cohen v. R.I. Tpk. & Bridge Auth.*, 775 F. Supp. 2d 439,

6    447 (D.R.I. 2011) ("[W]hen a law does not implicate the kind of 'local economic protectionism'

7    that the Commerce Clause aims to eradicate, the rationale for equating differentiation and

8    discrimination disappears . . . . Plaintiff has failed to identify a specific in-state commercial

9    interest that is favored by the [law] at the expense of particular out-of-state competitors, so it

10   cannot demonstrate that the discount discriminates against interstate commerce.").

11   **2.      The *Pike* Balancing Test**

12          Without discrimination, a law need only meet the lenient *Pike* balancing test, under

13   which courts "will uphold the law 'unless the burden imposed on [interstate] commerce is clearly

14   excessive in relation to the putative local benefits.'" *Corey*, 730 F.3d at 1087–88 (quoting *Pike*,

15   397 U.S. at 142). Mitchell "bears the burden of proof in establishing the excessive burden in

16   relation to the local benefits." *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v.*

17   *Brown*, 567 F.3d 521, 528 (9th Cir. 2009). Courts will not look beyond a law's putative benefits

18   absent proof of an excessive burden. *Harris*, 682 F.3d at 1155.

19          I-1639's benefits, however, are substantial. Thus, even if Mitchell had shown that the law

20   substantially burdens interstate commerce, it would still pass constitutional muster because it

21   advances a bona fide state interest in public safety that far outweighs any perceived burden on

22   interstate commerce. I-1639 was adopted to "increase public safety and reduce gun violence," an

23   unquestionably legitimate government interest. To advance this interest, the people of

24

1  Washington extended an existing safeguard on handgun sales to SAR sales: the requirement to

2  undergo an enhanced background check, in which law enforcement searches additional state and

3  local databases to ensure that the buyer is not prohibited by law from buying the firearm.

4      It is undisputed that enhanced background checks are more comprehensive than an NICS

5  check alone. As the Fifth Circuit has noted, "The states voluntarily provide records for use in the

6  databases accessed by NICS," and, "for various reasons, some records are not timely provided,

7  or are not provided at all." *Mance*, 896 F.3d at 707. This enhanced background check cannot be

8  conducted on nonresidents because Washington State cannot request—much less require—out-

9  of-state law enforcement agencies to assist with running Washington's background checks. Thus,

10  the Nonresident Sales Provision is necessary to ensure an enhanced background check is

11  conducted before an SAR is sold in Washington. This local benefit far outweighs any alleged

12  burden. The Nonresident Sales Provision is constitutional under *Pike* balancing.

13                              **IV. CONCLUSION**

14      For the reasons stated above, the Plaintiffs' Motion for Summary Judgment [Dkt. #76] is

15  **DENIED**, and the Defendants' and Intervenor's Cross Motion for Summary Judgment [Dkt.

16  #84] is **GRANTED**. The Court's earlier Minute Entry **DENIED** Defendants' Motion to Exclude

17  Expert Testimony of Sheriff Ozzie Krezovich [Dkt. #77]. The Plaintiffs' Complaint is

18  **DISMISSED WITH PREJUDICE**. Each side shall bear their own costs of this litigation.

19      IT IS SO ORDERED.

20      Dated this 31st day of August, 2020.

21

22

23      Ronald B. Leighton
        United States District Judge

24